# EXHIBIT A
# UNPUBLISHED OPINIONS

Higgins v. Frank Bonin Funeral Parlor, Not Reported in Fed. Supp. (2015)

2015 WL 10944445

2015 WL 10944445
Only the Westlaw citation is currently available.
United States District Court, M.D. Pennsylvania.

Lawrence HIGGINS, Plaintiff,

v.

FRANK BONIN FUNERAL PARLOR
and Donna George, Defendants.

CIVIL NO. 3:14-CV-581
|
Signed 02/12/2015

**Attorneys and Law Firms**

Lawrence Higgins, Huntsville, TX, pro se.

Anthony T. Bowser, Thomas, Thomas & Hafer
LLP, Ira H. Weinstock, Jason M. Weinstock, Ira H.
Weinstock, P.C., Harrisburg, PA, for Defendants.

**REPORT AND RECOMMENDATION**

Martin C. Carlson, United States Magistrate Judge

**I. Statement of Facts and of the Case**

 *1 This case call upon us to once again consider a
curious juxtaposition of issues of life and death.

The plaintiff, Lawrence Higgins, is currently an inmate
imprisoned in Texas following his conviction in that
state for causing the death of another. (Doc. 14, p.6.)
As Higgins has noted the courts in other, related
litigation: "Plaintiff knows that he killed a man in
Texas ...." (Doc. 13-3, p. 5.)

Higgins' role in the death of another, and his
subsequent imprisonment for that death, caused
Higgins to be far removed from Pennsylvania in
December 2012, when his adult son, Jared Higgins,
died. (Doc. 1.) Upon the death of Higgins' son,
the Frank J. Bonin Funeral Home, Inc., ("Bonin"),
undertook to make arrangements for Jared's burial.
(Id.) As part of this sad, funereal process, Bonin
contacted Jared Higgins' nearest relative, his spouse
who was allegedly residing in Tennessee, to determine
the family's wishes with respect to Jared's remains.
(Id.) Jared Higgins' wife is then alleged to have
executed a waiver form, authorizing Jared's next of kin

in Pennsylvania, his mother Donna George, to make
these funeral arrangements. (Id.) Donna George, in
turn, authorized the cremation of her child, and Jared's
remains were cremated. (Id.)

The performance of this sad duty, a mother's
arrangements for her son's funeral, has now become
a federal lawsuit. From his prison cell in Texas,
Lawrence Higgins brought this action in federal court,
suing both Bonin and George. (Id.) Alleging that the
disposition of his son's remains was not undertaken
in accordance with a Pennsylvania statute governing
such matters, 20 Pa. C.S. § 305(b), Higgins' complaint
insisted that this cremation was somehow fraudulent
and conspiratorial. Higgins then demanded that he
be awarded $250,000 in damages as a result of this
conduct. (Id.)

This was not Higgins' first legal foray from prison in
which this convicted killer has protested the manner
in which his son's remains were handled upon his
death. Quite the contrary, more than a year prior to the
filing of this lawsuit, in April 2013, Higgins filed a
nearly identical lawsuit in the Court of Common Pleas
of Luzerne County against Bonin and George. (Doc.
13-2.)

We granted Higgins leave to proceed *in forma pauperis*
and permitted service of his complaint. The defendants
then moved to dismiss this *pro se* complaint. (Docs.
13 and 16.) We recommended that these motions
to dismiss be granted, and Higgins' complaint be
dismissed. (Doc. 19.) The district court adopted
this recommendation dismissing these claims, but
allowed Higgins the opportunity to endeavor to amend
his complaint upon completion of the parallel state
litigation. (Doc. 24.) That litigation has now drawn to
a close with the dismissal of Higgins' state complaint.
(Doc. 25.) Notwithstanding this failure to state a claim
in state court, Higgins now has filed an amended
complaint in federal court. (Doc. 27.) Our screening
review of this pleading reveals, however, that it simply
repeats and restates Higgins' contentions that the
cremation of his son's remains was not undertaken
in accordance with a Pennsylvania statute governing
such matters, 20 Pa. C.S. § 305(b), and that this
cremation was somehow fraudulent and conspiratorial.
(Id.) Thus, the amended complaint contains all of the
flaws and defects previously identified by this Court

2015 WL 10944445

in Higgins' original complaint; indeed, the amended complaint persists in advancing claims that Higgins has been informed are meritless. Accordingly, for the reasons set forth below, it is recommended that this amended complaint be dismissed with prejudice.

## II. Discussion

### A. Screening of Civil Complaints, Standards of Review

**\*2** This Court has an on-going statutory obligation to conduct a preliminary review of complaints filed by plaintiffs who seek leave to proceed *in forma pauperis*. See 28 U.S.C. §§ 1915 and 1915A. Specifically, we must assess whether a *pro se, in forma pauperis* complaint "fails to state a claim upon which relief may be granted." This statutory text, in turn, mirrors the language of Rule 12(b)(6) of the Federal Rules of Civil Procedure, which provides that a complaint should be dismissed for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. Rule 12(b)(6).

With respect to this benchmark standard for legal sufficiency of a complaint, the United States Court of Appeals for the Third Circuit has aptly noted the evolving standards governing pleading practice in federal court, stating that:

> Standards of pleading have been in the forefront of jurisprudence in recent years. Beginning with the Supreme Court's opinion in Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007) continuing with our opinion in Phillips [v. County of Allegheny, 515 F.3d 224, 230 (3d Cir. 2008)] and culminating recently with the Supreme Court's decision in Ashcroft v. Iqbal ___ U.S. ___, 129 S.Ct. 1937 (2009) pleading standards have seemingly shifted from simple notice pleading to a more heightened form of pleading, requiring a plaintiff to plead more than the possibility

of relief to survive a motion to dismiss.

Fowler v. UPMC Shadyside, 578 F.3d 203, 209-10 (3d Cir. 2009).

In considering whether a complaint fails to state a claim upon which relief may be granted, the court must accept as true all allegations in the complaint and all reasonable inferences that can be drawn therefrom are to be construed in the light most favorable to the plaintiff. Jordan v. Fox Rothschild, O'Brien & Frankel, Inc., 20 F.3d 1250, 1261 (3d Cir. 1994). However, a court "need not credit a complaint's bald assertions or legal conclusions when deciding a motion to dismiss." Morse v. Lower Merion Sch. Dist., 132 F.3d 902, 906 (3d Cir. 1997). Additionally a court need not "assume that a ... plaintiff can prove facts that the ... plaintiff has not alleged." Associated Gen. Contractors of Cal. v. California State Council of Carpenters, 459 U.S. 519, 526 (1983). As the Supreme Court held in Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007), in order to state a valid cause of action a plaintiff must provide some factual grounds for relief which "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of actions will not do." Id. at 555. "Factual allegations must be enough to raise a right to relief above the speculative level." Id.

In keeping with the principles of Twombly, the Supreme Court has underscored that a trial court must assess whether a complaint states facts upon which relief can be granted when ruling on a motion to dismiss. In Ashcroft v. Iqbal, 556 U.S. 662 (2009), the Supreme Court held that, when considering a motion to dismiss, a court should "begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." Id. at 679. According to the Supreme Court, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. at 678. Rather, in conducting a review of the adequacy of complaint, the Supreme Court has advised trial courts that they must:

> [B]egin by identifying pleadings that because they

Higgins v. Frank Bonin Funeral Parlor, Not Reported in Fed. Supp. (2015)

2015 WL 10944445

are no more than conclusions are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.

**\*3** Id. at 679.

Thus, following Twombly and Iqbal a well-pleaded complaint must contain more than mere legal labels and conclusions. Rather, a complaint must recite factual allegations sufficient to raise the plaintiff's claimed right to relief beyond the level of mere speculation. As the United States Court of Appeals for the Third Circuit has stated:

> [A]fter Iqbal, when presented with a motion to dismiss for failure to state a claim, district courts should conduct a two-part analysis. First, the factual and legal elements of a claim should be separated. The District Court must accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions. Second, a District Court must then determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.' In other words, a complaint must do more than allege the plaintiff's entitlement to relief. A complaint has to

'show' such an entitlement with its facts.

Fowler, 578 F.3d at 210-11.

As the court of appeals has also observed: "The Supreme Court in Twombly set forth the 'plausibility' standard for overcoming a motion to dismiss and refined this approach in Iqbal. The plausibility standard requires the complaint to allege 'enough facts to state a claim to relief that is plausible on its face.' Twombly, 550 U.S. at 570, 127 S.Ct. 1955. A complaint satisfies the plausibility standard when the factual pleadings 'allow[ ] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.' Iqbal, 129 S.Ct. at 1949 (citing Twombly, 550 U.S. at 556, 127 S.Ct. 1955). This standard requires showing 'more than a sheer possibility that a defendant has acted unlawfully.' Id. A complaint which pleads facts 'merely consistent with' a defendant's liability, [ ] 'stops short of the line between possibility and plausibility of "entitlement of relief." ' " Burtch v. Milberg Factors, Inc., 662 F.3d 212, 220-21 (3d Cir. 2011) cert. denied, 132 S. Ct. 1861, 182 L.Ed. 2d 644 (U.S. 2012).

In practice, consideration of the legal sufficiency of a complaint entails a three-step analysis: "First, the court must 'tak[e] note of the elements a plaintiff must plead to state a claim.' Iqbal, 129 S.Ct. at 1947. Second, the court should identify allegations that, 'because they are no more than conclusions, are not entitled to the assumption of truth.' Id. at 1950. Finally, 'where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief.' Id." Santiago v. Warminster Tp., 629 F.3d 121, 130 (3d Cir. 2010).

In addition to these pleading rules, a civil complaint must comply with the requirements of Rule 8(a) of the Federal Rule of Civil Procedure which defines what a complaint should say and provides that:

> (a) A pleading that states a claim for relief must contain (1) a short and plain statement

Case 3:20-cv-00044-CCC   Document 8-1   Filed 01/30/20   Page 5 of 86

Higgins v. Frank Bonin Funeral Parlor, Not Reported in Fed. Supp. (2015)

2015 WL 10944445

of the grounds for the court's jurisdiction, unless the court already has jurisdiction and the claim needs no new jurisdictional support; (2) a short and plain statement of the claim showing that the pleader is entitled to relief; and (3) a demand for the relief sought, which may include relief in the alternative or different types of relief.

**\*4** Applying these benchmarks, we find that Higgins' amended complaint remains subject to dismissal on multiple grounds since the amended complaint still fails to state a claim upon which relief may be granted in federal court. The independent grounds that exist for dismissal of this action are discussed separately below.

**B. Higgins' Amended Complaint Fails on Its Merits**
In assessing Higgins' amended complaint, we note that it is well-settled that federal courts are courts of limited jurisdiction. As a general rule, there are two primary grounds for federal district court jurisdiction over a civil lawsuit. First, "district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between–(1) citizens of different States." 28 U.S.C. § 1332(a) (1). This ground of federal jurisdiction is known as diversity jurisdiction. The second principal ground for invoking the jurisdiction of a federal court is known as federal question jurisdiction. Under this ground of jurisdiction, "district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331.

Here, with respect to Higgins' claims, the amended complaint does not allege any "civil actions arising under the Constitution, laws, or treaties of the United States," 28 U.S.C. § 1331, giving rise to federal question jurisdiction. Indeed, Higgins cannot bring such claims against private parties as civil rights violations pursuant to 42 U.S.C. § 1983, the primary federal civil rights statute. It is well-established that

§ 1983 does not by its own force create new and independent legal rights to damages in civil rights actions. Rather, § 1983 simply serves as a vehicle for private parties to bring civil actions to vindicate violations of separate, and pre-existing, legal rights otherwise guaranteed under the Constitution and laws of the United States. Albright v. Oliver, 510 U.S. 266, 271 (1994); Graham v. Connor, 490 U.S. 386, 393-94 (1989). Therefore, any analysis of the legal sufficiency of a cause of action under § 1983 must begin with an assessment of the validity of the underlying constitutional and statutory claims advanced by the plaintiff.

In this regard, it is also well-settled that:

> Section 1983 provides a remedy for deprivations of federally protected rights caused by persons acting under color of state law. The two essential elements of a § 1983 action are: (1) whether the conduct complained of was committed by a person acting under color of state law; and (2) whether this conduct deprived a person of a federally protected right. Parratt v. Taylor, 451 U.S. 527, 535 (1981).

Boykin v. Bloomsburg University of Pennsylvania, 893 F.Supp. 409, 416 (M.D. Pa. 1995), aff'd, 91 F3d 122 (3d Cir. 1996). Thus, it is essential to any civil rights claim brought under § 1983 that the plaintiff allege and prove that the defendant was acting under color of law when that defendant allegedly violated the plaintiff's rights. Therefore, to the extent that the amended complaint continues to seek to hold private parties liable for alleged civil rights violations, it fails to state a valid cause of action under 42 U.S.C. § 1983 since the statute typically requires a showing that the defendants are state actors. Am. Mfrs. Mut. Ins. Co. v. Sullivan, 526 U.S. 40, 49-50 (1999).

**\*5** Instead, it is evident that Higgins must proceed under this Court's diversity jurisdiction when bringing

Case 3:20-cv-00044-CCC   Document 8-1   Filed 01/30/20   Page 6 of 86

Higgins v. Frank Bonin Funeral Parlor, Not Reported in Fed. Supp. (2015)

2015 WL 10944445

a civil action as a Texas inmate against these private parties in Pennsylvania "where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between–(1) citizens of different States." 28 U.S.C. § 1332(a)(1). However, we find that this amended complaint still fails as a matter of law as a Pennsylvania state law claim brought in federal court based upon diversity of citizenship.

The defects in this amended complaint are manifold. First, to the extent Higgins is alleging a fraud claim, this spare, bare-bones pleading continues to fail to adequately plead this type of claim. Under the Federal Rules of Civil Procedure, when a plaintiff like Higgins alleges fraud, it is incumbent upon the plaintiff to: "comply with Federal Rule of Civil Procedure 9(b), which requires that allegations of fraud be pled with specificity. In order to satisfy Rule 9(b), plaintiffs must plead with particularity 'the "circumstances" of the alleged fraud in order to place the defendants on notice of the precise misconduct with which they are charged, and to safeguard defendants against spurious charges of immoral and fraudulent behavior.'. Plaintiffs may satisfy this requirement by pleading the 'date, place or time' of the fraud, or through 'alternative means of injecting precision and some measure of substantiation into their allegations of fraud.' Plaintiffs also must allege who made a misrepresentation to whom and the general content of the misrepresentation." Lum v. Bank of America, 361 F.3d 217, 223-4 (3d Cir. 2004)(citations omitted.) Thus, "[p]ursuant to Rule 9(b), a plaintiff averring a claim in fraud must specify ' "the who, what, when, where, and how: the first paragraph of any newspaper story.' " Advanta Corp. Sec. Litig., 180 F.3d 525, 534 (3d Cir. 1999) (quoting DiLeo v. Ernst & Young, 901 F.2d 624, 627 (7th Cir. 1990)). 'Although Rule 9(b) falls short of requiring every material detail of the fraud such as date, location, and time, plaintiffs must use "alternative means of injecting precision and some measure of substantiation into their allegations of fraud.' " In re Rockefeller Ctr. Props. Secs. Litig., 311 F.3d 198, 216 (3d Cir. 2002) (quoting In re Nice Sys., Ltd. Secs. Litig., 135 F.Supp.2d 551, 577 (D.N.J. 2001), emphasis supplied)." Animal Science Products, Inc. v. China Nat. Metals & Minerals Import & Export Corp., 596 F.Supp.2d 842, 878 (D.N.J.,2008). "The rule applies not only to fraud actions under federal statutes, but

to fraud claims based on state law." Christidis v. First Pennsylvania Mortgage Trust, 717 F.2d 96, 99 (3d Cir. 1983).

Therefore, Higgins must comply with Rule 9(b) in pleading this fraud claim, and we find that he has not done so in his amended complaint. This failure of pleading, however, continues to mask a more profound failure of substance in this case. At bottom, the gravamen of Higgins' claim is that Bonin and George failed to comply with the Pennsylvania statute governing disposition of a decedent's remains, 20 Pa. C.S. § 305, in ways which were somehow fraudulent, and give rise to a private right of action under Pennsylvania law.

In this regard, Higgins' claims rest upon a fundamental misreading of this state statute. While 20 Pa. C.S. § 305 prescribes procedures for disposition of human remains in Pennsylvania, nothing in the statute authorizes a private cause of action for damages against Funeral directors or family members of the deceased. As a federal court exercising diversity jurisdiction in this case, we are obliged to apply the substantive law of Pennsylvania to this dispute. Chamberlain v. Giampapa, 210 F.3d 154, 158 (3d. Cir. 2000). Under Pennsylvania law, state courts are typically extremely reluctant to imply a cause of action for damages from a state statute in the absence of some specific expressed intent by the legislature to permit such a cause of action. Rather, it is well-settled that: "The violation of a statute and the fact that some person suffered harm does not automatically give rise to a private cause of action in favor of the injured person. This court will not engraft a private cause of action onto the statute without further guidance from the General Assembly." Estate of Witthoeft v. Kiskaddon, 557 Pa. 340, 348, 733 A.2d 623, 627 (1999), See Alfred M. Lutheran Distributors, Inc. v. A.P. Weilersbacher, Inc., 437 Pa. Super. 391, 650 A.2d 83 (1994). [1] Since no such legislative intent to allow damages claims has been expressed by the General Assembly, we should not gratuitously engraft such a cause of action upon this statute, and this claim fails as a matter of law.

**\*6** More fundamentally, the facts alleged by Higgins still do not describe a violation of 20 Pa. C.S. § 305 by either of the defendants named in this complaint.

Higgins v. Frank Bonin Funeral Parlor, Not Reported in Fed. Supp. (2015)

2015 WL 10944445

In pertinent part, this statute provides for the following procedure for disposition of human remains:

(b) **Disposition of the remains of a deceased spouse.**—Absent an allegation of enduring estrangement, incompetence, contrary intent or waiver and agreement which is proven by clear and convincing evidence, a surviving spouse shall have the sole authority in all matters pertaining to the disposition of the remains of the decedent.

(c) **Disposition of the remains of others.**—If there is not a surviving spouse, absent an allegation of enduring estrangement, incompetence, contrary intent or waiver and agreement which is proven by clear and convincing evidence, the next of kin shall have sole authority in all matters pertaining to the disposition of the remains of the decedent.

20 Pa. C.S. §§ 305 (b) and (c).

Under Pennsylvania law, "next of kin" is then defined in a hierarchical fashion, and in a way which would permit the decedent's parent, in this case Jared's mother, to act on his behalf once a spouse had waived her rights to dispose of his remains. See 20 Pa.C.S. § 2103.

According to Higgins' complaint, the process contemplated by Pennsylvania law is precisely what happened here. Upon Jared's death, the funeral director contacted the first decision-maker provided for under state law, Jared's surviving spouse. Once the spouse waived her rights to make decisions regarding Jared's remains, his next of kin in Pennsylvania, his mother, made these end-of-life choices on behalf of her deceased son.

Ignoring this plain language of § 305, authorizing what occurred here, Higgins insists that § 305(d), of Title 20, Pennsylvania Consolidated Statutes, created some substantive rights on his behalf to contest this cremation. That provision of state law provides as follows: "(d) Procedure.—Where a petition alleging enduring estrangement, incompetence, contrary intent or waiver and agreement is made within 48 hours of the death or discovery of the body of the decedent, whichever is later, a court may order that no final disposition of the decedent's remains take place until a final determination is made on the petition." 20

Pa. C.S. § 305 (d). Contending that various family members were estranged at the time of Jared's death, Higgins seems to suggest that this statutory text, which merely provided a procedural mechanism for the resolution of family disputes regarding the disposition of human remains prior to internment, also created some form of substantive, free-standing right on his part to collect damages from those who arranged this funeral years after his son's death. Mindful of the fact that Pennsylvania courts "will not engraft a private cause of action onto the statute without further guidance from the General Assembly," Estate of Witthoeft v. Kiskaddon, 557 Pa. 340, 348, 733 A.2d 623, 627 (1999), we conclude that this procedural tool for intervening in the disposition of remains prior to a burial, a tool which Higgins never utilized, simply does not create some substantive right to sue for damages after-the-fact.

In sum, since the well-pleaded facts in Higgins' complaint reveals that the defendants did not violate 20 Pa.C.S. § 305, and further disclose that Higgins is not entitled to lodge a claim for damages under this state statute, Higgins claims fail as a matter of law and should be dismissed.[2]

## C.  The Rooker-Feldman Doctrine Also Bars Consideration of This Case

**\*7** Further, we note that, according to Higgins, the state courts have recently rejected the state law claims that Higgins is now attempting to present in this lawsuit. Therefore, at this juncture, Higgins has filed an amended civil action which invites this Court to set aside findings made by state courts in the course of state litigation instigated by the plaintiff. In essence, the plaintiff urges us to sit as a state appellate court and review, re-examine and reject these state court rulings in his parallel state case.

This we cannot do. Indeed, the United States Supreme Court has spoken to this issue and announced as a rule, the Rooker-Feldman doctrine, which compels federal district courts to decline invitations to conduct what amounts to appellate review of state trial court decisions. As described by the Third Circuit:

That doctrine takes its name from the two Supreme Court cases that gave rise to the doctrine. Rooker v. Fidelity Trust Co., 263 U.S. 413, 44 S.Ct. 149,

Higgins v. Frank Bonin Funeral Parlor, Not Reported in Fed. Supp. (2015)
2015 WL 10944445

68 L.Ed. 362 (1923); District of Columbia Court of Appeals v. Feldman, 460 U.S. 462, 103 S.Ct. 1303, 75 L.Ed.2d 206 (1983). The doctrine is derived from 28 U.S.C. § 1257 which states that "[f]inal judgments or decrees rendered by the highest court of a state in which a decision could be had, may be reviewed by the Supreme Court....". See also Desi's Pizza, Inc. v. City of Wilkes Barre, 321 F.3d 411, 419 (3d Cir. 2003). "Since Congress has never conferred a similar power of review on the United States District Courts, the Supreme Court has inferred that Congress did not intend to empower District Courts to review state court decisions." Desi's Pizza, 321 F.3d at 419.

Gary v. Braddock Cemetery, 517 F.3d 195, 200 (3d Cir. 2008).

Because federal district courts are not empowered by law to sit as reviewing courts, reexamining state court decisions, "[t]he Rooker-Feldman doctrine deprives a federal district court of jurisdiction in some circumstances to review a state court adjudication." Turner v. Crawford Square Apartments III, LLP, 449 F.3d 542, 547 (3d Cir. 2006). Cases construing this jurisdictional limit on the power of federal courts have quite appropriately:

> [E]mphasized the narrow scope of the Rooker-Feldman doctrine, holding that it "is confined to cases of the kind from which the doctrine acquired its name: cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." [Exxon Mobil Corp. v. Saudi Basic Industries Corp.], 544 U.S. at 284, 125 S.Ct. at 1521-22; see also Lance v. Dennis, 546 U.S. 459, ____, 126 S.Ct. 1198, 1201, 163 L.Ed.2d 1059 (2006)

Id.

However, even within these narrowly drawn confines, it has been consistently recognized that the Rooker-Feldman doctrine prevents federal judges from considering lawsuits "brought by state-court losers complaining of injuries caused by state-court judgments ... and inviting district court review and rejection of those judgments." This principle applies here and compels dismissal of this case, to the extent that Higgins improperly invites us to act as a Pennsylvania appellate court for matters and claims relating to a state litigation arising out of the plaintiff's parallel state lawsuit.

**D. This Amended Complaint Should Be Dismissed With Prejudice**

Having conducted this second legal analysis of Higgins' pleadings and determined that this amended complaint is still wanting, we recognize that in civil cases *pro se* plaintiffs often should be afforded an opportunity to amend a complaint before the complaint is dismissed in its entirety, see Fletcher-Hardee Corp. v. Pote Concrete Contractors, 482 F.3d 247, 253 (3d Cir. 2007), unless granting further leave to amend would be futile or result in undue delay. Alston v. Parker, 363 F.3d 229, 235 (3d Cir. 2004). In this case the Court has previously provided the plaintiff with an opportunity to amend these pleadings, but to no avail. The current amended complaint still fails to state a viable civil cause of action against these defendants, and actually repeats assertions that were previously found to be legally insufficient. Since the plaintiff has been afforded an opportunity to correct the deficiencies identified in this prior complaint with respect to these defendants, has failed to state a viable civil cause of action, and the factual and legal grounds proffered in support of the amended complaint make it clear that the plaintiff has no right to relief, granting further leave to amend would be futile or result in undue delay. Alston v. Parker, 363 F.3d 229, 235 (3d Cir. 2004). Therefore, it is recommended that the amended complaint be dismissed without further leave to amend.

**III. Recommendation**

*8 Accordingly, for the foregoing reasons, IT IS RECOMMENDED that the plaintiff's amended complaint (Doc. 27.), should be dismissed with prejudice.

The Parties are further placed on notice that pursuant to Local Rule 72.3:

> Any party may object to a magistrate judge's proposed findings, recommendations or

Higgins v. Frank Bonin Funeral Parlor, Not Reported in Fed. Supp. (2015)

2015 WL 10944445

report addressing a motion or matter described in 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof. Such party shall file with the clerk of court, and serve on the magistrate judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The briefing requirements set forth in Local Rule 72.2 shall apply. A judge shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The judge may also receive further evidence, recall witnesses or recommit the matter to the magistrate judge with instructions.

Submitted this 12th day of February, 2015.

**All Citations**

Not Reported in Fed. Supp., 2015 WL 10944445

Footnotes

1    Our conclusion that § 305 does not give rise to a private cause of action under state law is further bolstered by the fact that Pennsylvania recognizes an independent common law cause of action " against '[a] person who wantonly mistreats the body of a dead person or who without privilege intentionally removes, withholds or operates upon the dead body.' Papieves v. Kelly, 437 Pa. 373, 376–379, 263 A.2d 118 (Pa. 1970) (noting the rule of recovery set forth in the Restatement of Torts § 868 (1939)). This tort has been narrowly interpreted to protect 'the right of a decedent's nearest relatives ... against intentional, outrageous or wanton conduct that is peculiarly calculated to cause them serious mental or emotional distress.' Id. at 378, 263 A.2d 118; see also Hackett v. United Airlines, 364 Pa.Super. 612, 528 A.2d 971, 974 (Pa. Super. Ct. 1987) (noting that Papieves 'expressly limits [§ 868 claims] to infliction of distress through intentional, outrageous or wanton behavior calculated to bring about such distress')." Beaky v. Cnty. of Bucks, CIV.A. 08-1251, 2009 WL 2390224 (E.D. Pa. Aug. 3, 2009). We further note that Higgins has not alleged well-pleaded facts which would give rise to a claim of wanton mistreatment of a body under Pennsylvania law. Rather, as discussed below, the well-pleaded facts in this complaint indicate that Jared's remains were disposed of in a manner which was entirely in accordance with state law.

2    Higgins' failure to set forth facts describing a substantive violation of state law is also fatal to any civil conspiracy claim which he attempts to bring under Pennsylvania law since a civil conspiracy claim cannot exist under state law without some underlying substantive violation of state law. See Price ex rel. O.P. v. Scranton Sch. Dist., CIV.A. 11-0095, 2012 WL 37090 (M.D. Pa. Jan. 6, 2012) citing Rose v. Wissinger, 294 Pa.Super. 265, 439 A.2d 1193, 1199 (Pa. Super. Ct. 1982). In short, under Pennsylvania law you may not sue parties for conspiring to take acts that were otherwise lawful.

Higgins v. Frank Bonin Funeral Parlor, Not Reported in Fed. Supp. (2015)

2015 WL 10944445

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

309 Fed.Appx. 546
This case was not selected for
publication in West's Federal Reporter.
See Fed. Rule of Appellate Procedure 32.1
generally governing citation of judicial decisions
issued on or after Jan. 1, 2007. See also U.S.Ct.
of Appeals 3rd Cir. App. I, IOP 5.1, 5.3, and 5.7.
United States Court of Appeals,
Third Circuit.

SPENCER BANK, S.L.A., a mutual
savings and loan association, Appellant
v.
Lawrence B. SEIDMAN; Seidman &
Associates, LLC; Veteri Place Corporation;
Menlo Acquisition Corporation.

No. 08–1343.
|
Submitted Under Third Circuit
LAR 34.1(a) Nov. 21, 2008.
|
Opinion Filed: Feb. 9, 2009.

**Synopsis**
**Background:** State-chartered mutual savings and loan
association sued private investors alleging violations
of Savings and Loan Holding Company Act (SLHCA).
The United States District Court for the District
of New Jersey, Walls, Senior District Judge, 528
F.Supp.2d 494, granted defendants' motion to dismiss,
and association appealed.

**Holdings:** The Court of Appeals, Restani, Judge,
sitting by designation, held that:

[1] no congressional intent to create personal right of
action under SLHCA was shown, and

[2] congressional intent to create private remedy under
SLHCA likewise was not shown.

Affirmed.

West Headnotes (2)

[1]   **Finance, Banking, and Credit**
      Right of action and defenses

Text of Savings and Loan Holding
Company Act (SLHCA) manifested
no congressional intent to create
personal right of action on part
of "savings association[s] which [are]
mutual association[s]," as required to
support state-chartered mutual savings
and loan association's argument that it
possessed implied private right of action
under SLHCA against private investors
whom it accused of seeking to gain control
of association; although association was
incidentally affected by SLHCA, focus of
Act was on regulation of savings and loan
holding companies. Home Owners' Loan
Act, § 10(h)(1), 12 U.S.C.A. § 1467a(h)
(1).

2 Cases that cite this headnote

[2]   **Finance, Banking, and Credit**
      Right of action and defenses

Text and legislative history of Savings and
Loan Holding Company Act (SLHCA)
manifested no congressional intent to
create private remedy, as required to
support state-chartered mutual savings
and loan association's argument that
it possessed implied private right of
action under SLHCA against private
investors whom it accused of seeking
to gain control of association; intent
of Act was to provide framework for
regulation of savings and loan holding
companies to be enforced by Office of
Thrift Supervision (OTS). Home Owners'
Loan Act, § 10(g), (h)(1), (i), 12
U.S.C.A. § 1467a(g), (h)(1), (i); Financial
Institutions Regulatory and Interest Rate
Control Act of 1978, §§ 1102, 1103(c),
1113(b), 12 U.S.C.A. §§ 3402, 3403(c),
3413(b); Financial Institutions Reform,

Recovery, and Enforcement Act of 1989, 12 U.S.C.A. § 1811 note.

**\*547** Appeal from the United States District Court for the District of New Jersey (D.C. No. 07–cv–01337), District Judge: Honorable William H. Walls.

**Attorneys and Law Firms**

Joseph N. Froehlich, Esq., Allen C. Wasserman, Esq., Locke Lord Bissell & Liddell, New York, NY, for Appellant.

Peter R. Bray, Esq., Bray, Chiocca & Miller, Parsippany, NY, Brian M. Dratch, Esq., Franzblau Dratch, Livingston, NJ, Donald A. Robinson, Esq., Robinson, Wettre & Miller, Newark, NJ, for Lawrence B. Seidman; Seidman & Associates, LLC; Veteri Place Corporation; Menlo Acquisition Corporation.

Before: BARRY and CHAGARES, Circuit Judges, and RESTANI,[*] Judge.

OPINION OF THE COURT

RESTANI, Judge.

**\*\*1** Appellant Spencer Bank, S.L.A. ("Spencer Bank") appeals the decision of the United States District Court for the District of New Jersey granting appellees Lawrence B. Seidman ("Seidman"), Seidman & Associates, LLC, Veteri Place Corporation, and Menlo Acquisition Corporation's (collectively "Appellees") motion to dismiss for failure to state a claim upon which relief can be granted. The District Court determined that there was no private right of action under the Savings and Loan Holding Company Act, 12 U.S.C. § 1467a ("SLHCA" or "Act"). We affirm.

**BACKGROUND AND PROCEDURAL HISTORY**

Spencer Bank, a state-chartered mutual savings and loan association, alleges that Seidman, a private investor and one of Spencer Bank's depositors, along with the other Appellees and their interested associates, have repeatedly engaged in unlawful activity by targeting and acquiring ownership in certain savings institutions in order to gain control of the board of directors and force the sale of the institutions.[1] According to Spencer Bank, Appellees **\*548** and their associates were one of the largest holders of the voting shares for the targeted institutions, and sixteen of the seventeen acquired savings institutions merged or were acquired by another institution within two years of Appellees' involvement, with Appellees gaining significant profits as a result.

Spencer Bank alleges that Appellees are now trying to gain control through placement of Seidman or his associates on the board of directors of Spencer Bank. Specifically, Spencer Bank alleges that Appellees have engaged in the following tactics: (1) opened deposit accounts to increase voting rights; (2) placed mail and phone complaints to Spencer Bank's president and CEO concerning recent business decisions; (3) mailed a letter to the CEO nominating Seidman and other associates to the board and requesting a list of depositor members and a letter to depositor members condemning the board and seeking the nomination of Seidman and his associates; (4) engaged in proxy solicitation outside one of Spencer Bank's branches; and (5) filed a lawsuit against Spencer Bank and the board alleging breaches of fiduciary duty.

Spencer Bank filed a complaint in March 2007, alleging that Appellees' attempts to control Spencer Bank violated the SLHCA. Spencer Bank sought an injunction or other equitable remedies to prevent Appellees from acquiring control in violation of § 1467a(h)(1), as well as other statutory damages under the SLHCA.

Appellees filed a motion to dismiss the complaint in April 2007, alleging that there was no private right of action under § 1467a(h)(1) and that the complaint failed to allege facts sufficient to state a claim under the SLHCA. In an opinion and order entered January 4, 2008, the District Court granted Appellees' motion, finding that § 1467a(h)(1) does not provide for a private right of action.[2] Spencer Bank now appeals.

**JURISDICTION AND STANDARD OF REVIEW**
**\*\*2** The Court has jurisdiction pursuant to 28 U.S.C. § 1291. We review *de novo* the District Court's

dismissal for failure to state a claim. *Three Rivers Ctr. for Indep. Living, Inc. v. Hous. Auth. of Pittsburgh,* 382 F.3d 412, 419 (3d Cir.2004).

## DISCUSSION

Spencer Bank concedes that no express private right of action exists under the terms of the SLHCA, but alleges that a private right of action can be implied from the SLHCA. Private rights of action may be implied in statutes that "do not contain provisions addressing either whether private parties may maintain a right of action or the scope of a right of action a private party may maintain." *Id.* at 421.

Whether an implied private right of action exists under a statute is a question of congressional intent, *Alexander v. Sandoval,* 532 U.S. 275, 286, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001), and may be implied by a court only when "it can *confidently conclude* Congress so intended," *Am. Trucking Ass'ns v. Del. River Joint Toll Bridge Comm'n,* 458 F.3d 291, 303 (3d Cir.2006) (internal quotation and citation omitted). We have held that in order "for an implied right of action to exist, a statute must manifest Congress's intent to create (1) a personal right, and (2) a private remedy." *Three Rivers,* 382 F.3d at 421 (citing *Sandoval,* 532 U.S. at 286, 121 S.Ct. 1511).

**\*549 A. There is no indication of legislative intent to create a federal right for mutual associations under § 1467a**

[1]    Section 1467a(h)(1) makes it unlawful for:

> any savings and loan holding company or subsidiary thereof, or any director, officer, employee, or person owning, controlling, or holding with power to vote, or holding proxies representing, more than 25 percent of the voting shares, of such holding company or subsidiary, to hold, solicit, or exercise any proxies in respect of any voting rights in a savings

association which is a mutual association[.]

12 U.S.C. § 1467a(h)(1) (2006). The District Court determined that while "§ 1467a(h)(1) benefits savings associations which are mutual associations," ultimately "the direct, unmistakable focus of § 1467a(h)(1) is upon savings and loan holding companies, *not* ... mutual associations." (J.A. 12.) The District Court held, therefore, that "[t]he statute provides no indication that Congress intended to confer a federal right upon Plaintiff." (*Id.*) We agree.

The first inquiry is into legislative intent, that is " '[t]he question is not simply who would benefit from the Act, but whether Congress intended to confer federal rights upon those beneficiaries.' " *Am. Trucking Ass'ns,* 458 F.3d at 297 (quoting *California v. Sierra Club,* 451 U.S. 287, 294, 101 S.Ct. 1775, 68 L.Ed.2d 101 (1981)). In examining whether § 1467a(h)(1) creates a federal right in favor of mutual associations, we "review[ ] the 'text and structure' of the statute to determine whether the statute contained 'rights-creating' language that focuses on the 'individual protected' rather than 'the person regulated.' " *Wisniewski v. Rodale, Inc.,* 510 F.3d 294, 301–02 (3d Cir.2007) (citing *Sandoval,* 532 U.S. at 288–89, 121 S.Ct. 1511). When "right-or duty-creating language" is not explicitly included in a statute, a court will rarely imply congressional intent to create a private right of action. *Gonzaga Univ. v. Doe,* 536 U.S. 273, 284 n. 3, 122 S.Ct. 2268, 153 L.Ed.2d 309 (2002).

**\*\*3** Section 1467a(h)(1) does not include rights-creating language that focuses on mutual associations. Rather, the focus of the provision is on the regulation of savings and loan holding companies, and while this may incidentally affect savings associations which are mutual associations, it does not necessarily follow that the SLHCA was enacted for the "especial benefit" of mutual associations. "Statutes that focus on the person regulated rather than the individuals protected create 'no implication of an intent to confer rights on a particular class of persons.' " *Sandoval,* 532 U.S. at 289, 121 S.Ct. 1511 (quoting *Sierra Club,* 451 U.S. at 294, 101 S.Ct. 1775). We find no indication that Congress intended to provide a federal right under § 1467a(h)(1).

Spencer Bank, S.L.A. v. Seidman, 309 Fed.Appx. 546 (2009)

**B. There is no indication of legislative intent to create a private remedy under § 1467a**

[2] Appellees argue that the administrative enforcement scheme of the SLHCA demonstrates that Congress intended to entrust the Office of Thrift Supervision ("OTS") with the sole power to enforce the Act. Spencer Bank maintains that implying a private right of action would not be inconsistent with the agency's enforcement of the Act. We agree with the District Court, which concluded that the text and legislative history of the statute reveal no congressional intent to create a private remedy.

The OTS is the administrative agency charged with ensuring compliance with the SLHCA. The director of the agency is authorized to issue regulations and orders, **\*550** conduct formal investigations to determine compliance, bring an action seeking an injunction, decree, restraining order, order of divestiture, or other appropriate orders to enjoin violations, and issue cease and desist orders after due notice and the opportunity for hearing. 12 U.S.C. § 1467a(g). The Act further provides for criminal and civil penalties for violations. *Id.* § 1467a(i). The existence of this comprehensive regulatory scheme indicates a congressional intent to place enforcement of the Act solely in the hands of the OTS, rather than a private party.

As the relevant legislative history has been thoroughly explained by the District Court, we repeat here only the latest iteration of congressional intent. Although derived from earlier statutes, the current SLHCA was enacted as part of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"), Pub.L. No. 101–73, § 301, 103 Stat. 183, 277–343. FIRREA repealed Title 4 of the National Housing Act in part, and the remaining sections of Title 4 were transferred to other statutes. § 407, 103 Stat. at 363. FIRREA was enacted in part "to enhance the regulatory and enforcement powers of Federal financial institutions regulatory agencies," 103 Stat. at 183, and established the OTS as the entity responsible for supervising and regulating savings institution holding companies, *see* § 201(b), 103 Stat. at 188.

Spencer Bank further alleges, however, that because disclosure and reporting requirements relating to the

acquisition of proxies by the holding company is not required, mutual associations cannot solely rely on the OTS to receive this critical information and enforce compliance. Spencer Bank contends that bank privacy restrictions placed on mutual associations provide that "no Government authority may have access to or obtain copies of, or the information contained in the financial records of any customer from a financial institution" and therefore mutual associations are prevented from being able to reveal this critical information to the OTS. 12 U.S.C. § 3402.

**\*\*4** Spencer Bank's argument is unpersuasive, however, as the statute provides exceptions to this prohibition, a number of which are applicable here. Section 3413(b) expressly states that the statute "shall not apply to the examination by or disclosure to any supervisory agency of financial records or information in the exercise of its supervisory, regulatory, or monetary functions." 12 U.S.C. § 3413(b). The statute further provides that a financial institution and its officers, employees, or agents are not precluded from notifying the government concerning "information which may be relevant to a possible violation of any statute or regulation" and that the institution or person will not be liable to the customer for such disclosure. 12 U.S.C. § 3403(c).[3] Accordingly, Spencer Bank's assertion that the regulation by the OTS of mutual associations is impossible absent an implied private right of action is without merit.

There is no indication that Congress intended to create a private remedy, but rather, the text and legislative history of the SLHCA indicate an intent to provide a **\*551** framework for the regulation of savings and loan holding companies to be enforced by the OTS. Consequently, as congressional intent to create a personal right and a private remedy has not been established, we find no implied right of action for mutual associations under 12 U.S.C. § 1467a.[4]

**CONCLUSION**

For the foregoing reasons, we will affirm the judgment of the district court.

Spencer Bank, S.L.A. v. Seidman, 309 Fed.Appx. 546 (2009)

---

**All Citations**

309 Fed.Appx. 546, 2009 WL 294759

**Footnotes**

\*    Honorable Jane A. Restani, Chief Judge of the United States Court of International Trade, sitting by designation.

1    Spencer Bank alleges that Appellees engaged in "wolf-pack" tactics, threatened and engaged in proxy contests, initiated lawsuits, forced "greenmail," and induced tender offers to influence the boards of directors of the savings institutions into merging with or being acquired by another institution. Spencer Bank further contends that Appellees engaged in publicity campaigns in furtherance of these schemes, including letter writing, phone calls, and public securities filings.

2    The District Court made no findings on Appellees' additional arguments and declined to consider Spencer Bank's request for equitable relief.

3    "Financial institutions" include "any office of a bank, savings bank ... [or] savings association," 12 U.S.C. § 3401(1); a "financial record" is defined as "an original of, a copy of, or information known to have been derived from, any record held by a financial institution pertaining to a customer's relationship with the financial institution," *id.* § 3401(2); "customer" includes "any person or authorized representative of that person who utilized or is utilizing any service of a financial institution," *id.* § 3401(5); and "supervisory agency" explicitly includes "Director, Office of Thrift Supervision," *id.* § 3401(7)(B).

4    As the text and legislative history of the SLHCA reveal that Congress intended to provide for the enforcement of the SLHCA through the OTS, the District Court did not abuse its discretion in declining to exercise its powers of equitable relief, as requested by Spencer Bank. *See Commodity Futures Trading Comm'n v. Am. Metals Exch. Corp.,* 991 F.2d 71, 76 (3d Cir.1993) (reviewing a district court's exercise of its equitable power for abuse of discretion).

---

**End of Document**    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

2013 WL 5874770

2013 WL 5874770
Only the Westlaw citation is currently available.

THIS IS AN UNREPORTED PANEL
DECISION OF THE COMMONWEALTH
COURT. AS SUCH, IT MAY BE CITED FOR
ITS PERSUASIVE VALUE, BUT NOT AS
BINDING PRECEDENT. SEE SECTION
414 OF THE COMMONWEALTH COURT'S
INTERNAL OPERATING PROCEDURES.

Commonwealth Court of Pennsylvania.

Legend COLLINS, a minor, Enshatel Sparrow,
a minor, Galord Sparrow, a minor, Mikel
Collins, a minor, by their mother, Denise
Collins; Saleem Bradley Capps, a minor, Adam
L. Jackson, a minor, by his grandmother,
Vanessa J. Miller; Quadin Williams, a minor,
by his mother, Andrea Fiqueroa; Tyjuwon
Scott, a minor, Jamal Scott, a minor, Kareem
Scott, a minor, Felisha Scott, a minor, by their
mother, Lasheena White; Kal'el Carr, a minor,
by his mother, Rachel Melton; DeSean Gay,
a minor, by his mother, Gervone Elliot; Taja
Wilson, a minor, by her mother, Cinquetta
Howard; all individually and on behalf of
all others similarly situated, Petitioners

v.

STATE of PA, Pennsylvania
Department of Education, The School
District of Philadelphia, The City
of Philadelphia, and The School
Reform Commission, Respondents.

No. 96 M.D.2013.
|
Argued Oct. 8, 2013.
|
Decided Oct. 31, 2013.

BEFORE: PELLEGRINI, President Judge, and
COVEY, Judge, and JAMES GARDNER COLINS,
Senior Judge.

MEMORANDUM OPINION

PELLEGRINI, President Judge.

**\*1** Before this Court in its original
jurisdiction are the preliminary objections of the
Commonwealth of Pennsylvania and the Pennsylvania
Department of Education (Department) (collectively,
Commonwealth); the School District of Philadelphia
(District) and the School Reform Commission
(Commission) (collectively, School Respondents); and
the City of Philadelphia (City) to an Amended Petition
for Review filed by several special needs' students
enrolled in the District and their parents and/or
guardians (Students). Students seek declaratory relief,
an accounting and injunctive relief with respect to
actions allegedly taken by School Respondents in
connection with the implementation of the District's
long-range Facilities Master Plan. For the reasons
that follow, we dismiss the action with respect to the
Commonwealth, and transfer Students' claims against
School Respondents and the City to the Court of
Common Pleas of Philadelphia County because we
lack original jurisdiction over those parties.

At issue in this case is the implementation of
the District's long-range Facilities Master Plan.
The District began developing the Facilities Master
Plan in 2010 to "standardize grade configurations,
increase school utilization and reduce excess
building capacity." http://webgui.phila. k12.pa.us/
offices/f/facilities-masterplan. Following numerous
public hearings, community engagement meetings and
submission of proposals from principals, students,
parents and community organizations, the Commission
approved the Facilities Master Plan on March 7, 2013.
*Id.* Implementation of the Facilities Master Plan will
result in several program relocations, mergers and
consolidations, personnel cuts, and the closure of 23
schools in the District at the end of the 2012–2013
academic year.

On February 28, 2013, Students filed a *pro se*
Petition for Review in this Court's original jurisdiction
seeking equitable relief against the District and
Commonwealth. This Court directed Students to
obtain counsel, and on June 10, 2013, Students'
counsel filed an Amended Petition for Review
(Amended Petition) against the Commonwealth,
School Respondents and the City.

Collins v. State, Not Reported in A.3d (2013)

2013 WL 5874770

The Amended Petition claims that the proposed school closures, personnel reductions and cuts in "related services" resulting from the Facilities Master Plan and proposed 2013–2014 District budget (1) are discriminatory[1] and (2) will deprive the District's special needs' students of a free appropriate public education (FAPE) by denying them services provided for in their Individualized Education Programs (IEP).[2] The Amended Petition alleges that the Facilities Master Plan violates the Due Process and Equal Protection Clauses of the 14th Amendment;[3] Article I, Section 26 of the Pennsylvania Constitution; 42 U.S.C. §§ 1981 and 1983; the IDEA, 20 U.S.C. §§ 1401–1487; Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794; the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12101–12213; and the No Child Left Behind Act (NCLBA), 20 U.S.C. §§ 6301–7941.[4]

**\*2** Students seek the following relief: (1) a declaration that the actions of School Respondents in adopting and initiating the Facilities Master Plan and the 2013–2014 budget are unconstitutional and in violation of federal and state law; (2) an order directing Respondents to provide an accounting of various information relating to special needs' students, budgets and funding for special education beginning with the 2011–2012 academic year; (3) a preliminary injunction halting Respondents' implementation of the Facilities Master Plan and 2013–2014 budget, pending receipt of and a hearing on the requested accounting information and a final determination by this Court; (4) a permanent injunction precluding implementation and enforcement of the Facilities Master Plan and 2013–2014 budget; and (5) reasonable attorneys' fees and costs.

The Commonwealth, School Respondents and the City each filed preliminary objections to the Amended Petition. Both the Commonwealth and School Respondents raised improper service of process, addition to several other preliminary objections. Students admitted that service to these parties was improper, but asserted that the Amended Petition was served on School Respondents on June 12, 2013, and that the defect was correctable with respect to the Commonwealth. Accordingly, by order dated August 14, 2013, this Court overruled the preliminary objection of School Respondents raising

improper service, and sustained in part the preliminary objection of the Commonwealth relating to service, ordering Students to serve the Amended Petition on the Commonwealth within 14 days.[5] Before this Court are the remaining preliminary objections of the Commonwealth, School Respondents and the City.[6]

**I.**

The Commonwealth has filed preliminary objections seeking to dismiss the Amended Complaint, alleging that:

- Students' state law claims are barred under the doctrine of sovereign immunity;

- This Court lacks jurisdiction because Students failed to exhaust their administrative remedies under the IDEA, ADA and Section 504 of the Rehabilitation Act;

- Students failed to state a claim under the IDEA, ADA and Section 504 of the Rehabilitation Act;

- Students failed to state a claim under the NCLBA;

- Students failed to state a claim under 42 U.S.C. § 1983; and

- Students failed to state a claim under 42 U.S.C. § 1981.[7]

**A.**

The Commonwealth asserts that Students' claims for a declaratory judgment, accounting and injunctive relief under Article I, Section 26 of the Pennsylvania Constitution, which provides that "[n]either the Commonwealth nor any political subdivision thereof shall deny to any person the enjoyment of any civil right, nor discriminate against any person in the exercise of any civil right," are barred under the doctrine of sovereign immunity.[8] Pa. Const. art. I, § 26. Sovereign immunity's source is Article I, Section 11 of the Pennsylvania Constitution, which provides in pertinent part: "Suits may be brought against the Commonwealth in such manner, in such courts and in such cases as the Legislature may by law direct." Pa. Const. art. I, § 11.

**\*3** The doctrine of sovereign immunity [9] bars claims against a "Commonwealth party" which is defined as "a Commonwealth agency and any employee thereof, but only with respect to an act within the scope of his office or employment." Section 8501 of the Judicial Code, 42 Pa.C.S. § 8501. The legislature specifically waived sovereign immunity in nine areas. *See* Section 8522(b) of the Judicial Code, 42 Pa.C.S. § 8522(b). [10] None of those nine areas are applicable here. Moreover, the General Assembly has not waived immunity for equitable claims seeking affirmative action by way of injunctive relief. *Bonsavage v. Borough of Warrior Run,* 676 A.2d 1330, 1331 (Pa.Cmwlth.1996). Finally, this Court has previously held that there is no indication in the text or legislative history of Article I, Section 26 indicating that the legislative intent was to have that section operate as a waiver of sovereign immunity. *McElwee v. Department of Transportation,* 373 A.2d 1163, 1165 (Pa.Cmwlth.1977).

The Commonwealth and Department are clearly "Commonwealth parties" and, thus, protected by sovereign immunity. Because none of the exceptions to sovereign immunity apply here, and Article I, Section 26 does not operate as a waiver of sovereign immunity, Students' claims for relief arising under that section are dismissed with respect to the Commonwealth.

**B.**

The Commonwealth next alleges that this Court lacks jurisdiction of Students' claims under the IDEA, Section 504 of the Rehabilitation Act, and the ADA because Students failed to exhaust their administrative remedies.

It is a "long-settled rule of judicial administration that no one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted ." *PennMont Securities v. Frucher,* 586 F.3d 242, 245 (3d Cir.2009). The IDEA provides for impartial administrative due process hearings to resolve disputes between parents and schools regarding the special education services schools must offer under the Act. 20 U.S.C. § 1415(f); *N.A. ex rel. D.A. v. Gateway School District,* 820 F.Supp.2d 649, 651 (W.D.Pa.2011). In Pennsylvania, a hearing officer first conducts an initial hearing,

and the parties may subsequently appeal the officer's findings to the Pennsylvania Special Education Due Process Appeals Review Panel. *Millersburg Area School District v. Lynda T.,* 707 A.2d 572, 576 (Pa.Cmwlth.1998); *Gateway School District,* 820 F.Supp.2d at 651. A party aggrieved by the findings of the administrative agency then has the right to bring a civil action in state or federal district court. 20 U.S.C. § 1415(i)(2)(A).

A primary purpose of requiring administrative exhaustion prior to filing a civil suit in the IDEA context is to develop the factual record and resolve evidentiary disputes concerning, for example, evaluation, classification and placement. *W.B. v. Matula,* 67 F.3d 484, 496 (3d Ci r.1995). In addition, use of the administrative process supports Congress' view that the needs of special education students are best accommodated by having the parents and the local education agency work together to formulate an individualized plan for each child's education. *Komninos ex rel. Komninos v. Upper Saddle River Board of Education,* 13 F.3d 775, 778 (3d Cir.1994).

**\*4** The IDEA exhaustion requirement may be excused where (1) exhaustion would be futile or inadequate; (2) the issue presented is purely a legal question; (3) the administrative agency cannot grant relief; or (4) exhaustion would work "severe or irreparable harm" upon a litigant. *Id.* In order to show "severe and irreparable harm," a plaintiff must provide a sufficient preliminary showing that the child will suffer serious and irreversible mental or physical damage (e.g., irremediable intellectual regression) by providing affidavits from competent professionals, along with other hard evidence that the child faces irreversible damage if the relief is not granted. *Id.* at 779.

Here, Students concede that they have not sought to exhaust their administrative remedies under the IDEA. However, they contend that the circumstances of this case warrant a waiver of the exhaustion requirement because it would "defeat the objective of the statute to require each and every special need[s] student in Philadelphia County to file an individual administrative appeal addressing this district-wide elimination of essential service personnel impacting all special needs students and their right to an appropriate

Collins v. State, Not Reported in A.3d (2013)
_____
2013 WL 5874770

IEP." (Students' September 13, 2013 Opposition Brief at 12).

This argument has been rejected by the federal courts. In *Blunt v. Lower Merion School District*, 559 F.Supp.2d 548 (E.D.Pa .2008),[11] current and former disabled and African–American students, their parents and two advocacy organizations brought a putative class action against the school district alleging disability and race discrimination under the IDEA and several other federal statutes. In dismissing the plaintiffs' IDEA claims for failure to exhaust administrative remedies, the Court explained:

> [T]he overwhelming focus of plaintiffs' Amended Complaint against the School District defendants is on the individualized circumstances of the named students and the School District defendants' failure to provide these students with the FAPE to which they are entitled. ... Plaintiffs cannot overcome the clear emphasis on the claims of the individual students by including concl usory allegations of some systemic deficiencies.

*Id.* at 559. More recently, in *Gateway School District*, parents of autistic students brought an action alleging that the school district violated the IDEA by failing to provide special education services and misrepresenting the students' educational progress and, therefore, denying them a FAPE. The Court, citing the above language from Blunt, also dismissed plaintiffs' IDEA claims for failure to exhaust administrative remedies. 820 F.Supp.2d at 653. Moreover, the Court rejected the plaintiffs' argument that they did not need to exhaust their administrative remedies where they sought relief on behalf of a class because "the named plaintiffs have not exhausted their administrative remedies." *Id.* Here, the Amended Complaint similarly contains conclusory allegations of "systemic deficiencies" resulting from the implementation of the District's Facilities Master Plan. Given the similarities between the allegations here and those in *Blunt* and *Gateway School District*, we find those cases persuasive and reject Students' argument that they should be excused from exhausting their administrative remedies because the Facilities Master Plan will affect all Special Needs' students in the District.

**\*5** However, Students argue that if the requested injunctive relief is not granted and they are forced to exhaust their administrative remedies, the entire Special Needs' student population in the District will suffer permanent and irreparable harm because, by that time, the essential service personnel will not be available. In making this argument, Students make only vague and conclusory allegations about the negative psychological and emotional effects that implementation of the Facilities Master Plan will have on them.[12] Because such general allegations simply are not sufficient to demonstrate that the District's Special Needs' students will suffer "irreversible damage" unless they are excused from first exhausting their administrative remedies available under the IDEA, Students' IDEA claims are dismissed for failure to exhaust administrative remedies.

**C.**

For the same reasons we dismiss Students' IDEA claims for failing to exhaust their administrative remedies, we also dismiss their claims under Section 504 of the Rehabilitation Act and the ADA. Section 1415(*l*) of the IDEA provides:

> Nothing in this chapter shall be construed to restrict or limit the rights, procedures, and remedies available under the Constitution, the Americans with Disabilities Act of 1990, ... title V of the Rehabilitation Act of 1973 ... or other Federal laws protecting the rights of children with disabilities, except that before the filing of a civil action under such laws seeking relief that is also available under this subchapter, the procedures under subsections (f) and (g) shall be exhausted to the same extent as would be required had the action been brought under this subchapter.

Collins v. State, Not Reported in A.3d (2013)
2013 WL 5874770

20 U.S.C. § 1415(*l* ) (citations omitted). In other words, "a party who brings a claim that seeks relief also available under [the] IDEA must first exhaust [the] IDEA's administrative remedies." *Jeremy H. by Hunter v. Mount Lebanon School District,* 95 F.3d 272, 282 (3d Cir.1996). Because Students' Section 504 and ADA claims were based on the same allegations as their IDEA claim and sought relief that would be available under the IDEA, they were also subject to the IDEA's exhaustion requirement. *See Blunt,* 559 F.Supp.2d at 560–61; *Gateway School District,* 820 F.Supp.2d at 654. Therefore, Students' claims under Section 504 of the Rehabilitation Act and the ADA are also dismissed. [13]

**D.**

The Commonwealth alleges that Students' NCLBA claims must be dismissed because there is no private right of action under that statute. The Commonwealth is correct. In *Horne v. Flores,* 557 U.S. 433, 456 n. 6 (2009), the United States Supreme Court explained:

> [The] NCLB[A] does not provide a private right of action.... Without statutory intent, a cause of action does not exist and courts may not create one, no matter how desirable that might be as a policy matter, or how compatible with the statute. Thus, NCLB[A] is enforceable only by the agency charged with administering it.

**\*6** 2(Citations omitted). Therefore, Students' NCLBA claims are barred.

**E.**

The Commonwealth next argues that Students cannot state a claim under 42 U.S.C. § 1983. To state a claim under Section 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting

under color of state law. *West v. Atkins,* 487 U.S. 42, 48 (1988). Both the United States Supreme Court and this Court have held that states and state agencies are not "persons" for purposes of Section 1983. *See Will v. Michigan Department of State Police,* 491 U.S. 58, 71 ("neither a State nor its officials acting in their official capacities are 'persons' under § 1983."); *Warren v. Pennsylvania Department of Corrections,* 616 A.2d 140, 142 (Pa.Cmwlth.1992) (Department of Corrections not "person" subject to suit under Section 1983); *Ziccardi v. Department of General Services, Bureau of Buildings and Grounds,* 527 A.2d 183, 188 (Pa.Cmwlth.1987) (Commonwealth is not a "person" subject to a suit for damages under Section 1983). Because neither the Commonwealth nor the Department of Education is a "person" under Section 1983, Students cannot state a claim against the Commonwealth under Section 1983.

**F.**

Finally, the Commonwealth argues that Students cannot state a claim under 42 U.S.C. § 1981. Section 1981(a) provides:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

42 U.S.C. § 1981(a).

While Section 1981 guarantees extensive rights, it does not create a private right of action against state actors. Rather, "the express cause of action for damages created by § 1983 constitutes **the exclusive federal**

2013 WL 5874770

remedy for violation of the rights guaranteed in § 1981 by state governmental units." *McGovern v. City of Philadelphia,* 554 F.3d 114, 116–117 (3d Cir .2009) (emphasis added). Because Students cannot state a claim against the Commonwealth under 42 U.S.C. § 1983, they have no remedy available for alleged violation of their Section 1981 rights.

Accordingly, the Amended Petition is dismissed as to the Commonwealth. [14]

**II.**

School Respondents also filed numerous preliminary objections, several of which repeat the arguments made by the Commonwealth. School Respondents first allege that this Court lacks jurisdiction over the District and the Commission because neither of those parties are "Commonwealth parties," and the actual Commonwealth parties are not indispensable. We agree.

Section 761(a) (1) of the Judicial Code, 42 Pa.C.S. § 761(a)(1), provides that the Commonwealth Court shall have original jurisdiction over all civil actions or proceedings against the Commonwealth government, including any officer thereof acting in his or her official capacity. Section 102 of the Judicial Code, 42 Pa.C.S. § 102, defines "Commonwealth government" as:

> *\*7* The government of the Commonwealth, including the courts and other officers or agencies of the unified judicial system, the General Assembly and its officers and agencies, the Governor, and the departments, boards, commissions,, authorities and officers and agencies of the Commonwealth, **but the term does not include any political subdivision,** municipal or other local authority, or any officer or agency of any such political subdivision or local authority. (Emphasis added).

That section defines "Commonwealth agency" as "any executive agency or independent agency." *Id.* Under 1 Pa.C.S. § 1991, the District is a political subdivision [15] and, therefore, not a part of the Commonwealth government. Similarly, the Commission, as an "instrumentality of a school district of the first class," [16] is a political subdivision and not a part of the Commonwealth government.

While the Amended Petition also includes Commonwealth parties over which this Court clearly has original jurisdiction, "[i]t is well established that merely naming the Commonwealth or its officers in an action does not conclusively establish original jurisdiction of this Court." *Village Charter School v. Chester Upland School District,* 813 A.2d 20, 25 (Pa.Cmwlth.2002). This Court has original jurisdiction in a suit against a Commonwealth party and non-Commonwealth parties only when the Commonwealth party is indispensable. *Id.*

In general, an indispensable party is "one whose rights are so connected with the claims of the litigants that no relief can be granted without infringing upon those rights." *Id.* "[A] Commonwealth agency should not be declared an indispensable party unless meaningful relief cannot conceivably be afforded without the involvement of the sovereign itself." *Annenberg v. Commonwealth,* 686 A.2d 1380, 1385 (Pa.Cmwlth.1996).

Here, the claims in the Amended Petition are all related to the Facilities Master Plan created by the District and the Commission. To the extent that Students are entitled to any relief, they could obtain this relief from the District and Commission, the only parties responsible for the creation and implementation of the Facilities Master Plan. Accordingly, the Commonwealth is not an indispensable party to this action, and, therefore, this Court does not have original jurisdiction over School Respondents.

Accordingly, School Respondents' preliminary objection for lack of jurisdiction is sustained, and Students' claims with respect to School Respondents are transferred to the Court of Common Pleas of Philadelphia County.

Collins v. State, Not Reported in A.3d (2013)
2013 WL 5874770

## III.

The City filed a preliminary objection in the nature of a demurrer pursuant to Pa. R.C.P. No. 1028(4) stating that the allegations in the Amended Petition are legally insufficient with respect to the City. The City argues that it is not a proper party to the action because it is a separate entity from the District, plays no role in managing the affairs of the District, and has no duty to develop educational plans for Special Needs' students under any of the federal laws cited by Students. However, we need not address that argument because, for the same reasons stated in the previous section with respect to School Respondents, we lack original jurisdiction over the City. [17]

**\*8** Accordingly, Students' claims with respect to the City are transferred to the Court of Common Pleas of Philadelphia County.

### ORDER

AND NOW, this 31st day of *October*, 2013, the preliminary objections of the Commonwealth of Pennsylvania and Department of Education are sustained and the Amended Petition for Review is dismissed as to them. The claims in the Amended Petition for Review against the School District of Philadelphia, the School Reform Commission and the City of Philadelphia are transferred to the Court of Common Pleas of Philadelphia County.

### All Citations

Not Reported in A.3d, 2013 WL 5874770

## Footnotes

1    The Amended Petition alleges that the Facilities Master Plan violates federal and state law by "providing for the immediate and arbitrary closure of multiple ... schools with large populations of children with Special Needs ... which are located primarily and disproportionately in non-white communities." (Amended Petition at ¶ 121).

2    The Individuals with Disabilities Education Act (IDEA) requires that for a state to receive federal assistance thereunder, it must provide a child with disabilities a "free appropriate public education" based on the unique needs of the student. 20 U.S.C. § 1412; *D.Z. v. Bethlehem Area School District*, 2 A.3d 712, 716 n. 2 (Pa.Cmwlth.2010). The IDEA establishes minimum requirements for the education of children with disabilities. *Id.* To implement those requirements, the Commonwealth, through the Department of Education, promulgated the Pennsylvania Special Education Regulations and the Pennsylvania Special Education Standards. *Id.* Pursuant to state regulations, a school district must develop an IEP tailored in accordance with certain procedures for each child with a disability. *Id.*

3    The Amended Petition repeatedly refers to the "13th Amendment Equal Protection Clause of the Constitution of the United States." Because there is no such clause, we will infer that Students are claiming a violation of the 14th Amendment's Equal Protection Clause.

4    The Amended Petition also claims that Respondents' actions violated Title I of the Elementary and Secondary Education Act of 1965 (ESEA). However, because the NCLBA reauthorized and amended the ESEA in 2002, we will consider Students' ESEA and NLCBA claims as one cause of action. Additionally, Paragraph 5 of the Amended Petition cites to numerous other federal statutes which are merely prior versions of current statutes or are not further addressed in the Amended Petition. We will not consider those claims.

5    Students served the Commonwealth on August 28, 2013, in compliance with this Court's August 14, 2013 Order.

6    In considering preliminary objections, we must accept as true all well-pled allegations of material fact and all inferences reasonably deducible from those allegations. *Brendley v. Pennsylvania Department of Labor and Industry*, 926 A.2d 1276, 1280 (Pa.Cmwlth.2007). We need not accept as true conclusions of law, unwarranted inferences from facts, argumentative allegations or expressions of opinion. *Id.* The Court will sustain preliminary objections when it appears with certainty that the law permits no recovery. *Bayada Nurses, Inc. v. Department of Labor and Industry*, 958 A.2d 1050, 1053 n. 4 (Pa.Cmwlth.2008).

7    The Commonwealth also filed a preliminary objection based on improper service. Students initially filed their *pro se* Petition for Review on February 28, 2013, but did not properly serve it upon the Commonwealth.

Collins v. State, Not Reported in A.3d (2013)

2013 WL 5874770

However, after this Court ordered Students to obtain counsel, they properly served the Amended Petition, and we will deny that preliminary objection on that basis.

8    We note that under Pa. R.C.P. No. 1030, immunity from suit is an affirmative defense that must be pled in a responsive pleading under the heading new matter, not as a preliminary objection. *Smolsky v. Pennsylvania General Assembly,* 34 A.3d 316, 321 n. 7 (Pa.Cmwlth.2011). However, courts have permitted a limited exception to this rule and have allowed parties to raise the affirmative defense of immunity as a preliminary objection where the plaintiff has not objected. *Id.* Here, Students have raised no objection to the Commonwealth raising sovereign immunity on preliminary objections.

9    Title 1 Pa.C.S. § 2310 provides, in relevant part:

    Pursuant to section 11 of Article 1 of the Constitution of Pennsylvania, it is hereby declared to be the intent of the General Assembly that the Commonwealth, and its officials and employees acting within the scope of their duties, shall continue to enjoy sovereign immunity and official immunity and remain immune from suit except as the General Assembly shall specifically waive the immunity.

10    The nine exceptions to sovereign immunity are: (1) vehicle liability; (2) medical-professional liability; (3) care, custody or control of personal property; (4) Commonwealth real estate, highways and sidewalks; (5) potholes and other dangerous conditions; (6) care, custody and control of animals; (7) liquor store sales; (8) National Guard activities; and (9) toxoids and vaccines.

11    We note that while decisions of lower federal courts are not binding on the courts of this Commonwealth, we may accept them as persuasive authority. *Goldman v. Southeastern Pennsylvania Transportation Authority,* 57 A.3d 1154, 1170 n. 12 (Pa.Cmwlth.2012).

12    For instance, the Affidavits submitted by the parents/guardians all state that Students are "being subjected to further emotional and psychological trauma and upset by the abrupt, destabilizing removal from their existing program(s) and school(s) and/or as a result of the ongoing anxiety about the availability of any future community based program suitable for their special needs and circumstances." (Exhibit 1 of Amended Petition).

13    Because we are dismissing Students' IDEA, Rehabilitation Act and ADA claims for failure to exhaust administrative remedies, we need not address the Commonwealth's preliminary objections relating to Students' failure to state a claim under those statutes.

14    Finally, we note that the Amended Petition does not delineate any specific causes of action, counts or factual allegations against the Commonwealth. Because the Amended Petition lacks any allegations of class-based intentional discrimination or deprivation of due process against the Commonwealth, to the extent Students are alleging 14th Amendment violations by the Commonwealth, those claims are dismissed.

15    That section defines "political subdivision" as "[a] ny county, city, borough, incorporated town, township, school district, vocational school district and county institution district."

16    Section 696 of the Public School Code of 1949, Act of March 10, 1949, P.L. 30, added by the Act of April 27, 1998, P.L. 270, *as amended,* 24 P.S. § 6–696. That section provides, in relevant part:

    (a) Within thirty (30) days of a declaration by the Secretary of Education that a school district of the first class is distressed under section 691(c) ... a School Reform Commission shall be established consisting of four members initially appointed by the Governor and one member initially appointed by the mayor of the city coterminous with the school district. The School Reform Commission shall be an instrumentality of a school district of the first class, exercising the powers of the board of school directors. The Governor shall appoint a chairman of the School Reform Commission. At least three of the commission members, including the member appointed by the mayor, must be residents of the school district. (Footnote omitted).

17    The City did not raise lack of jurisdiction in their preliminary objections. However, "questions of jurisdiction can never be waived, and may be raised at any time by the parties or *sua sponte* by an appellate court." *Pennhurst Medical Group, P.C. v. Department of Public Welfare,* 796 A.2d 423, 425 n. 2 (Pa.Cmwlth.2002).

---

**End of Document**                                                              © 2020 Thomson Reuters. No claim to original U.S. Government Works.

PAMELA PALMITER,                 :   IN THE COURT OF COMMON PLEAS
                                 :      OF LACKAWANNA COUNTY
              Plaintiff          :
                                 :
         vs.                     :   CIVIL ACTION - LAW
                                 :
COMMONWEALTH HEALTH SYSTEMS, :
INC. d/b/a COMMONWEALTH HEALTH,  :
PHYSICIANS HEALTH ALLIANCE d/b/a :
COMMONWEALTH HEALTH, and         :
MOSES TAYLOR HOSPITAL d/b/a      :
COMMONWEALTH HEALTH,             :
                                 :
              Defendants         :   NO.  19 CV 1315


## MEMORANDUM AND ORDER

### NEALON, J.

The employers' preliminary objections in this employment litigation raise an issue

of first impression that has not yet been addressed by a state or federal court in

Pennsylvania: whether Section 2103(b)(1) of the Medical Marijuana Act ("MMA"), 35

P.S. § 10231.2103(b)(1), which states that "[n]o employer may discharge...or otherwise

discriminate or retaliate against an employee...solely on the basis of such employee's

status as an individual who is certified to use medical marijuana," creates a private cause

of action for a medical assistant who was terminated by her health care employers for

prescribed use of medical marijuana while not working at her place of employment?  The

employers have filed a demurrer to the employee's wrongful termination claim under Section 2103(b)(1) the MMA, and contend that the Department of Health ("the Department") has the exclusive authority to enforce the MMA's provisions, such that the employee's sole remedy for her firing is to seek the assessment of a civil penalty by the Department on the employers. They likewise demur to the employee's common law wrongful discharge claim on the basis that she has not articulated a clear mandate of public policy that was violated by her discharge. The employers also challenge the legal sufficiency of the employee's claims for breach of oral contract and invasion of privacy/intrusion upon seclusion.

The MMA grants broad administrative power to the Department with respect to certified medical marijuana users, registered physicians, medical marijuana organizations, independent testing laboratories, health care medical marijuana organizations, academic clinical research centers, and clinical registrants, and reflects a legislative intent to empower the Department to exercise regulatory control over those people and entities that have opted to participate in Pennsylvania's "Medical Marijuana Program" and thereby submit to the administrative oversight of the Department. However, nothing in the MMA or the promulgated regulations vests the Department or any other state agency with the authority to enforce Section 2103(b)(1) against private employers that have not chosen to voluntarily take part in that program, and those anti-discrimination provisions would be rendered meaningless if an aggrieved employee could not pursue a private cause of action and seek to recover compensatory damages from an employer that violates Section 2103(b)(1). Recognition of an implied right of action under Section 2103(b)(1) is consistent with the MMA's stated purpose of providing safe and effective access to

- 2 -

medical marijuana for eligible patients, while simultaneously protecting them from adverse employment treatment in furtherance of the legislative intent in Section 2103(b)(1). Therefore, the employers' demurrer to the employee's private cause of action based upon Section 2103(b)(1) will be overruled.

Similarly, since the employee has alleged that she was terminated for a reason expressly prohibited by the MMA, she has identified a clear mandate of public policy that was implicated by her firing, as a result of which the employers' preliminary objection to the legal sufficiency of the employee's alternative claim for common law discharge will be overruled. However, inasmuch as the employee has not alleged sufficient additional consideration to negate the presumption of at-will employment and support a claim for breach of contract, the demurrer to the employee's breach of oral employment contract claim will be sustained. Additionally, the employee's contention that her employers discovered the identity of her treating physician from their review of her medical records is insufficient as a matter of law to sustain her claims for invasion of privacy/intrusion on seclusion, and the employers' demurrers to those claims will also be sustained.

## I. FACTUAL BACKGROUND

Plaintiff, Pamela Palmiter ("Palmiter"), avers that she became employed as a medical assistant by Medical Associates of NEPA ("Medical Associates") on January 9, 2017. (Docket Entry No. 16 at ¶¶ 1, 9). Because of a "medical condition of chronic pain, chronic migraines, and persistent fatigue," she reportedly "became a patient able to use medical marijuana through[out] the Commonwealth of Pennsylvania for her medical conditions" in December 2018. (Id. at ¶¶ 10-11). Palmiter maintains that she

- 3 -

immediately informed Medical Associates, which was comprised of Tracy Galardi, M.D., Michael G. Gilhooley, M.D., and Daniel Kazmierski, M.D., "that her doctor authorized her to use medical marijuana to treat her medical conditions." (Id. at ¶ 12).

While Medical Associates was in the process of being acquired by Physicians Health Alliance ("PHA"), Moses Taylor Hospital ("Moses Taylor"), and Commonwealth Health Systems, Inc. ("Commonwealth Health"), Palmiter was allegedly "told that she would be grandfathered in related to Medical Associates' acceptance of the use of medical marijuana off the job site for treatment of her medical conditions." (Id. at ¶ 13). It is further averred that "[i]n November/December 2018, Dr. Gilhooley and Dr. Kazmierski stated that everything would be fine related to [Palmiter's] getting approval for medical marijuana and her continuing to work for [PHA, Moses Taylor, and Commonwealth Health]." (Id. at ¶ 22). Palmiter asserts that "[o]n or about January 2019, [Medical Associates'] Office Manager, Pam Doto, told [Palmiter] that everything would stay the same [and] she would keep her job and her seniority." (Id. at ¶ 23).

On January 11, 2019, Palmiter apparently "applied for the position of Certified Medical Assistant," and on January 15, 2019, she was notified via email that she was "a new employee of Moses Taylor Hospital." (Id. at ¶¶ 14-15, Exhibit A). On January 22, 2019, Palmiter "was scheduled to undergo a drug test related to her employment with" PHA, Moses Taylor, and Commonwealth Health, and "[a]t that time, [she] reported to the lab that [she] was on prescribed medical marijuana." (Id. at ¶¶ 16-17). On January 25, 2019, Palmiter also "faxed a copy of her certification that Dr. [Christopher] Connor approved her for medical marijuana to treat her medical conditions." (Id. at ¶ 18).

- 4 -

Palmiter contends that on January 29, 2019, she "received a call" from Jessica Vaccaro of PHA, Moses Taylor, and Commonwealth Health advising her that her employers "would not allow [her] to work" for them based upon her drug test. (Id. at ¶ 19). On February 21, 2019, Palmiter commenced this litigation against PHA, Moses Taylor, and Commonwealth Health asserting a single claim for violation of Section 2103(b) of the MMA. (Docket Entry No. 1 at ¶¶ 9-19). She further maintains that on March 1, 2019, she was advised by her treating physician, Dr. Galardi, that PHA, Moses Taylor, and Commonwealth Health had "informed Dr. Galardi that she could no longer treat [Palmiter] because of the lawsuit and [that] it was a conflict of interest." (Docket Entry No. 16 at ¶ 29).

In her third amended complaint, Palmiter advances five causes of action for "Violation of Medical Marijuana Act," "Breach of Contract," "Invasion of Privacy," "Violation of Public Policy," and "Intrusion on Seculusion (sic)." (Id. at pp. 3, 5-6, 8-9). She first asserts that her termination violated Section 2103(b) of the MMA which provides that no employer may discharge or otherwise discriminate against an employee "solely on the basis of such employee's status as an individual who is certified to use medical marijuana." (Id. at ¶ 20) (quoting 35 P.S. § 10231.2103(b)). Her breach of contract claim contends that she relied upon the foregoing promises by Dr. Gilhooley, Dr. Kazmierski, and Office Manager Pam Doto that her prescribed use of medical marijuana would not affect her employment status, that "[t]here was consideration for the oral promises since [she] continued to work at the medical facility," and that PHA, Moses Taylor, and Commonwealth Health "breached their oral promises since [she] was not allowed to work for [them]." (Id. at ¶¶ 22-25, 27).

- 5 -

In Count III of the third amended complaint, Palmiter references her alleged conversation with Dr. Galardi on March 1, 2019, and claims that PHA, Moses Taylor, and Commonwealth Health "invaded [her] privacy when they accessed her medical records to see who was her medical treating physicians and direct[ed] them to no longer treat [her]." (Id. at ¶ 31). Palmiter's cause of action asserting a "public policy" violation likewise cites Section 2103(b) of the MMA, avers that it "is illegal to terminate an employee or refuse to hire an employee simply because she is prescribed medical marijuana," and posits that "it is a violation of public policy to terminate or fail to hire an employee because she tests positive for the use of prescribed medical marijuana and exercises her statutory rights under the MMA." (Id. at ¶¶ 39-40, 42). Last, Palmiter's intrusion upon seclusion claim is premised upon her assertion that the drug testing policy of PHA, Moses Taylor, and Commonwealth Health "required her to disclose her private use of medical marijuana and her medical conditions," "invaded [her] private, medical[ly] authorized use of medical marijuana," and "improperly intruded on [her] private medical conditions and authorized medical marijuana use." (Id. at ¶¶ 45-47).

PHA, Moses Taylor, and Commonwealth Health have filed preliminary objections in the nature of a demurrer seeking to dismiss the five causes of action asserted by Palmiter on the grounds of legal insufficiency.[1] (Docket Entry No. 18). First, they demur

---

[1] In their preliminary objections, PHA, Moses Taylor, and Commonwealth Health identify themselves as "Scranton Quincy Clinic Company, LLC d/b/a Physicians Health Alliance and Scranton Quincy Hospital Company, LLC d/b/a Moses Taylor Hospital." (Docket Entry No. 18 at p. 1). On December 31, 2011, Moses Taylor was purchased by Community Health Systems, Inc., and became affiliated with the Commonwealth Health network comprised of six hospitals, Berwick Hospital Center, First Hospital Wyoming Valley, Moses Taylor, Regional Hospital of Scranton, Tyler Memorial Hospital, and Wilkes-Barre General Hospital, that are owned by Community Health Systems, Inc. See Venosh v. Henzes, 31 Pa. D. & C. 5th 411, 417 (Lacka. Co. 2013), aff'd, 105 A.3d 788 (Pa. Super. 2014). Following that 2011 acquisition, Moses Taylor became Scranton Quincy Hospital Company, LLC d/b/a Moses Taylor Hospital, and PHA transitioned to Scranton Quincy Clinic Company, LLC d/b/a Physicians Health Alliance. See Kellock v. Wilkes-Barre Hospital Company, 2018 WL 986052, at *3 (Lacka. Co. 2018); Hughes v. Wilkes-Barre Hospital Company, LLC, 2017 WL 3479383, at *17 n.1 (Lacka. Co. 2017).

- 6 -

to her claim based upon the MMA, and assert that Palmiter "cannot pursue a private right of action under the MMA" since such a remedy is not expressed or implied by the statutory language or the intent of that statute which purportedly vests the Department with the exclusive authority to enforce Section 2103(b)(1) of the MMA. (Id. at ¶¶ 27-34). Second, noting that the common law presumption of at-will employment status may only be rebutted by proper proof of an intent to create an employment contract, they seek to dismiss Palmiter's breach of contract claim on the basis that she has not alleged the requisite consideration necessary to form such a contract. (Id. at ¶¶ 36-51). Third, PHA, Moses Taylor, and Commonwealth Health submit that Palmiter has not stated a cause of action for invasion of privacy inasmuch as she "has not alleged facts that could show a substantial, highly offensive, intentional intrusion by [them]." (Id. at ¶¶ 53-81). Fourth, they challenge the viability of Palmiter's "violation of public policy" claim by arguing that her claimed exception to the at-will employment doctrine requires a "clear mandate of public policy" which demands much more than a mere termination "based on the result of a drug test." (Id. at ¶¶ 83-90). Fifth, they demur to Palmiter's "intrusion on seclusion" claim, and submit that she "has not alleged any facts that would support her contention that the drug test unduly intruded on her privacy interest." (Id. at ¶¶ 92-109).

In response, Palmiter maintains that "[t]he courts in Delaware, Arizona, Rhode Island, and Connecticut, which all have similar anti-discrimination provisions [in their medical marijuana laws], have ruled that a private cause of action exists," and contends that there is no "justification why Pennsylvania should not follow suit with Delaware, Arizona, Rhode Island, and Connecticut." (Docket Entry No. 22 at pp. 3-4, 12-13). To that end, she argues that the Department's enforcement power under Section 1308 of the

- 7 -

MMA "does not cover an unlawful discharge" that is in contravention of Section 2103(b)(1). (Id. at pp. 6-7). With respect to her breach of "oral contract for employment" claim, Palmiter asserts that she has specifically averred that representatives of PHA, Moses Taylor, and Commonwealth Health "made promises of continued employment with the same benefits" notwithstanding her medical marijuana status, and that she justifiably relied upon those assurances, thereby providing "sufficient additional consideration" to sustain her contract claim and rebut the presumption of at-will employment. (Id. at pp. 13-15). Palmiter opposes the demurrer to her invasion of privacy claim by alleging that her former employers "access[ed] her medical records to find out who her treating physician was" and "intentionally invaded her private, confidential medical history to direct her treating physician not to treat her anymore," which "conduct was 'highly offensive'...to any reasonable man." (Id. at pp. 16-18). Arguing that a public policy may be derived from the "Constitution, legislation, an administrative regulation, or a judicial decision," Palmiter posits that her "violation of public policy" claim must stand inasmuch as "an employer cannot discharge an employee because he or she exercised her statutory rights" and "became a state certified user of medical marijuana." (Id. at pp. 19-20). Finally, Palmiter contends that she has stated a cognizable claim for intrusion upon seclusion "because the drug lab shared private medical information o[f] the fact that [she] was using legalized medical marijuana." (Id. at pp. 22-23).

## II. DISCUSSION

### (A) STANDARD OF REVIEW

- 8 -

"Preliminary objections in the nature of a demurrer test the legal sufficiency of the complaint." American Interior Construction & Blinds, Inc. v. Benjamin's Desk, LLC, 206 A.3d 509, 512 (Pa. Super. 2019). When considering preliminary objections, all material facts set forth in the challenged pleading are admitted as true, as well as all inferences reasonably deducible from those facts. John v. Philadelphia Pizza Team, Inc., 209 A.3d 380, 383 (Pa. Super. 2019). "The question presented by the demurrer is whether, on the facts averred, the law says with certainty that no recovery is possible." Keller v. Bank of New York Mellon, 212 A.3d 52, 56 (Pa. Super. 2019). "If any doubt exists as to whether a demurrer should be sustained, it should be resolved in favor of overruling the preliminary objections." John, supra; American Interior Construction & Blinds, Inc., supra.

### (B) PRIVATE RIGHT OF ACTION UNDER MMA

The first demurrer filed by PHA, Moses Taylor, and Commonwealth Health asserts that the MMA cannot serve as the basis for a private right of action by an employee who is discharged by an employer for lawful use of medical marijuana outside of her hours of employment. Citing federal precedent from the United States Court of Appeals for the Third Circuit, they contend that "[l]egislative intent is the 'sole touchstone' of the court's inquiry" in making that determination, and argue that "[t]here is nothing in the MMA that indicates that the General Assembly intended to create a private right of action under the MMA." (Docket Entry No. 19 at pp. 8, 11). Noting that Section 1308 of the MMA authorizes the Department "to issue civil penalties for violations of the MMA," they posit that "[t]he delegation of enforcement to the Department by the Legislature is a strong indication that the General Assembly intended to preclude private enforcement" of the

- 9 -

MMA's anti-discrimination prohibition in Section 2103(b)(1) of the MMA. (Id. at pp. 12, 14).

In matters involving statutory interpretation, courts must apply the Statutory Construction Act, 1 Pa.C.S. §§ 1501, et. seq., "which directs us to ascertain and effectuate the intent of the General Assembly." Pennsylvania Restaurant and Lodging Association v. City of Pittsburgh, 211 A.3d 810, 822 (Pa. 2019) (citing 1 Pa. C.S. § 1921(a)). "As [the Supreme] Court has noted time and again, the plain language of a statute is the best indicator of its intent." Reuther v. Delaware County Bureau of Elections, 205 A.3d 302, 306 (Pa. 2019). Furthermore, in ascertaining the intention of the General Assembly, it must be presumed that "the General Assembly intended the entire statute to be effective and did not intend a result that is absurd, impossible of execution or unreasonable." Harmon v. Unemployment Compensation Board of Review, 207 A.3d 292, 304 (Pa. 2019) (citing 1 Pa.C.S. § 1922).

The language of the MMA does not expressly grant or deny a private statutory cause of action to an employee who, in violation of Section 2103(b)(1), is terminated for being certified by a physician to use medical marijuana. If statutory language does not explicitly create or foreclose a private right of action, the Supreme Court of Pennsylvania has employed the three-prong analysis derived from Cort v. Ash, 422 U.S. 66, 78 (1975) to determine whether a private remedy is implicit in a statute that does not expressly provide such a cause of action. See Schappel v. Motorists Mut. Ins. Co., 594 Pa. 94, 103, 934 A.2d 1184, 1189 (2007) ("This Court has adopted a three-prong test used to determine whether a statute provides a private remedy where the statutory language is not explicit."); Estate of Witthoeft v. Kiskaddon, 557 Pa. 340, 346, 733 A.2d 623, 626 (1999)

- 10 -

("We believe that the <u>Cort</u> decision offers a beneficial framework within which to analyze whether the statute at issue implicitly creates a private right of action."). In the context of litigation by private parties, that test considers: (1) whether the plaintiff is one of the class for whose "especial" benefit the statute was enacted; (2) whether there is any indication of legislative intent, explicit or implicit, to create or deny such a remedy; and (3) whether it is consistent with the underlying purposes of the legislative scheme to imply such a cause of action. <u>MERSCORP, Inc. v. Delaware County</u>, 207 A.3d 855, 870 n. 14 (Pa. 2019) (citing <u>Estate of Witthoeft</u>, 557 Pa. at 346, 733 A.2d at 626); <u>Schappell</u>, <u>supra</u> (same).[2] To resolve those questions, a comprehensive review of the MMA's legislative scheme and intent is necessary.

Pennsylvania enacted the MMA effective May 17, 2016, based upon the expressed legislative finding that medical marijuana is a "potential therapy that may mitigate suffering in some patients and also enhance quality of life." 35 P.S. § 10231.102(1). The stated intent of the MMA is to provide "a program of access to medical marijuana which balances the need of patients to have access to the latest treatments with the need to promote patient safety," to furnish "a safe and effective method of delivery of medical marijuana to patients," and to promote "high quality research into the effectiveness and

---

[2]PHA, Moses Taylor, and Commonwealth Health claim that Pennsylvania courts "[p]reviously...applied the three-part test established in <u>Cort</u>," but "have moved away from that test in recent years." (Docket Entry No. 19 at p. 8 n.5) (citing <u>NASDAQ OMX PHLX, Inc. v. PennMont Securities</u>, 52 A.3d 296 (Pa. Super. 2012)). As noted above, our Supreme Court embraced the <u>Cort</u> analysis in <u>Schapell</u> and <u>Estate of Witthoeft</u>, just as the Superior Court of Pennsylvania had done in earlier rulings. <u>See</u> <u>D'Errico v. DeFazio</u>, 763 A.2d 424, 429 (Pa. Super. 2000), <u>app. denied</u>, 566 Pa. 663, 782 A.2d 546 (2001); <u>Alfred M. Lutheran Distributors, Inc. v. A. P. Weilersbacher, Inc.</u>, 437 Pa. Super. 391, 399, 650 A.2d 83, 87 (1994), <u>app. denied</u>, 540 Pa. 627, 658 A.2d 791 (1995). In <u>NASDAQ</u>, the Superior Court discussed the United States Supreme Court's subsequent modification of the <u>Cort</u> framework in addressing the existence or absence of private causes of action under federal statutes. <u>See</u> <u>NASDAQ</u>, 52 A.3d at 304-314. However, in <u>MERSCORP</u>, the Supreme Court of Pennsylvania continued to recognize the three-prong analysis in <u>Cort</u> as controlling when deciding whether a private cause of action exists under a Pennsylvania statute. <u>MERSCORP</u>, <u>supra</u>.

- 11 -

utility of medical marijuana." 35 P.S. § 10231.102(3)(i)-(iii). The Act is divided into 14

chapters addressing a variety of relevant matters. *See* 35 P.S. §§ 10231.101-10231.2110.

Chapter 3 of the MMA establishes the "Medical Marijuana Program" which is to

"be implemented and administered by the [D]epartment," and defines both the "lawful

use" and "unlawful use" of medical marijuana. *See* 35 P.S. §§ 10231.301(a), 10231.303-

10231.304. In connection with that program, the Department is vested with the authority

to:

- issue permits to "medical marijuana organizations" authorizing them "to grow, process or dispense medical marijuana;"

- register "practitioners and ensure their compliance" with the MMA;

- regulate "the growing, processing, sale and use of medical marijuana;"

- establish "an electronic database" of "activities and information relating to medical marijuana organizations, certifications and identification cards issued, practitioner registration, and electronic tracking of all medical marijuana as required" by the MMA;

- maintain "a directory of patients and caregivers approved to use or assist in the administration of medical marijuana;"

- develop a "four-hour training course for physicians, pharmacists, certified registered nurse practitioners, and physician assistants regarding the latest scientific research on medical marijuana;"

- develop "a two-hour course for the principals and employees of a medical marijuana organization" concerning "[m]ethods to recognize and report unauthorized activity, including diversion of medical marijuana for unlawful purposes and falsification of identification cards," and the "[p]roper handling of medical marijuana and recordkeeping;"

- establish "enforcement procedures, including announced and unannounced inspections of facilities of the grower/processors and dispensaries and all records of the medical marijuana organizations,"

- 12 -

- create "a program to authorize the use of medical marijuana to conduct medical research relating to the use of medical marijuana to treat serious medical conditions, including the collection of data and the provision of research grants;"

- develop "public outreach programs about the medical marijuana program;"

- collaborate "with other Commonwealth agencies or contract with third parties as necessary to carry out" the MMA;

- determine "the minimum number and type of medical marijuana products to be produced by a grower/processor and dispensed by a dispensary;"

- formulate "recordkeeping requirements for all books, papers, any electronic database or tracking system data, and other information of a medical marijuana organization;"

- restrict "the advertising and marketing of medical marijuana;" and

- "promulgate all regulations necessary to carry out" the MMA.

35 P.S. § 10231.301(a)-(b).  Section 302 of Chapter 3 requires the Department to "maintain a confidential list of patients and caregivers to whom it has issued identification cards" authorizing access to medical marijuana, with the caveat that "[a]pplications for permits submitted by medical marijuana organizations," the "names, business addresses and medical credentials of practitioners authorized to provide certifications to patients to enable them to obtain and use medical marijuana," and information "relating to penalties or other disciplinary actions taken against a medical marijuana organization or practitioner by the [Department]" remain subject to public disclosure pursuant to the Right-to-Know Law.  35 P.S. § 10231.302(a)-(b).

 Chapter 4 addresses physicians who are registered by the Department to issue certifications, on forms developed by the Department, to patients enabling them to use medical marijuana to "receive therapeutic or palliative benefits" for a "serious medical

- 13 -

condition," including the practitioners' eligibility criteria, their application to the Department for approval to issue such certifications, their approval by and registration with the Department, and their prohibited acts and practices.[3] 35 P.S. §§ 10231.401 – 10231.405. Chapter 5 concerns medical marijuana patients and their caregivers, and contains provisions governing the Department's issuance of "an identification card to a patient who has a certification approved by the [D]epartment and to a caregiver designated by the patient" entitling "the patient to obtain and use medical marijuana" or "the caregiver to obtain medical marijuana on behalf of the patient." 35 P.S. §§ 10231.501 – 10231.502, 10231.507. Section 503.1 requires the Department to "verify the information in a patient or caregiver's application and on any renewal form," and Section 509 provides that the identification card of a patient or caregiver may be suspended or revoked if "a patient or caregiver intentionally, knowingly or recklessly violates any provision of [the MMA] as determined by the [Department]." 35 P.S. §§ 10231.503, 10231.509.

Chapter 6 covers the Department's issuance of permits to "grower/processors" and "dispensaries" to operate "as a medical marijuana organization to grow, process or dispense medical marijuana," including the Department's establishment of "a minimum of three regions within this Commonwealth for the purpose of granting permits" to those

---

[3]The MMA identifies the following 17 conditions as constituting "serious medical conditions" which warrant medical marijuana use upon certification by a practitioner and the Department's issuance of a medical marijuana identification card: (1) cancer; (2) positive status for human immunodeficiency virus or acquired immune deficiency syndrome; (3) amyotrophic lateral sclerosis; (4) Parkinson's disease; (5) multiple sclerosis; (6) damage to the nervous tissue of the spinal cord with objective neurological indication of intractable spasticity; (7) epilepsy; (8) inflammatory bowel disease; (9) neuropathies; (10) Huntington's disease; (11) Crohn's disease; (12) post-traumatic stress disorder; (13) intractable seizures; (14) Glaucoma; (15) sickle cell anemia; (16) severe chronic or intractable pain of neuropathic origin or severe chronic or intractable pain in which conventional therapeutic intervention and opiate therapy is contraindicated or ineffective; and (17) Autism. 35 P.S. 10231.103.

- 14 -

organizations, the publication of its boundaries' "determination in the Pennsylvania

Bulletin," its renewal, suspension, or revocation of an issued permit, and its promotion

and implementation of diversity goals in the permitting process. 35 P.S. §§ 10231.601 –

10231.604, 10231.607 – 10231.609, 10231.612 – 10231.615. Chapter 7 sets forth specific

"medical marijuana controls" such as (a) the establishment of "an electronic inventory

tracking system" by each grower, processor, or dispensary "that electronically tracks all

medical marijuana on a daily basis," (b) restrictions upon how a grower or processor may

"grow, store, harvest or process medical marijuana in an indoor, enclosed, secure facility,"

(c) the Department's development of regulations "relating to the storage and

transportation of medical marijuana among grower/processors, testing laboratories and

dispensaries," (d) the testing of all "medical marijuana produced by [a] grower/processor"

which must be conducted by "an independent laboratory" that has been approved by the

Department, and (e) the Department's monitoring of "the price of medical marijuana sold

by grower/processors and by dispensaries," which may include the implementation of "a

cap on the price of medical marijuana being sold for a period of six months." 35 P.S. §

10231.701 – 10231.705. Dispensaries are also addressed by Chapter 8 of the MMA

which requires dispensaries to "provide to the patient or caregiver a receipt" containing

certain information, to "have a physician or a pharmacist onsite at all times during the

hours the dispensary is open to receive patients and caregivers," to "file the receipt

information with the [D]epartment utilizing the electronic tracking system," to dispense

medical marijuana with "a safety insert" and "in a sealed and properly labeled package,"

and to refrain from dispensing medical marijuana in "an amount greater than a 30-day

supply." 35 P.S. § 10231.801. Section 802 generally bars a dispensary from operating

- 15 -

"on the same site as a facility used for growing and processing medical marijuana" or being "located within 1,000 feet of the property line of a public, private or parochial school or day-care center," and Section 803 obligates the dispensary to "post a copy of its permit" in an "easily observable" location within its facility. 35 P.S. §§ 10231.802 – 10231.803.

Chapter 9 enacts a gross receipts tax of 5% on growers and processors of medical marijuana, and provides for the deposit of those tax proceeds into the "Medical Marijuana Program Fund…as a special fund in the State Treasury" and the allocation of those proceeds among the Department, the Department of Drug and Alcohol Programs, and the Pennsylvania Commission on Crime and Delinquency. *See* 35 P.S. §§ 10231.901 – 10231.902. The administration of the MMA is governed by Chapter 11 which contains provisions regarding the filing of periodic reports by medical marijuana organizations, the Department's notification of law enforcement "relating to any violation or suspected violation" of the MMA, the Department's "analysis and evaluation of the implementation and effectiveness" of the MMA, and its submission of biennial reports to the Governor, General Assembly, and Attorney General regarding the same. 35 P.S. §§ 10231.1102 – 10231.1105. Section 1107 of the MMA empowers the Department to "promulgate temporary regulations" in order to facilitate the prompt implementation of the MMA. 35 P.S. § 10231.1107.

Chapter 12 creates the "Medical Marijuana Advisory Board" within the Department, and Section 1201 delineates the composition and duties of that board. *See* 35

P.S. § 1023.1201. Section 1202 states that after the Medical Marijuana Advisory Board

has issued its written report to the Governor and the General Assembly setting forth its

recommendations and findings, the Department "may promulgate regulations to effectuate

recommendations made by the advisory board." 35 P.S. § 10231.1202. Within 12 months

of the Department's receipt of the advisory board's report, it must issue a "notice in the

Pennsylvania Bulletin" outlining "the recommendations of the advisory board" and stating

"the specific reasons for the decision of the [Department's] secretary on whether or not to

effectuate each recommendation." Id.

   Chapter 13 establishes criminal offenses and penalties pertaining to medical

marijuana, such as the "criminal diversion of medical marijuana" by practitioners,

patients, caregivers, or medical marijuana organizations to unauthorized individuals, the

"criminal retention of medical marijuana" by patients or caregivers in "an amount in

excess of the amount legally permitted," the falsification of identification cards, the

adulteration of medical marijuana, and the disclosure of protected information related to

the use of medical marijuana. *See* 35 P.S. §§ 10231.1301 – 10231.1307. Section 1308(a)

creates criminal penalties for "a practitioner, caregiver, patient, employee, financial

backer, operator or principal of any medical marijuana organization, health care medical

organization or university participating in a research study under Chapter 19 [footnote omitted],

and an employee, financial backer, operator or principal of a clinical registrant or

academic or clinical research center under Chapter 20, [footnote omitted] who violates any of the

provisions of [the MMA], other than those specified in section 1301, 1302, 1303, 1304,

- 17 -

1305, 1306 or 1307, [footnote omitted] or any regulation promulgated under [the MMA]."[4]   35

P.S. § 10231.1308(a).  In addition, Section 1308(b) provides that the Department "may

assess a civil penalty for a violation of [the MMA], a regulation promulgated under [the

MMA], or an order issued under [the MMA] or regulation as provided in this subsection."

35 P.S. § 10231.1308(b).  Among the factors to be considered by the Department in

determining the penalty for any violation "as provided in this subsection" are the

"gravity" and "willfulness" of the violation, the "potential harm resulting from the

violation to patients, caregivers or the general public," any "previous violations…by the

person being assessed," the "economic benefit to the person being assessed," and whether

the "violation did not threaten the safety or health of a patient, caregiver, or the general

public." 35 P.S. § 10231.1308(b)(1)-(2).  Section 1308(c) further authorizes the

Department to impose additional "sanctions" for violations of the MMA, the

Department's regulations, or an order issued under the MMA or a regulation by revoking

or suspending "the permit of a person found to be in violation" or "the registration of a

practitioner for a violation" and "order[ing] restitution of funds or property unlawfully

obtained or retained by a permittee or registrant." 35 P.S. § 10231.1308(c)(1).

---

[4]Chapter 19 directs the Department to "establish and develop a research program to study the impact of medical marijuana on the treatment and symptom management of serious medical conditions," and imposes specific statutory duties upon it in that regard, including "engag[ing] universities within this Commonwealth to participate" in the study, the approval of "vertically integrated health systems" to participate in the study, and the promulgation of regulations setting forth "the procedure to be used by a health care medical marijuana organization that grows and processes medical marijuana." 35 P.S. §§ 10231.1902 – 10231.1904, 10231.1907. In an effort to facilitate "research programs and studies" by accredited medical schools that are "approved and certified by the [D]epartment" as "academic clinical research centers," and the accompanying need for the Department to approve "additional grower/processors and dispensaries" and "clinical registrants" which have " a contractual relationship with a medical school that operates or partners with a hospital to provide advice about medical marijuana so that patient safety may be enhanced," Chapter 20 sets forth procedures for the approval and certification of "academic clinical research centers" and "clinical registrants" and the filing of their research study findings with the Department.  35 P.S. §§ 10231.2000, 10231.2001.1 – 10231.2004.

- 18 -

The final chapter, Chapter 21, contains "Miscellaneous Provisions" concerning the MMA, and imposes certain duties upon identified state agencies and commissions. Sections 2101, 2102, and 2107 state that the growth, distribution, possession or consumption of medical marijuana which is permitted under the MMA may not be deemed a violation of the Controlled Substances Act, 35 P.S. §§ 780-101, *et seq.*, that nothing in the MMA shall be construed as requiring an insurer or health plan "to provide coverage for medical marijuana," and that a grower/processor and dispensary must "meet the same municipal zoning and land use requirements" as other comparable facilities "that are located in the same zoning district." 35 P.S. §§ 10231.2101, 10231.2102, 10231.2107. Section 2104 requires the Department of Education to promulgate regulations regarding the possession and use of medical marijuana "by a student on the grounds of a preschool, primary school and a secondary school" and "an employee of a preschool, primary school and a secondary school on the grounds of such school," whereas Section 2105 directs the Department of Human Services to adopt regulations concerning such possession and use by (a) a child under the care of a child-care or social service center licensed or operated by the Department of Human Services," (b) "an employee" of such a center, and (c) "employees of a youth development center or other facility which houses children adjudicated delinquent." 35 P.S. §§ 10231.2104 – 10231.2105.

Section 2101.1 establishes restrictions upon individuals who may possess a financial interest in or be employed by a medical marijuana organization or its holding company, affiliate, intermediary, or subsidiary. Subsections (a) and (b) of Section 2101.1 state that no "executive-level public employee, public official or party officer, or an immediate family member thereof" may hold such employment or financial interest

- 19 -

"while the individual is an executive-level public employee, public official or party officer and for one year following termination of the individual's status as an executive-level public employee, public official or party officer." 35 P.S. § 10231.2101.1(a)-(b). Any individual who does so "commits a misdemeanor and shall, upon conviction, be sentenced to pay a fine of not more than $1,000 or to imprisonment for not more than one year, or both." 35 P.S. § 10231.2101.1(c). Subsection (d) of Section 2101.1 authorizes the State Ethics Commission, upon written request, to "[i]ssue a written determination of whether a person is subject to subsection (a) or (b)," and to publish in the Pennsylvania Bulletin biennially "a list of all State, county, municipal and other government positions that meet the definitions 'public official' or 'executive-level public employee'" for purposes of this proscription. 35 P.S. § 10231.2101.1(d).

Section 2103, which is the subject of Palmiter's employer-related claims, contains specific protections for identified individuals or entities in connection with their licensure, employment, and child custody disputes. Subsection (a) provides that a patient, caregiver, practitioner, medical marijuana organization, health care medical marijuana organization or university participating in a research study, clinical registrant or academic research center, employee, principal or financial backer of a medical marijuana organization, employee of a health care medical marijuana organization, university participating in a research study, clinical registrant, or academic clinical research center, or a pharmacist, physician assistant, or certified registered nurse practitioner may not "be subject to arrest, prosecution or penalty in any manner, or denied any right or privilege, including civil penalty or disciplinary action by a Commonwealth licensing board or commission, solely for lawful use of medical marijuana" or its manufacture, distribution, or sale, "or for any

- 20 -

other action taken in accordance with [the MMA]." 35 P.S. § 10231.2103(a).  Section

2103(b) states that "[n]o employer may discharge, threaten, refuse to hire or otherwise

discriminate or retaliate against an employee regarding an employee's compensation,

terms, conditions, location or privileges solely on the basis of such employee's status as

an individual who is certified to use medical marijuana," although an employer is not

required "to make any accommodation of the use of medical marijuana on the property or

premises of any place of employment," nor is the employer restricted in the "ability to

discipline an employee for being under the influence of medical marijuana in the

workplace or for working while under the influence of medical marijuana when the

employee's conduct falls below the standard of care normally accepted for that position."

35 P.S. § 10231.2103(b)(1)-(2).  Subsection (c) of Section 2103 addresses custody

determinations, and provides that "[t]he fact that an individual is certified to use medical

marijuana and acting in accordance with the [MMA] shall not by itself be considered by a

court in a custody proceeding."  35 P.S. § 10231.2103(c).

Unlike other "miscellaneous provisions" in Chapter 21 which vest the State Ethics

Commission, the Department of Education, and the Department of Human Services with

the authority to take certain action, *see* 35 P.S. §§ 10231.2101.1(d), 10231.2104,

10231.2105, Section 2103 of the MMA does not grant any state agency or commission the

power to enforce or regulate the licensing, employment, and custody litigation protections

set forth therein.  In its sole reference to the Department, Chapter 21 states that upon the

legislative amendment "removing marijuana from Schedule I of the Controlled Substances

Act, the [D]epartment shall publish notice of the effective date of the amendment in the

Pennsylvania Bulletin," and that "[t]he issuance of permits and other authorizations shall

- 21 -

begin upon publication of a notice by the [D]epartment in the Pennsylvania Bulletin that
adequate temporary or permanent regulations have been adopted to initiate the program
under [the MMA]." 35 P.S. §§ 10231.2108 – 10231.2109.  No other provision in Chapter
21 references the Department.

The statutory framework of the MMA grants the Department considerable
regulatory authority with respect to individuals and entities that opt to participate in the
"Medical Marijuana Program" in this Commonwealth.  Chapters 3, 4, 5, 6, 7, 11, 19, and
20 confer specific powers upon the Department relative to registered practitioners,
certified medical marijuana users and their caregivers, medical marijuana organizations,
independent testing laboratories, health care medical marijuana organizations, academic
clinical research centers, and clinical registrants.  *See* 35 P.S. §§ 10231.301, 10231.302,
10231.401, 10231.404, 10231.501, 10231.503.1, 10231.509, 10231.603 – 10231.604,
10231.607 – 10231.609, 10231.612 – 10231.613, 10231.615, 10231.703 – 10231.705,
10231.1102 – 10231.1105, 10231.1902 – 10231.1904, 10231.1907, 10231.2001.1 –
10231.2004.  This scheme evinces a legislative intent to empower the Department to
exercise regulatory control over those people and entities that have affirmatively chosen to
take part in the Medical Marijuana Program, and in the process, to submit to the
administrative jurisdiction of the Department.

Although employers are not parties that have voluntarily decided to participate in
the Medical Marijuana Program and to subject themselves to regulation by the
Department, PHA, Moses Taylor, and Commonwealth Health nevertheless argue that the
MMA vests the Department with the exclusive authority to enforce Section 2103(b)(1) by
assessing civil penalties against culpable employers pursuant to Section 1308(b).  (T.P.

- 22 -

9/25/19 at pp. 2-4, 8). However, when asked at oral argument whether any such civil

penalty was payable to the aggrieved employee as a personal remedy, rather than to the

Department itself, PHA, Moses Taylor, and Commonwealth Health replied that they were

"not certain as to where that [money] goes." (Id. at p. 8). Additionally, while PHA,

Moses Taylor, and Commonwealth Health insisted that "the Department has a wide swath

within which to create and fashion a remedy that it believes to be appropriate" for a

violation of Section 2103(b)(1), they could not state whether the proffered remedy

purportedly available to an employee includes reinstatement, an award of backpay, and/or

reimbursement of counsel fees. (Id. at pp. 9-10).

       Throughout the MMA, the General Assembly has designated the appropriate state

agencies to regulate specific matters within their administrative authority. By way of

illustration, the Department of Revenue is obligated to "monitor the price of medical

marijuana sold by growers/processors and by dispensaries," 35 P.S. § 10231.705, the

Department of Education is tasked with developing regulations governing the possession

and use of medical marijuana on school grounds, 35 P.S. § 10231.2104, the Department of

Human Services is responsible for promulgating regulations regarding such possession

and use at child-care, social service, and youth development centers, 35 P.S. §

10231.2105, and the State Ethics Commission is empowered to issue written

determinations concerning the eligibility of certain public officials and their family

members to own a financial interest in or be employed by a medical marijuana

organization. 35 P.S. § 10231.2101.1(d). Section 2103 of the MMA does not grant the

Department or any other agency the administrative authority to enforce the anti-

discrimination mandate in 35 P.S. § 10231.2103(b)(1). *See* Doe v. Franklin County, 644

- 23 -

Pa. 1, 26, 174 A.3d 593, 608 (2017) ("Where the legislature includes specific language in one section of the statute and excludes it from another, the language should not be implied where excluded."). If the General Assembly had intended to restrict an employee, who has been wrongfully discharged simply for being a certified medical marijuana user, to an administrative remedy under the MMA, the General Assembly could have vested the proper state agency with that enforcement authority in Section 2103. Assuming *arguendo* that the Legislature had intended to limit such an aggrieved employee to administrative redress only, it presumably would have vested either the Department of Labor and Industry, 71 P.S. §§ 561-579, or the Pennsylvania Human Relations Commission, 43 P.S. §§ 951-963, with that authority over employers who violate Section 2103(b)(1).

The regulations which have been promulgated by the Department support the conclusion that, contrary to the argument being advanced by PHA, Moses Taylor, and Commonwealth Health, an employee's recourse against an employer for wrongful termination in violation of Section 2103(b) is not confined to a civil penalty by the Department under Section 1308(b). The Department has published sweeping regulations relating to its administrative authority under Chapters 3, 4, 5, 6, 7, 11, 19, and 20 of the MMA. *See* 28 Pa. Code §§ 1141.21 – 1141.52, 1151.21 – 1151.45, 1161.21 – 1161.41, 1171.21 – 1171.39, 1181.21 – 1181.34, 1191.21 – 1191.34, 1211.21 – 1211.37. With regard to the Department's power to assess civil penalties under Section 1308(b), the Department has promulgated 28 Pa. Code § 1141.47(a)(1)-(6) which mirrors much of the language contained in Section 1308(b)-(c) of the MMA. Notably, Section 1141.47(a) speaks largely to medical marijuana organizations and the Department's administrative power to suspend or revoke a medical marijuana organization's permit, to issue "cease

- 24 -

and desist" orders "to immediately restrict" a medical marijuana organization's operations, to "[o]rder the restitution of funds or property unlawfully obtained or retained by a medical marijuana organization," to issue "a written warning if the Department determines" that "the medical marijuana organization took immediate action to remedy the violation," and to "require a medical marijuana organization to develop and adhere to a plan of correction approved by the Department." 28 Pa. Code § 1141.47(a)(1), (3)-(6). However, as for the prohibition in Section 2103(b) barring employers from discharging or otherwise discriminating against employees based upon their status as certified medical marijuana users, the Department has not issued a single regulation.

In determining whether the MMA implicitly creates a private right of action for an employee who is discharged for being a certified medical marijuana user, we must consider whether (1) Palmiter is a member of the class of people for whose special benefit the MMA was enacted, (2) there is any explicit or implicit indication of legislative intent to establish or deny such a remedy, and (3) it is consistent with the underlying purpose of the legislative scheme to imply a private cause of action.[5] MERSCORP, 207 A.3d at 870 n.14; Solomon v. U. S. Healthcare Systems of Pennsylvania, Inc., 797 A.2d 346, 352 (Pa. Super. 2002), app. denied, 570 Pa. 688, 808 A.2d 573 (2002). By enacting the MMA, the General Assembly expressly declared "that medical marijuana is one potential therapy that may mitigate suffering in some patients and also enhance quality of life," and that regulating the Medical Marijuana Program "which allows access to medical marijuana

---

[5] The Cort decision contains a fourth consideration, to wit, "is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law?" Cort, 422 U.S. at 78. "Obviously, the fourth prong is inapplicable to a state statute." Estate of Witthoeft, 557 Pa. at 346 n.3, 733 A.2d at 626 n.3.

- 25 -

will enhance patient safety while research into its effectiveness continues." 35 P.S. §
10231.102(1)-(2). The stated intent of the legislature in adopting the MMA is to provide
"a program of access to medical marijuana which balances the need of patients to have
access to the latest treatments with the need to promote patient safety," to furnish "a safe
and effective method of delivery of medical marijuana to patients," and to promote "high
quality research into the effectiveness and utility of medical marijuana." 35 P.S. §
10231.102(3). To ensure that certified medical marijuana patients have safe "access to the
latest treatment" involving medical marijuana while simultaneously being gainfully
employed, Section 2103 of the MMA establishes specific "[p]rotection for patients and
caregivers" and bars any employer from discharging or otherwise discriminating against
an employee based upon the employee's status "as an individual who is certified to use
medical marijuana." 35 P.S. § 10231.2103(b)(1). Therefore, it is clear from the plain
language of the MMA that, as a certified medical marijuana user, Palmiter is one of the
class for whose special benefit the MMA was enacted, and that implying a private right of
action is consistent with the stated purposes of the MMA and effectuates the legislative
intent evident in Section 2103(b)(1) by preventing employers from firing or
discriminating against lawful medical marijuana users.

As for the second prong of the controlling analysis, no Pennsylvania court has had
occasion to consider whether there is an express or implied indication of legislative intent
in the MMA to create or reject a private cause of action for a violation of Section
2103(b)(1). (T.P. 9/25/19 at pp. 5, 28, 35). When confronted with an issue unaddressed
by the courts of this Commonwealth, it is appropriate to consider decisions from other
jurisdictions for persuasive guidance. Com. v. Manivannan, 186 A.3d 472, 483-484 (Pa.

- 26 -

Super. 2018); Newell v. Montana West, Inc., 154 A.3d 819, 823 & n.6 (Pa. Super. 2017).

Some state medical marijuana statutes expressly prohibit authorized medical marijuana users from suing their employers for wrongful discharge based upon their lawful use of medical marijuana. *See, e.g.*, Fla. Stat. § 381.986 (15)(c) ("This section does not create a cause of action against an employer for wrongful discharge or discrimination."); Ohio Rev. Code Ann. § 3796.28(A)(2), (5) ("Nothing in this chapter...prohibits an employer from discharging...a person because of that person's use...of medical marijuana" or "permits a person to commence a cause of action against an employer for...discharging...a person...related to medical marijuana."). Other jurisdictions, whose medical marijuana statutes do not contain anti-discrimination provisions such as 35 P.S. § 10231.2103(b)(1), have declined to recognize an implied cause of action due to the absence of any statutory language providing any employment protection to a medical marijuana user.[6] *See*, Roe v. TeleTech Customer Care Management (Colorado), LLC, 171 Wash.2d. 736, 748, 257 P.3d 586, 591-592 (2011) ("The language of [Washington's Medical Use of Marijuana Act] MUMA is unambiguous - - it does not regulate the conduct of a private employer or protect an employee from being discharged because of authorized medical marijuana use."); Ross v. RagingWire Telecommunications, Inc., 42

---

[6]In Barbuto v. Advantage Sales and Marketing, LLC, 477 Mass. 456, 78 N.E.3d 37 (2017), the Supreme Judicial Court of Massachusetts concluded that Massachusetts' separate anti-discrimination statute prohibits employers from terminating employees for medical marijuana use outside the workplace, and held that a discharged employee stated a claim for handicap discrimination under that general anti-discrimination law. Id. at 461-462, 78 N.E.3d at 43-44. With respect to that employee's independent claim based upon Massachusetts' medical marijuana statute which does not contain an anti-discrimination provision protecting employees, Barbuto reasoned that "where a comparable cause of action already exists under our law prohibiting handicap discrimination, a separate, implied private right of action is not necessary to protect a patient using medical marijuana from being unjustly terminated for its use." Id. at 470, 78 N.E.3d at 49. As a result, it did "not imply a separate cause of action for aggrieved employees under the medical marijuana act, where such employees are already provided a remedy under our discrimination law, and where doing so would create potential confusion." Id. at 470, 78 N.E.3d at 50.

Cal. 4th 920, 928, 932, 70 Cal. Rprtr. 3d, 382, 388, 392, 174 P.3d 200, 205, 208 (2008) (medical marijuana statutory provisions at issue only granted defenses to certain criminal charges, but "do not speak to employment law" and "do not mention employment law," and "[n]othing in the Act's text or history indicates the voters intended to articulate any policy concerning marijuana in the employment context, let alone a fundamental policy requiring employers to accommodate marijuana use by employees.").

In those jurisdictions where the courts have considered the availability of a private right of action under medical marijuana statutes that contain anti-discrimination language, but do not expressly authorize a cause of action, the courts have applied the three-part test in Cort, including the second factor regarding explicit or implicit indication of legislative intent to create or deny such a remedy, and have uniformly concluded that an implied private right of action exists.  The federal district court in Noffsinger v. SSC Niantic Operating Company, LLC, 273 F.Supp.3d 326 (D. Conn. 2017), addressed the viability of a private right of action under Connecticut's medical marijuana law which provides that "[n]o employer may refuse to hire a person or may discharge, penalize or threaten an employee solely on the basis of such person's or employee's status as a qualifying patient or primary caregiver" under the statute.[7]  Id. at 331 n.2.  The employer argued that Connecticut's statute "lacks an explicit authorization for a private right of action" and "delegates administrative oversight and enforcement authority to the Connecticut Department of Consumer Protection," and, therefore, "does not give rise to a private right of action."  Id. at 338, 340.

---

[7]Connecticut adopted the Cort test in Napoletano v. CIGNA Healthcare of Connecticut, Inc., 238 Conn. 216, 249, 680 A.2d 127, 145 (1996), *cert. denied*, 520 U.S. 1103 (1997).

- 28 -

This district court noted Connecticut's presumption "that private enforcement does not exist unless expressly provided in a statute," and the rule that a plaintiff "bears the burden of overcoming this presumption." Id. at 338. Citing Napoletano, it stated that "[w]ith respect to the second factor, there is no indication of legislative intent to deny a private cause of action." Id. at 339. Not unlike Pennsylvania's MMA, Connecticut's medical marijuana law assigns certain "administrative authority to the Department," but does not expressly grant it any power with regard to the anti-discrimination provision. Id. at 340-341. In finding that the anti-discrimination section in Connecticut's medical marijuana statute "contains an implied private right of action," Id. at 341, Noffsinger concluded that "without a private cause of action, [the anti-discrimination clause] would have no practical effect, because the law does not provide for any other enforcement mechanism." Id. at 340. The Superior Court of Connecticut subsequently agreed with Noffsinger, and held that the Connecticut law implied a private right of action to enforce its anti-discrimination provision. *See* Bulerin v. City of Bridgeport, 2019 WL 1766067, at *5 (Conn. Super. 2019) ("This court finds that the Department is responsible for promulgating regulations under [the medical marijuana statute], overseeing registration of qualifying patients and primary caregivers who can issue written certifications to qualifying patients, licensing dispensaries and producers of marijuana for palliative use, creating a Board of Physicians knowledgeable about palliative use of marijuana, and regulating laboratories and research programs regarding marijuana," but "[t]here is no mention of the Department in the anti-discrimination provisions of Section 21a-408p."); Smith v. Jensen Fabricating Engineers, Inc., 2019 WL 1569048, at *7 (Conn. Super. 2019) (recognizing "an implied private right of action," and reasoning that "[t]here is no

- 29 -

explicit language in the statute itself regarding whether the General Assembly intended to create a private right of action, but the court cannot ignore the plain intent of § 21a-408p(b)(3) that employers be prohibited from terminating or refusing to hire individuals solely on the basis of their use of medical marijuana.").

The Superior Court of Rhode Island considered whether a private right of action was implied in its medical marijuana law which contains a provision stating that "[n]o...employer may refuse to employ, or otherwise penalize, a person solely for his or her status as a cardholder" for lawful use of medical marijuana. Callaghan v. Darlington Fabrics Corp., 2017 WL 2321181, at *2 (R.I. Super. 2017) (quoting Section 21-28.6-4(d)). "Despite this direct prohibition, the statute fails to provide an express private right of action," not unlike 35 P.S. § 10231.2103(b)(1). Id. Comparable to Section 2103(b)(1), "there are no listed penalties for violations of § 21-28.6-4(d)" in the Rhode Island law, and "no state department is given authority to administer § 21-28.6-4(d)" and "to intervene on behalf of...an employee who was denied employment." Id. at *5. Applying "the first three factors discussed in Cort," Callaghan concluded "that there is only one sensible interpretation of § 21-28.6-4(d)," and that it "must have an implied private right of action" to avoid "be[ing] meaningless." Id. at *8.

The Superior Court of Delaware similarly addressed the question of an implied private right of action under Delaware's medical marijuana law, which states that "[a]n employer may not discriminate against a person in hiring, termination, or any term or condition of employment...if the discrimination is based upon...[t]he person's status as a cardholder, or [a] registered qualifying patient's positive drug test for marijuana components or metabolites...." Chance v. Kraft Heinz Foods Company, 2018 WL

- 30 -

6655670, at *3 (Del. Super. 2018) (quoting 16 Del. C. § 4905A(a)(3)).  Like PHA, Moses

Taylor, and Commonwealth Health, the employer in <u>Chance</u> argued that the second <u>Cort</u>

factor militated against "an implied private right of action" since (1) "had the legislature

wanted to create a private right of action, it could have done so expressly," (2) Delaware's

medical marijuana law "should not be construed liberally," and (3) "the legislative history

contains no indication of an intent to create an implied private right of action." <u>Id.</u> at *5.

Characterizing the holdings in <u>Noffsinger</u> and <u>Callaghan</u> as "persuasive," <u>Id.</u> at *3, the

Superior Court of Delaware rejected the employer's arguments, found that "no agency or

commission has been tasked with enforcement of the anti-discrimination provision,"

observed that "[s]tatutes prohibiting discrimination are generally deemed remedial

and…granted a liberal construction," and concluded that "a private right of action is the

only means of effectuating the statute's remedial purpose." <u>Id.</u> at *6-7.

　　　　More recently, the federal district court in <u>Whitmire v. Wal-Mart Stores, Inc.</u>, 359

F.Supp.3d 761 (D. Ariz. 2019), was confronted with the issue of whether an implied

private cause of action existed under A.R.S. § 36-2813(B), which states that "an employer

may not discriminate against a person in hiring, termination or imposing any term or

condition of employment or otherwise penalize a person based upon…a registered

qualifying patient's positive drug test for marijuana components or metabolites…."[8] <u>Id.</u> at

774.  <u>Whitmire</u> agreed with the employer that "Section 36-2813(B) of the AMMA does

not provide an express cause of action," but nevertheless found that "an implied private

cause of action exists under § 36-2813(B) because this subsection imposes on employers

---

[8] Arizona adopted the <u>Cort</u> test in <u>City of Tucson v. Superior Court of Pima County</u>, 127 Ariz. 205, 208, 619 P.2d 33, 36 (1980).

- 31 -

an affirmative obligation to abide by the anti-discrimination mandate of the statute." Id. at

775-776. Discussing and relying upon Noffsinger, Callaghan and Chance, the district

court held that "there is no indication of legislative intent to deny a private cause of

action" in the Arizona statute, and that recognition of an implied private cause of action

"effectuates the evident legislative purpose of preventing discrimination in employment

against qualifying patients using medical marijuana outside of the workplace since the law

lacks any explicit enforcement mechanism." Id. at 781.

    The sound and insightful reasoning in Noffsinger, Callaghan, Chance, and

Whitmire support the recognition of an implied right of action for an employee who is

discharged in violation of 35 P.S. § 10231.2103(b)(1).[9]  There is no indication of any

legislative intent in the MMA to deny a wrongfully discharged employee a private cause

of action under Section 2103(b)(1).  The MMA imposes an affirmative obligation on

employers to refrain from discharging or discriminating against an employee solely based

upon the employee's status as a certified medical marijuana user.  Contrary to the defense

contention regarding an alleged administrative remedy in the form of a civil penalty by the

Department, neither the MMA nor the regulations promulgated by the Department provide

an independent enforcement mechanism against employers who violate Section

2103(b)(1).[10]  Cf. Smith, supra, at *7 ("[T]o expect the [Department of Consumer

---

[9]At least eight other states have anti-discrimination provisions in their medical marijuana laws which prohibit
employers from discriminating against employees based upon their status as lawful medical marijuana users.
See Ark. Const. Amend. 98, § 3(f)(3)(A); 410 Ill. Comp. Stat. 130/40(a)(1); Minn. Stat. Ann. § 152.32 subd.
3(c); Nev. Rev. Stat. § 613.333; N.J. Stat. Ann. 24:6I-6.1; N.Mex. Stat. Ann. § 26-2B-9; 63 Okla. Stat. Ann. §
425(B); W.Va. Code § 16A-15-4(b)(1).  However, no court in those jurisdictions has issued a reported ruling
addressing the merits of an employee's wrongful termination claim under those anti-discrimination provisions.
[10]In addition to barring discrimination in employment, Section 2103 also provides protection for patients and
caregivers in child custody proceedings by precluding "a court in a custody proceeding" from considering "[t]he
fact that an individual is certified to use medical marijuana." 35 P.S. § 10231.2103(c). Taking to its logical
conclusion the defense argument that Section 1308(b) of the MMA vests the Department with the exclusive

- 32 -

Protection] to bring an action every time a Connecticut citizen believes they have been discriminated against under § 21a-408p(b)(3), with all the costs in attorney time, investigation, and litigation, is to ignore the reality of limited government resources."). Unless a private cause of action is granted to an employee who is terminated or discriminated against solely for being properly certified as a medical marijuana user, the mandate contained in Section 2103(b)(1) will ring hollow.

Although it concerned a common law wrongful discharge claim predicated upon a public policy violation, rather than an implied private cause of action under a statute, the rationale and holding in Roman v. McGuire Memorial, 127 A.3d 26 (Pa. Super. 2015), *app. denied*, 635 Pa. 744, 134 A.3d 57 (2016) are instructive on the issue of whether, as alleged by PHA, Moses Taylor, and Commonwealth Health, Palmiter's sole remedy is the assessment of a civil penalty by the Department under Section 1308(b) of the MMA. In Roman, a direct care health care worker, who allegedly was discharged in retaliation for refusing to accept overtime work, filed an action against her former employer and asserted that her discharge "offend[ed] the public policy of the Commonwealth of Pennsylvania as embodied" in The Prohibition of Excessive Overtime in Health Care Act ("Act 102"), 43 P.S. §§ 932.1 – 932.6. Id. at 27-28. Section 3(a)(1) of Act 102 states that a health care facility "may not require an employee to work in excess of an agreed to, predetermined and regularly scheduled daily work shift," whereas Section 3(b) provides that "[t]he refusal of an employee to accept work in excess of the limitations set forth in subsection

---

authority to enforce Section 2103 by imposing civil penalties, a judge who erroneously considers a patient's status as a medical marijuana user in a child custody ruling would be subject to the assessment of a civil penalty by the Department for violating Section 2103(c). Clearly, the General Assembly did not intend such an absurd result. *See* 1 Pa. C.S. § 1922(1) (in ascertaining the intention of the General Assembly, it is presumed that it "does not intend a result that is absurd, impossible of execution or unreasonable.").

- 33 -

(a) shall not be grounds for discrimination, dismissal, discharge or any other employment decision adverse to the employee." 43 P.S. § 932.3(a)(1), (b). Section 6 of Act 102 expressly authorizes the Department of Labor and Industry to impose "an administrative fine on a health care facility or employer that violates this act" and to "order a health care facility to take an action which the department deems necessary to correct a violation of [43 P.S. § 932.3]." 43 P.S. § 932.6(a) – (b).

After the trial court rendered a non-jury verdict in favor of the employee "in the amount of $121,869.93 and reinstat[ed] her to her former position as a direct care worker," Roman, 127 A.3d at 26, the employer appealed and asserted that the "administration and implementation of Act 102 was vested in the Pennsylvania Department of Labor and Industry," that the Department had implemented regulations "that cover complaint and investigation procedures, remedies and penalties," and that there was "no basis for a common pleas court to have jurisdiction while there is a statutory/administrative remedy." Id. at 33. In rejecting the employer's claim that the employee had failed to identify a cognizable public policy to overcome her at-will employment status, (see Section II(E), infra), the Superior Court stated that "Act 102 establishes the public policy that 'a health care facility may not require an employee to work in excess of an agreed to, predetermined and regularly scheduled daily work shift.'" Id. (quoting 43 P.S. § 932.3(a)(1)). More importantly, with respect to the employer's argument that the legislature had provided the discharged employee with a statutory and administrative remedy in the form of fines and corrective action orders against the employer, Roman concluded:

- 34 -

> However, Act 102 does not provide any administrative or statutory remedies to employees who are fired in retaliation for refusing to work forced overtime. Rather, it provides for fines to be levied against the facility and allows for orders directing facilities to take certain actions to correct violations. Act 102 contains nothing that allows for an employee in Ms. Roman's position to seek any remedy or even what administrative procedure she should follow to recover from [the employer] for its actions.

Id. at 34. Likewise, although 35 P.S. § 10231.1308(b) and 28 Pa. Code § 1141.47(a) generally empower the Department to assess civil penalties for violations of the MMA, no statutory provision in the MMA or regulation promulgated by the Department expressly provides for a wrongfully discharged medical marijuana user to recover lost wages or to secure reinstatement via the Department's administrative authority.

It is also noteworthy that the only commentators who have published any analyses of the MMA have not suggested that certified medical marijuana users are restricted to a civil penalty or administrative remedy by the Department as their sole relief for employers' violations of 35 P.S. § 10231.2103(b)(1). An attorney who "represents employers in the public and private sectors" has stated that "an applicant for employment may not be denied a position or otherwise discriminated or retaliated against solely based on his or her status as a medical-marijuana patient" and "may not be discharged or otherwise discriminated or retaliated against regarding compensation, terms, conditions or other privileges of employment solely on the basis of the employee's status as an individual certified to use medical marijuana." George A. Voegele, Jr., "The Impact of Pennsylvania's New Medical Marijuana Act on Employers," *The Pennsylvania Lawyer*, Vol. 38, No. 5 at p. 21 (September/October 2016). Another commentator has concluded that "[i]n the employment context, courts should expect wrongful termination suits from employees fired for using state-legal medical marijuana." Thomas G. Wilkinson, Jr.,

- 35 -

"Pennsylvania's New Medical Marijuana Law: The Legal Roadmap For a Growing

Industry," 87 Pa. B.A.Q. 147, 154 (Oct. 2016).  Moreover, since a prospective or existing

employee may become a certified medical marijuana user only if [s]he has a defined

"serious medical condition," (*see* n.3, <u>supra</u>), "an employer who learns that an employee

or job applicant uses medical marijuana necessarily learns that the individual has a serious

health condition that may result in additional protections for them under federal or state

law." Voegele, <u>supra</u>.  As a consequence, "***not only is the employer potentially exposed

to liability under the Medical Marijuana Act should it take some adverse action against

the individual***, it is also exposed to a potential claim under the Americans with

Disabilities Act and/or the Pennsylvania Human Relations Act." <u>Id.</u> (emphasis added).

*Accord* Wilkinson, 87 Pa. B.A.Q. at 158 ("Further, the MMA may restrict curious

employers from asking employees whether they have valid medical marijuana

certifications.  As certification requires demonstration of a serious medical condition, an

affirmative answer may expose employers to liability under the Americans with

Disabilities Act and/or the Pennsylvania Human Relations Act.").  Thus, the only

published commentaries on the MMA have reasoned that employers may be civilly liable

for wrongful discharge if they terminate an employee for being a certified medical

marijuana user.

  With the exception of penal laws, retroactive provisions, or statutory provisions

that impose taxes, confer the power of eminent domain, exempt persons or property from

taxation or the power of eminent domain, or decrease the jurisdiction of a court, "[a]ll

other provisions of a statute shall be liberally construed to effect their objects and to

promote justice." 1 Pa.C.S. § 1928(b)-(c).  Anti-discrimination statutes involve remedial

- 36 -

provisions aimed at prohibiting discrimination, *see* <u>Gomez-Perez v. Potter</u>, 553 U.S. 474, 481 (2008), *and* <u>Hull v. Rose, Schmidt, Hasley & DiSalle, P.C.</u>, 700 A.2d 996, 1000 (Pa. Super. 1997), and "[r]emedial legislation enjoys liberal construction, while any exceptions to its remedial provisions must be narrowly construed." <u>In re A.B.</u>, 987 A.2d 769, 775 (Pa. Super. 2009), *app. denied*, 608 Pa. 644, 12 A.3d 369 (2010). Based upon the foregoing discussion, Palmiter is a member of the class of people for whose special benefit the MMA was enacted, there is implicit indication of legislative intent to establish a private cause of action for an employee who is terminated in violation of Section 2103(b)(1), and recognizing such a private right of action is consistent with the MMA's stated purpose of providing safe and effective access to medical marijuana for certified patients while ensuring their equal opportunities for employment. Neither the MMA nor any regulation promulgated by the Department provides the Department with the administrative authority to enforce the anti-discrimination provisions of Section 2103(b)(1) by imposing civil penalties upon employers pursuant to Section 1308(b). Without the availability of an implied right of action for an employee who is fired solely for being certified as a medical marijuana user, the anti-discrimination directive in Section 2103(b)(1) would be rendered impotent. Since PHA, Moses Taylor, and Commonwealth Health have not established that it is clear and free from doubt that Palmiter cannot recover compensatory damages based upon an implied private right of action under 35 P.S. § 10231.2103(b)(1), their demurrer to Count I of the third amended complaint will be overruled.

### (C) BREACH OF ORAL CONTRACT

Palmiter advances a breach of contract claim in Count II of the third amended complaint, and "seeks all remedies available pursuant at law, including but not limited to enforcement of oral contract…." (Docket Entry No. 16 at p. 6). She asserts that Dr. Gilhooley, Dr. Kazmierski, and Pam Doto assured her that her certification as a medical marijuana user would not affect her continued employment. (Id. at ¶¶ 22-23). Palmiter alleges that "[t]here was consideration for the oral promises since [she] continued to work at the medical facility and relied on the oral promises when she obtained her medical certification for the use of marijuana." (Id. at ¶ 25). She contends that "going without required, authorized and legal medication is undergoing a substantial hardship since [Palmiter's] medical condition was not being treated as authorized by her treating physician." (Id. at ¶ 26). PHA, Moses Taylor, and Commonwealth Health submit that the foregoing allegations are insufficient to establish the requisite "additional consideration" to rebut Palmiter's at-will employment status. (T.P. 9/25/19 at pp. 18-20).

"'The presumption under Pennsylvania law is that all employment is at-will, and, therefore, an employee may be discharged for any reason or no reason.'" Babb v. Geisinger Clinic, 2019 WL 5265300, at *11 (Pa. Super. 2019) (quoting Luteran v. Loral Fairchild Corp., [455 Pa. Super. 364], 688 A.2d 211, 214 (Pa. Super. 1997), app. denied, 549 Pa. 717, 701 A.2d 578 (1997)). To rebut the presumption of at-will employment, a party "must establish one of the following: (1) an agreement for a definite duration; (2) an agreement specifying that the employee will be discharged for just cause only; (3) sufficient additional consideration; or (4) an applicable recognized public policy exception." Grose v. Procter & Gamble Paper Products, 866 A.2d 437, 431 (Pa. Super.

- 38 -

2005), *app. denied*, 585 Pa. 697, 889 A.2d 89 (2005); Janis v. AMP, Inc., 856 A.2d 140,

144 (Pa. Super. 2004), *app. denied*, 583 Pa. 663, 875 A.2d 1075 (2005).  Palmiter does

not contend that she had "an agreement for a definite duration" or one stating that she

would be "discharged for just cause only."  Her "breach of contract" claim in Count II of

the third amended complaint is predicated solely on the allegation that she provided

"additional consideration" to PHA, Moses Taylor, and Commonwealth Health so as to

overcome the presumption of at-will employment.[11]

      A court may find additional consideration "when an employee affords his

employer a substantial benefit other than the services which the employee is hired to

perform, or when the employee undergoes a substantial hardship other than the services

which he is hired to perform."  Donahue v. Federal Express Corp., 753 A.2d 238, 245 (Pa.

Super. 2000); Rapagani v. Judas Co., 736 A.2d 666, 671 (Pa. Super. 1999).  Palmiter has

not alleged a "substantial benefit" that she supposedly provided to PHA, Moses Taylor, or

Commonwealth Health so as to demonstrate some form of "additional consideration" to

overcome the presumption of at-will employment.  *See* Donahue, supra (holding that

"superior work performance is insufficient to establish additional consideration" inasmuch

as "performing well on the job does not generally confer a substantial benefit on an

employer beyond that which the employee is paid to do.").  Nor has she identified a

"substantial hardship" that she underwent which establishes the requisite "additional

consideration."  Such a hardship has been found to exist where the employee

detrimentally relied upon a promise of employment "for a definite minimum time period

---

[11]Palmiter also alleges a "recognized public policy exception" to at-will employment status in Count IV of her
pleading, and that argument is addressed in Section II(E) below.

of three to five years" by "selling his home in Pennsylvania" and moving "to a foreign, economically deprived country" to assume the role of industrial engineer, Janis, 856 A.2d at 145, or where, in response to the employer's persistent recruitment efforts, the employee gave up a stable position in another state, sold his house, and relocated to a new city with his pregnant wife and two year old child, only to be fired after 16 days on the job. Cashdollar v. Mercy Hospital of Pittsburgh, 406 Pa. Super. 606, 612-613, 595 A.2d 70, 73 (1991). However, such a "substantial hardship" has been determined not to exist as a matter of law where a musician closed his studio in California to join a touring company "on the road" and was terminated eight months later, Rapagnani, 736 A.2d at 670-671, or an employee transferred to a new position, agreed to confidentiality and non-competition clauses, and assigned the title to all his future inventions to his employer. Luteran, 455 Pa. Super. at 374-376, 688 A.2d at 216-217.

While the fact-finder must usually consider whether the employee's alleged circumstances support a finding of "additional consideration," Greene v. Oliver Realty, Inc., 363 Pa. Super. 534, 556, 526 A.2d 1192, 1202 (1987), *app. denied*, 517 Pa. 607, 536 A.2d 1331 (1987), the discharged employee "'must first present averments which would raise a legally sufficient factual dispute'" concerning the existence of such "additional consideration." Rapagnani, 736 A.2d at 671 (quoting Scott v. Extracorporeal, Inc., 376 Pa. Super. 90, 103, 545 A.2d 334, 340 (1988)). Instantly, Palmiter merely avers that she was assured by Dr. Gilhooley, Dr. Kazmierski, and Pam Doto that her medical marijuana patient status would not affect her employment and that she would remain employed by PHA, Moses Taylor, and Commonwealth Health. A promise of continued employment notwithstanding an employee's specific conduct does not "raise a legally sufficient factual

- 40 -

dispute" regarding the "additional consideration" necessary to negate the presumption of at-will employment. *See* Cathcart v. Micale, 2019 WL 4076089, at *2 (E.D. Pa. 2019) (employer's assurance that employee's employment "would not be affected" by the employee's complaint concerning a supervisor, which the employer's human resources director had concluded "was well-founded," did not constitute "a substantial hardship" so as to create a factual issue as to the "additional consideration" needed to rebut the at-will employment status). Palmiter's claims of "undergoing a substantial hardship" are insufficient as a matter of law to establish sufficient "additional consideration" to support her breach of oral contract claim, as a result of which the demurrer to Count II of the third amended complaint will be sustained.

### (D)  INVASION OF PRIVACY/INTRUSION ON SECLUSION

In Counts III and V of the third amended complaint, Palmiter appears to contend that PHA, Moses Taylor, and Commonwealth Health invaded her privacy by (1) "inform[ing] Dr. Galardi that she could no longer treat [Palmiter] because of the lawsuit a[s] it was a conflict of interest," and (2) implementing a "drug testing policy [that] invaded [Palmiter's] private, medical authorized use of medical marijuana" by "requir[ing] her to disclose her private use of medical marijuana." (Docket Entry No. 16 at ¶¶ 29, 32, 45-46).  Defense counsel noted at the time of oral argument that Pennsylvania law permits employment-related drug screening, *see* Katera's Kove, Inc. v. Unemployment Compensation Board of Review, 130 A.3d 800, 803 (Pa. Cmwlth. 2015) (employee terminated for positive drug test was ineligible for unemployment compensation benefits under 43 P.S. § 802(e.1) since the test was conducted pursuant to the employer's established substance abuse policy), as a result of which Palmiter cannot

- 41 -

claim that her privacy was improperly invaded merely by the lawful administration of an employment drug screen test.  (T.P. 9/25/19 at p. 25).  In response, Palmiter's counsel confirmed on the record that Palmiter is alleging that the actionable "invasion [wa]s finding out the fact that Dr. Galardi was her treating physician."[12] (Id. at p. 41).

"It is well established in Pennsylvania that a violation of the right of privacy is an actionable tort."  Tagouma v. Investigative Consultant Services, Inc., 4 A.3d 170, 174 (Pa. Super. 2010); Dunbar v. Rivello, 34 Pa. D. & C. 5th 87, 107 (Lacka. Co. 2013).  "A cause of action for invasion of privacy is 'actually comprised of four analytically distinct torts: (1) intrusion upon seclusion, (2) appropriation of name or likeness, (3) publicity given to private life, (4) publicity placing a person in false light.'"  Krajewski v. Gusoff, 53 A.3d 793, 805 (Pa. Super. 2012) (quoting Larsen v. Philadelphia Newspapers, Inc., 375 Pa. Super. 66, 543 A.2d 1181, 1188 (1988), app. dismissed, 624 Pa. 224, 84 A.3d 1057 (2014)).  Based upon the factual averments contained in Palmiter's pleading and the representation made by her counsel during oral argument, the only privacy tort that is being asserted in this case is "intrusion upon seclusion." (T.P. 9/25/19 at p. 24).

---

[12]Referencing Dr. Galardi's alleged statement that, per the advice of PHA, Moses Taylor, and Commonwealth Health, "she could no longer treat [Palmiter] because of the lawsuit," Palmiter asserted during the oral argument that she has the right "to be treated by a physician who has an oath to make sure they take care of their patients." (Id. at p. 42).  Some jurisdictions have recognized a patient's cause of action against a third party for tortiously inducing a physician to terminate the physician-patient relationship with the patient.  See Phoebe Carter, Liability for Interference with Physician-Patient Relationship, 87 A.L.R. 4th 845 at §21 (1991).  It is unclear whether such a claim is cognizable in Pennsylvania.  See Richette v. Solomon, 410 Pa. 6, 15, 187 A.2d 910, 915 (1963) (stating in obiter dictum that anyone has a right to advise a person to change doctors and "may recommend him to a doctor other than the one presently prescribing for him," but such advice "must not be accompanied with threats" which "may well be interpreted as reflecting malice, vindictiveness, and wanton disregard of the…doctor's rights which would call for punitive damages.").  A physician may arguably recover for the intentional and improper interference with the physician's continuing and prospective business relations with the physician's patients.  See, e.g., Posner v. Lankenau Hospital, 645 F.Supp. 1102, 1111-1112 (E.D. Pa. 1986), aff'd, 865 F.2d 252 (3rd Cir. 1988); McMorris v. Williamsport Hospital, 597 F.Supp. 899, 917 (M.D. Pa. 1984) (Nealon, C.J.).  Since Palmiter has not asserted a claim for tortious interference with the physician-patient relationship, the viability of such a cause of action in this Commonwealth need not be addressed.

- 42 -

Section 652B of the Restatement (Second) of Torts describes the tort of "intrusion upon seclusion" as follows: "[o]ne who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, is subject to liability to the other for invasion of his privacy, if the intrusion would be highly offensive to a reasonable person." <u>Burger v. Blair Medical Associates, Inc.</u>, 600 Pa. 194, 203, 964 A.2d 374, 379 (2009); <u>Dunbar</u>, 34 Pa. D. & C. 5th at 108. It is not sufficient that the plaintiff was "subjectively offended" by the intrusion since the test requires that "a reasonable person would be *highly* offended." <u>Spencer v. General Telephone Co. of Pennsylvania</u>, 551 F.Supp. 896, 899 (M.D. Pa. 1982)(emphasis in original). "The invasion may be (1) 'by physical intrusion into a place where the plaintiff has secluded himself;' (2) 'by use of the defendant's senses to oversee or overhear the plaintiff's private affairs;' or (3) 'some other form of investigation or examination into plaintiff's private concerns.'" <u>Tagouma</u>, 4 A.3d at 174 (quoting Restatement (Second) of Torts § 652B, Comment b). To state a claim for intrusion upon seclusion, "a plaintiff must aver that there was an intentional intrusion on the seclusion of their private concerns which was substantial and highly offensive to a reasonable person, and aver sufficient facts to establish that the information disclosed would have caused mental suffering, shame or humiliation to a person of ordinary sensibilities." <u>Pro Golf Manufacturing, Inc. v. Tribune Review Newspaper Co.</u>, 570 Pa. 242, 248, 809 A.2d 243, 247 (2002); <u>Moon v. Garibotto</u>, 2010 WL 2812270, at * 3 (Lacka. Co. 2010). Hence, there can be no tort liability for intrusion upon seclusion "'unless the interference with the plaintiff's seclusion is substantial and would be highly offensive to the ordinary reasonable person.'" <u>Tagouma</u>, <u>supra</u> (quoting Restatement (Second) of Torts § 652B, Comment d).

- 43 -

Palmiter contends that PHA, Moses Taylor, and Commonwealth Health are liable for intrusion upon seclusion since "they accessed her medical records to see who was her medical treating physician," their "unauthorized access to her private medical file was substantial" and "highly offensive," and she "suffered mental suffering and humiliation as a result of [their] invasion of privacy." (Docket Entry No. 16 at ¶¶ 31, 36-37).  Affording Palmiter the benefit of "all inferences reasonably deducible" from those allegations, McIlawin v. Saber Healthcare Group, LLC, 208 A.3d 478, 483 (Pa. Super. 2019), that unauthorized access occurred subsequent to Palmiter's filing of her original complaint demanding her "reinstatement" and damages for "backpay, front pay, [and] emotional distress" since PHA, Moses Taylor, and Commonwealth Health allegedly advised that treating physician, Dr. Galardi, "that she could no longer treat [Palmiter] because of the lawsuit." (Docket Entry No. 1 at p. 4; Docket Entry No. 16 at ¶ 29).  Based upon that alleged intrusion upon seclusion, Palmiter seeks "compensatory damages, emotional distress, [and] punitive damages." (Docket Entry No. 16 at p. 8).

Pennsylvania case law generally does not consider unauthorized access to medical records or information sufficiently offensive to cause mental suffering or humiliation so as to sustain a cause of action for intrusion upon seclusion.  In Chicarella v. Passant, 343 Pa. Super. 330, 494 A.2d 1109 (1985), the plaintiff sued a liability insurer, its investigator, and a hospital for intrusion upon seclusion after the hospital's credit manager privately provided the investigator with information concerning the plaintiff's treatment at the hospital.  Id. at 334-335, 494 A.2d at 1111-12.  The records at issue contained information regarding the plaintiff's "medical complaint, diagnosis, and charge for each visit," and reflected that plaintiff "was treated for bronchitis, hematemisis, a shoulder injury, and a

- 44 -

series of migraine headaches." Id. at 339, 494 A.2d at 1114.  In rejecting the plaintiff's

contention that the defendants "intentionally intruded upon his private affairs by securing

the hospital's records," the Superior Court noted that "liability will not attach to that act

unless the intrusion is *substantial* and *highly offensive*," and concluded that the discovery

of the plaintiff's "medical treatment cannot be deemed a substantial intrusion" and that

"the information disclosed by the hospital records is not of the sort which would cause

mental suffering, shame or humiliation to a person of ordinary sensibilities." Id.

(emphasis in original). *Accord*, Adamski v. Johnson, 80 Pa. D. & C. 4ᵗʰ 69, 71-74

(Monroe Co. 2006) (employer, who improperly learned "the particulars of [the

employee's] pending surgery by questioning [her] fellow employees" after she "refused to

divulge" requested "information on the nature of the surgery," could not be found liable

for intrusion upon seclusion claim since the employee did not allege "sufficient facts to

establish a substantial intrusion of a highly offensive nature" and the disclosure of the

employee's "prospective surgery, which was certainly her private affair," would not

"cause her mental suffering, shame or humiliation."); Yerger v. Landis Manufacturing

Systems, Inc., 1989 WL 66443, at *7 (E.D. Pa. 1989) ("Medical reports or brief

descriptions of common ailments or treatments are insufficient as a matter of law to meet

the standard" of being "offensive to a reasonable person" and "caus[ing] mental suffering,

shame or humiliation to a person of ordinary sensibilities.").

   Based upon Chicarella, the alleged actions of PHA, Moses Taylor, and

Commonwealth Health in discovering Dr. Galardi's status as Palmiter's treating physician

via unauthorized access to her medical records are insufficient as a matter of law to

establish an intrusion that "was substantial and highly offensive to a reasonable person"

- 45 -

and which disclosed information that "would have caused mental suffering, shame or humiliation to a person of ordinary sensibilities."[13] Pro Golf Manufacturing, Inc., 570 Pa. at 248, 809 A.2d at 247. Thus, "on the facts averred, the law says with certainty that no recovery is possible" by Palmiter for invasion of privacy/intrusion upon seclusion. Keller, 212 A.3d at 56. As a result, the demurrers to Counts III and V of the third amended complaint will be sustained.

### (E)  VIOLATION OF PUBLIC POLICY

"It is well-settled that Pennsylvania is an at-will employment state," Greco v. Myers Coach Lines, Inc., 199 A.3d 426, 435 (Pa. Super. 2018), app. denied, 208 A.3d 462 (Pa. 2019), and as a general rule, "there is no common law cause of action against an employer for termination of an at-will employment relationship." McLaughlin v. Gastrointestinal Specialists, Inc., 561 Pa. 307, 313-314, 750 A.2d 283, 287 (2000) (quoting Paul v. Lankenau Hospital, 524 Pa. 90, 95, 569 A.2d 346, 348 (1990)). Rather, "absent a statutory or contractual provision to the contrary, either party may terminate an employment relationship for any or no reason." Weaver v. Harpster, 601 Pa. 488, 500, 975 A.2d 555, 562 (2009). An at-will employee "may bring a cause of action for a termination of that relationship only in the most limited circumstances, where the

---

[13] As noted above, it appears that the alleged access to Palmiter's medical records occurred after she commenced this lawsuit on February 21, 2019. (Docket Entry No. 1). A plaintiff waives the physician-patient privilege, 42 Pa.C.S. § 5929, by filing a civil action for personal injuries, Moses v. McWilliams, 379 Pa. Super. 150, 160-161, 549 A.2d 950, 955 (1988), app. denied, 521 Pa. 630, 558 A.2d 532 (1989), and similarly waives the psychiatrist/licensed psychologist-privilege, 42 Pa.C.S. § 5944, by filing a lawsuit alleging anxiety, mental injury, severe emotional trauma requiring treatment, or any comparable psychiatric/psychological condition. Gormley v. Edgar, 995 A.2d 1197, 1205-06 & n.8-9 (Pa. Super. 2010). The implied waivers of those privileges do not entitle a treating physician, psychiatrist, or licensed psychologist to privately discuss the patient's medical or psychological information with the patient's adversary in litigation. See Marek v. Ketyer, 733 A.2d 1268, 1270 (Pa. Super. 1999), app. denied, 561 Pa. 677, 749 A.2d 471 (2000); White v. Behlke, 65 Pa. D. & C. 4th 479, 486-489 (Lacka. Co. 2004). Palmiter merely alleges that PHA, Moses Taylor, and Commonwealth Health advised Dr. Galardi to terminate her physician-patient relationship with Palmiter, and does not contend that any medical or mental health information was privately discussed or disclosed.

- 46 -

termination implicates a clear mandate of public policy." Id. at 502, 975 A.2d at 563;

Stewart v. FedEx Express, 114 A.3d 424, 427 (Pa. Super. 2015), *app. denied*, 633 Pa. 781,

126 A.3d 1285 (2015).

"Our Supreme Court first recognized in Geary v. U. S. Steel Corp., 456 Pa. 171,

319 A.2d 174 (1974), that an at-will employee may have a cause of action against an

employer for wrongful discharge when the discharge threatens a clear mandate of public

policy." Owens v. Lehigh Valley Hospital, 103 A.3d 859, 862 (Pa. Cmwlth. 2014).

However, "[i]n our judicial system, the power of the courts to declare pronouncements of

public policy is sharply restricted," and "it is for the legislature to formulate the public

policies of the Commonwealth." Weaver, supra; Gross v. Nova Chemicals Services, Inc.,

161 A.3d 257, 262 (Pa. Super. 2017). To that end, "we declare the public policy of this

Commonwealth by examining the precedent within Pennsylvania, looking to our own

Constitution, court decisions, and statutes promulgated by our legislature." McLaughlin,

561 Pa. at 315-216, 750 A.2d at 288. Applying this standard, Pennsylvania courts have

found actionable public policy exceptions to the at-will employment doctrine where the

termination was in retaliation for filing a worker's compensation claim, Shick v. Shiery,

552 Pa. 590, 716 A.2d 1238 (1998), for failing to dissuade a subordinate employee from

filing a worker's compensation claim, Rothrock v. Rothrock Motor Sales, Inc., 584 Pa.

297, 883 A.2d 511 (2005), for filing an unemployment compensation claim, Highhouse v.

Avery Transportation, 443 Pa. Super. 120, 660 A.2d 1374 (1995), for refusing to submit

to a polygraph test in contravention of 18 Pa.C.S. § 7321, Kroen v. Bedway Security

Agency, Inc., 430 Pa. Super. 83, 633 A.2d 628 (1993), for reporting a nuclear safety

violation to the Nuclear Regulatory Commission in compliance with federal law, Field v.

- 47 -

Philadelphia Electric Company, 388 Pa. Super. 400, 565 A.2d 1170 (1989), for exercising

First Amendment rights by refusing to participate in the employer's legislative lobbying

efforts and by opposing the employer's political position, Novosel v. Nationwide

Insurance Company, 721 F.2d 894 (3d Cir. 1983), for serving on a jury pursuant to 42

Pa.C.S. § 4501, Reuther v. Fowler & Williams Inc., 255 Pa. Super. 28, 386 A.2d 119

(1978), and for filing a complaint with the Pennsylvania Human Relations Commission

alleging disability discrimination, Nazar v. Clark Distribution Systems, Inc., 46 Pa. D. &

C. 4th 28 (Lacka. Co. 2000).

What has evolved from this body of case law is that "an employer (1) cannot

require an employee to commit a crime, (2) cannot prevent an employee from complying

with a statutorily imposed duty, and (3) cannot discharge an employee when specifically

prohibited from doing so by statute." Greco, 199 A.3d at 436; Mikhail v. Pennsylvania

Organization for Women in Early Recovery, 63 A.3d 313, 317 (Pa. Super. 2013) (quoting

Spierling v. First American Home Health Services, Inc., 737 A.2d 1250, 1252 (Pa. Super.

1999)).  Outside of those categories of our legislature's expression of public policy, a

court may find a public policy exception that will sustain a wrongful termination action

only if the public policy "is so obviously for or against public health, safety, morals, or

welfare that there is a virtual unanimity of opinion in regard to it." Weaver, 601 Pa. at

502, 975 A.2d at 563; Stewart, 114 A.3d at 428; Owens, 103 A.3d at 863.  The issue

"before any court in deciding such a case is the broader question of whether the employee

alleged that the termination violated **any** clear mandate of a public policy of this

Commonwealth," and the public policy exception does not require an employee to

- 48 -

identify a specific policy "that relates to the employer-employee relationship" between the parties. Mikhail, 63 A.3d at 320 (emphasis in original).

Thus, an at-will employee may state a cognizable claim for wrongful discharge by averring that [s]he was terminated for a reason that a statute expressly prohibits the employer from using as a basis to terminate the employment relationship. *See* Roman, 127 A.3d at 33. Section 2103(b)(1) of the MMA distinctly states that "[n]o employer may discharge…or otherwise discriminate or retaliate against an employee…solely on the basis of such employee's status as an individual who is certified to use medical marijuana." Palmiter has alleged that PHA, Moses Taylor, and Commonwealth Health terminated her employment on January 29, 2019, on the singular ground that she was a certified medical marijuana user. Such a discharge "implicates a clear mandate of public policy" as declared by the General Assembly in the unambiguous language of 35 P.S. § 10231.2103(b)(1). Accepting as true the factual allegations set forth in the third amended complaint, Palmiter has stated a cause of action for wrongful discharge under the public policy exception to the at-will employment doctrine, and the demurrer to Count IV of the third amended complaint will, therefore, be overruled.[14]

---

[14] An at-will employee cannot maintain a separate common law action for wrongful discharge based upon public policy grounds if that employee has a statutory cause of action or remedy. *See* Clay v. Advanced Computer Applications, 522 Pa. 86, 89, 559 A.2d 917, 118 (1989); Jacques v. Akzo International Salt, Inc., 422 Pa. Super. 419, 428-429, 619 A.2d 748, 753 (1993). However, it is also true that Pa.R.C.P. 1020(c) permits a party to plead causes of action in the alternative, even if the claims asserted are inconsistent, so long as they are pled in separate counts of the pleading. Khawaja v. RE/MAX Central, 151 A.3d 626, 633 (Pa. Super. 2016); Lugo v. Farmer's Pride, Inc., 967 A.2d 963, 970 (Pa. Super. 2009), *app. denied*, 602 Pa. 668, 980 A.2d 609 (2009). Therefore, although Palmiter maintains that she has a private cause of action under the MMA, she may plead in the alternative that she has a public policy-based claim for wrongful discharge.

- 49 -

PAMELA PALMITER,          :  IN THE COURT OF COMMON PLEAS
                              :    OF LACKAWANNA COUNTY

           Plaintiff      :

                              :

          vs.           :     CIVIL ACTION - LAW

                              :

COMMONWEALTH HEALTH SYSTEMS,  :
INC. d/b/a COMMONWEALTH HEALTH,  :
PHYSICIANS HEALTH ALLIANCE d/b/a  :
COMMONWEALTH HEALTH, and    :
MOSES TAYLOR HOSPITAL d/b/a    :
COMMONWEALTH HEALTH,        :

                              :

         Defendants    :    NO.  19 CV 1315

## ORDER

     AND NOW, this 22nd day of November, 2019, upon consideration of

"Defendants' Preliminary Objections to Plaintiff's Third Amended Complaint," the

memoranda of law submitted by the parties, and the oral argument of counsel, and based

upon the reasoning set forth in the foregoing Memorandum, it is hereby ORDERED and

DECREED that:

     1.     Defendant's preliminary objections in the nature of a demurrer to Count I and

Count IV of the plaintiff's third amended complaint are OVERRULED;

     2.     Defendant's preliminary objections in the nature of a demurrer to Count II,

Count III, and Count V of plaintiff's third amended complaint are SUSTAINED; and

3.    Within the next twenty (20) days, defendants shall file a responsive pleading to the third amended complaint, with the exception of paragraphs 21-37 and 43-47 which have been stricken pursuant to Pa.R.C.P. 1028(a)(4) by virtue of paragraph two above.

BY THE COURT:

Terrence R. Nealon

cc:    *Written notice of the entry of the foregoing Memorandum and Order has been provided to each party pursuant to Pa. R. C. P. 236 (a)(2) and (d) by transmitting time-stamped copies via electronic mail to:*

Cynthia L. Pollick, Esquire        pollick@lawyer.com
The Employment Law Firm
363 Laurel Street
Pittston, PA 18640
    Counsel for Plaintiff

Sidney R. Steinberg, Esquire      ssteinberg@postschell.com
Kayleen Egan, Esquire           kegan@postschell.com
Post & Schell, P.C.
14th Floor, Four Penn Center
1600 John F. Kennedy Boulevard
Philadelphia, PA 19103
    Counsel for Defendants

Case 3:20-cv-00044-CCC Document 8-1 Filed 01/30/20 Page 75 of 86

Angelini v. U.S. Facilities, Inc., Not Reported in Fed. Supp. (2018)

2018 WL 3155995, 2018 Fair Empl.Prac.Cas. (BNA) 230,075

2018 WL 3155995
United States District Court, E.D. Pennsylvania.

Duilio ANGELINI, Plaintiff

v.

U.S. FACILITIES, INC., Defendant

CIVIL ACTION NO. 17-4133
|
Filed 06/27/2018

**Attorneys and Law Firms**

Mark Daniel Schwartz, Bryn Mawr, PA, Jason L. Pearlman, The Pearlman Law Firm, PLLC, Bala Cynwyd, PA, for Plaintiff.

H. David Seidman, Obermayer Rebmann Maxwell & Hippel, Philadelphia, PA, for Defendant.

**MEMORANDUM OPINION**

NITZA I. QUIÑONES ALEJANDRO, U.S.D.C. J.

**INTRODUCTION**

*1 Duilio Angelini ("Plaintiff") filed an amended employment discrimination complaint against his former employer, U.S. Facilities, Inc. ("Defendant"), in which he asserts claims of unlawful discrimination and hostile work environment based on violations of 42 U.S.C. § 1981 ("§ 1981"); Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"); the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 623 *et seq.* (the "ADEA"); the Pennsylvania Human Relations Act, 43 P.S. § 951 *et seq.* (the "PHRA"); and the Philadelphia Fair Practices Ordinance, § 9-1100 *et seq.* (the "Philadelphia Ordinance"). [ECF 4]. Plaintiff has also asserted state law claims for wrongful discharge under the Pennsylvania Whistleblower Law, 43 Pa. Cons. Stat. § 1421, and Pennsylvania common law.

Before this Court is Defendant's *motion to dismiss* the amended complaint for failure to state a claim upon which relief can be granted filed pursuant to Federal Rule of Civil Procedure ("Rule") 12(b)(6). [ECF 6]. Plaintiff has opposed the motion. [ECF 11]. The issues presented have been fully briefed and, therefore, this matter is ripe for disposition. For the reasons set forth herein, Defendant's motion to dismiss is granted, *in part*, and denied, *in part*.

**BACKGROUND**

When ruling on a motion to dismiss, a court must accept as true all the factual allegations in the operative complaint, and construe the complaint in the light most favorable to the non-movant. *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008) (citing *Pinker v. Roche Holdings Ltd.*, 292 F.3d 361, 374 n.7 (3d Cir. 2002) ). Here, Plaintiff's amended complaint contains seven counts wherein Plaintiff avers that Defendant; *to wit*: unlawfully discriminated against him because of his race and/or that Defendant's conduct toward Plaintiff constituted a hostile work environment in violation of § 1981 and Title VII, (Counts I and II, Am. Compl. at ¶¶ 38-53); unlawfully discriminated against him based on his age and/or that Defendant's conduct toward Plaintiff constituted a hostile work environment, in violation of the ADEA, (Count III, *id.* at ¶¶ 54-65); unlawfully discriminated against Plaintiff based on his age, race, religion, and ethnicity/ancestry in violation of his rights under the PHRA and the Philadelphia Ordinance, (Counts IV and V, *id.* at ¶¶ 66-75); unlawfully terminating Plaintiff's employment in retaliation for having made reports of wrongdoing in violation of the Pennsylvania Whistleblower Statute and Pennsylvania common law. (Counts VI and VII, *id.* at ¶¶ 115-26). Briefly, the relevant facts in Plaintiff's amended complaint are as follows:

Plaintiff is a Caucasian male of Italian American descent and a devout Catholic. (Am. Comp. ¶ 2). At the time of his firing in February 2017, Plaintiff was "over the age of forty." (*Id.*).[1] Defendant is alleged to be a minority business enterprise which holds a contract to manage certain properties owned by the City of Philadelphia (the "City"). (*Id.* at ¶ 76). In particular, Defendant provided management services for three buildings owned by the City; *to wit*: the Criminal Justice Facility (the "CJC"); the Municipal Services Building (the "MSB"); and the One Parkway Building (the "OPB") (collectively, the "Triplex"). (*Id.*). At all times relevant to Plaintiff's claims, Plaintiff reported directly to Chief Operating Officer ("COO") Jim Dorris, who in turn reported to James Dobrowolski, Defendant's President and CEO. (*Id.* at ¶ 18).

Angelini v. U.S. Facilities, Inc., Not Reported in Fed. Supp. (2018)

2018 WL 3155995, 2018 Fair Empl.Prac.Cas. (BNA) 230,075

### *Facts Relevant to Plaintiff's Discrimination Claims*

**\*2**  On December 17, 2002, during a phone call in which Plaintiff was offered a job with Defendant, Defendant's then-COO, Wendall Ashley, asked him "if he got along with minorities" and if he "got along with black people." (*Id.* at ¶ 12). Plaintiff responded that he got along with all people. (*Id.*). Shortly after this phone call, on December 19, 2002, Plaintiff began working for Defendant as a Support Supervisor. (*Id.* at ¶ 13). Plaintiff proceeded through the ranks with Defendant and became the Building Manager at the CJC, on January 15, 2007. (*Id.*). According to Plaintiff, he was transferred to the CJC because the performance of the previous building manager (an African American) was substandard and there was a need to repair relationships with City officials. (*Id.*).

Sometime at the end of December 2002, Plaintiff had an initial in-person meeting at the MSB. (*Id.* at ¶ 14). During the meeting, Mr. David Rivers (an African American), a vice president for one of Defendant's subcontractors, turned to one of Defendant's Building Managers, Mr. Herman Woods (an African American), pointed to Plaintiff and Mr. Griff Reigard (both Caucasians) and made the comment: "I think we're going to have problems with those two at the end of the table." (*Id.*).

On February 5, 2016, Plaintiff was formally notified of his promotion from Building Manager at the CJC (a position he had held since 2007) to Project Manager of the Triplex. (*Id.* at ¶ 15). The promotion became effective on February 29, 2016. (*Id.*).

During his employment, Plaintiff had to interact with Ms. Carmen Diaz Rosario, a Puerto Rican female, and Manager of the MSB. (*Id.* at ¶ 19). Without any specificity, Plaintiff alleges that he "had to endure Ms. Rosario's negative comments regarding Italians, whether directed at himself (sic) or directed at a Philadelphia public official." (*Id.*). Plaintiff interacted with Mr. Ed Siegler, Assistant Project Manager, who also made fun of Plaintiff's Italian heritage. (*Id.* at ¶ 22).

Plaintiff also interacted with Mr. Zachary Jones, an African American, Maintenance Manager. (*Id.* at ¶ 20). Without any specificity, Plaintiff alleges that Mr. Jones repeatedly directed derogatory comments about Italians to Plaintiff, asserting that "all Italians are related and alike, even smelling alike." (*Id.*). Mr. Jones also allegedly "constantly used the offensive and derogatory term 'Mamaluke' to refer to Plaintiff specifically and Italians in general." (*Id.*). Mr. Jones "denigrate[d] Plaintiff's religion with a host of negative and disparaging statements, including his statement that 'All Catholics drink Jesus' juice.' " (*Id.*). Mr. Jones made fun of and criticized Plaintiff's maintenance of personal religious objects in his office space. (*Id.*). Plaintiff also alleges that Mr. Jones' conduct was "consistent with the Anti-Catholic tone set by Mr. Karl Letterman, Project Manager of the Triplex." (*Id.*).

During the course of his employment, Plaintiff also interacted with Ms. Susan Laramore, an African American Human Resources Manager. (*Id.* at ¶ 24). According to Plaintiff, Ms. Laramore "exhibited racial hostility towards Plaintiff, repeatedly attempting to undermine Plaintiff in his work." (*Id.*). Sometime in 2012, Plaintiff alleges that he was verbally abused and physically intimidated during an evaluation attended by Project Manager, Kevin McKinney, and Assistant Project Manager Christian Holland (both African Americans). (*Id.* at ¶ 26). The incident was reported to Ms. Laramore and Vice President Karl Letterman, but no action was taken. (*Id.*).

On January 9, 2017, Plaintiff was called to a meeting with CEO Dobrowolski and Mr. Dorris, where Plaintiff was told that there had been complaints against him about his leadership and management style. (*Id.* at ¶¶ 29, 31). Plaintiff was offered the choice of either remaining as Triplex Project Manager to be shadowed by Mr. Dorris, or to be demoted to Building Manager for the CJC. (*Id.* at ¶ 31). At or about the same time, CEO Dobrowolski asked Plaintiff how old he was and how much longer he wanted to work. (*Id.* at ¶ 32).

**\*3**  On January 31, 2017, Plaintiff attended another meeting with CEO Dobrowolski and Mr. Dorris and was asked whether he would accept a demotion, with the option of remaining as Project Manager no longer being offered. (*Id.* at ¶ 33). Plaintiff protested that he was being handled in a

2018 WL 3155995, 2018 Fair Empl.Prac.Cas. (BNA) 230,075

fashion fundamentally different than others. (*Id.*) He subsequently took approved vacation to tend to the health of his wife. (*Id.* at ¶ 34). On February 3, 2017, while on this approved vacation, Plaintiff was fired, (*id.*), and was replaced by someone younger in age. (*Id.* at ¶ 37).

### *Facts Relevant to Plaintiff's Whistleblower/ Wrongful Discharge Claims*

Plaintiff commenced his employment with Defendant on December 19, 2002. (*Id.* at ¶ 86). In late December 2013 and January 2014, when he was Building Manager for the CJC, Plaintiff reported life safety issues with respect to the lack of elevator preventive maintenance. (*Id.* at ¶ 91). A memo was sent to Project Manager, Mr. Kevin Smith, with copies to Assistant Project Managers, Mr. Edward Siegler and Ms. Carmen Diaz-Rosario, and Maintenance Manager, Mr. Zachary Jones. (*Id.*). The memo reflected that necessary work had not been completed. (*Id.*). Plaintiff told Mr. Smith and Mr. Siegler that this was a life safety issue and that those working at the Triplex were concerned about the fact that the elevators were not maintained and were repeatedly out of order. (*Id.*).

In October 2013, Defendant awarded its elevator maintenance contract to Schindler Elevator Corporation ("Schindler"). (*Id.* at ¶ 100). Defendant's John Lontz was the contract manager and his brother, Mr. Robert Lontz, worked for Schindler as the Elevator Superintendent. (*Id.*). Shortly after the contract was awarded, Plaintiff brought this alleged conflict of interest to the attention of Project Manager, Mr. Kevin Smith. (*Id.*). Mr. Smith agreed with Plaintiff that this was a conflict, but advised Plaintiff to keep his mouth shut or be fired. (*Id.*).

Plaintiff contends that Schindler's services were substandard, late, and overly expensive. (*Id.*). On May 29, 2014, Plaintiff advised senior management in writing that Schindler mechanics were not updating elevator log books as required by the City. (*Id.* at ¶ 93). On October 8, 2014, Plaintiff advised senior management in writing that "I personally don't believe that Schindler spends enough time at CJC on PM (preventative maintenance) of elevators/ escalators, just from the fact that every time we do

have an issue, they're at OPB or MSB." (*Id.* at ¶ 94). On January 5, 2015, Plaintiff complained to senior management in an email about the lack of elevator preventative maintenance by Schindler. (*Id.* at ¶ 95). Plaintiff's email included his criticism of Schindler's inefficiency: "Schindler has taken a 6 to 8 hour job, and has turned it into a one week project." (*Id.* at ¶ 96). This email was copied to City Department of Public Property employee, Jerry Merrigan. (*Id.* at ¶ 95). Defendant's John Lontz responded "Let's be mindful of our emails. Jerry doesn't need to see all this." (*Id.*). Plaintiff alleges that his repeated protests mounted to the point that Mr. Siegler told elevator subcontractors to withhold information from Plaintiff "because we can't let Lou know what's going on." (*Id.* at ¶ 98).

Plaintiff allegedly complained repeatedly to Mr. Smith and Mr. Siegler that Schindler had stopped completing mandatory preventative maintenance. (*Id.* at ¶ 101). Elevator issues with Schindler continued for the remainder of 2015 and into April 2016. (*Id.* at ¶ 102).

The contract with Schindler was terminated in July 2016. (*Id.*). On August 4, 2016, an elevator accident at the CJC resulted in serious injuries to a Sheriff's deputy. (*Id.*). On the weekend of the CJC elevator accident, Plaintiff offered to relieve Mr. Siegler at the accident site, but was refused. (*Id.* at ¶ 104). Plaintiff alleges that Mr. Dorris and HR Manager Anita Pirrone deliberately kept Plaintiff out of the information loop with respect to the accident. (*Id.*).

**\*4** Shortly after the elevator accident, Plaintiff heard CEO Dobrowolski brag to Mr. Dorris that Defendant would be making a lot of money as a result of the accident. (*Id.* at ¶ 105). Plaintiff then saw CEO Dobrowolski and Mr. Dorris high-fiving each other. (*Id.*).

In a meeting on September 23, 2016, CEO Dobrowolski warned attendees to be careful regarding the Lontz brothers' relationship; to make it appear that there was no conflict of interest between the brothers and to state that a firewall was in place. (*Id.* at ¶ 103). Attendees were told to be careful about what was told to the City Department of Public Property Commissioner. (*Id.*). In September 2016, Mr. Siegler admitted that he and Mr. Jones routinely

2018 WL 3155995, 2018 Fair Empl.Prac.Cas. (BNA) 230,075

reset elevator control panels. (*Id.* at ¶ 107). Plaintiff admonished them never to do this as they were not licensed, certified, or trained elevator mechanics. (*Id.*). Between September 2016 and January 2017, Mr. Dorris held up funding to complete necessary weight load testing to the Triplex elevator systems because of purported money issues at Defendant. (*Id.* at ¶ 106).

On February 3, 2017, Plaintiff's employment with Defendant was terminated. (*Id.* at ¶ 112).

**LEGAL STANDARD**

When considering a Rule 12(b)(6) motion to dismiss for failure to state a claim, a court "must accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-11 (3d Cir. 2009) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) ). The court must "determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.' " *Id.* at 211 (quoting *Iqbal*, 556 U.S. at 679, 129 S.Ct. 1937). The complaint must do more than merely allege the plaintiff's entitlement to relief; it must "show such an entitlement with its facts." *Id.* (citation and internal quotation marks omitted). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.' " *Iqbal*, 556 U.S. at 679, 129 S.Ct. 1937 (quoting Fed. R. Civ. P. 8(a)(2) ). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* 556 U.S. at 678, 129 S.Ct. 1937 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) ). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955). To survive a motion to dismiss under Rule 12(b)(6), a plaintiff must allege facts sufficient to " 'nudge [his or her] claims across the line from conceivable to plausible.' " *Phillips*, 515 F.3d at 234 (quoting *Twombly*, 550 U.S. at 570, 127 S.Ct. 1955).

**DISCUSSION**

Defendant moves to dismiss Plaintiff's claims on the ground that Plaintiff has failed to allege sufficient facts to support each of the requisite elements of his alleged claims. Plaintiff disputes Defendant's contentions. This Court will address each of Plaintiff's claims.

*Plaintiff's Racial Discrimination Claims*

At Counts I, II, IV and V of the amended complaint, Plaintiff asserts claims of racial discrimination under § 1981,[2] Title VII,[3] the PHRA,[4] and the Philadelphia Ordinance.[5] These statutes prohibit an employer from discriminating against any individual with respect to employment and/or employment-related matters because of the individual's race. Here, Defendant contends that Plaintiff's racial discrimination claims fail because Plaintiff has not alleged sufficient facts for this Court to reasonably infer that Plaintiff's employment was terminated based on his race. This Court agrees.

**\*5** To assert a viable claim for employment discrimination under § 1981, Title VII, the PHRA, and the Philadelphia Ordinance,[6] a plaintiff must allege facts sufficient to show that: (1) he is a member of a protected class; (2) he is qualified for the position or satisfactorily performed the duties required by his position; (3) he suffered an adverse employment action; and (4) either similarly-situated non-members of the protected class were treated more favorably, or the circumstances of the adverse employment action give rise to an inference of unlawful discrimination. *Wallace v. Federated Dep't Stores, Inc.*, 214 Fed.Appx. 142, 144-45 (3d Cir. 2007) (§ 1981); *Groeber v. Friedman & Schuman, P.C.*, 555 Fed.Appx. 133, 135 (3d Cir. 2014) (Title VII). "While similarly situated does not mean identically situated, the plaintiff must nevertheless be similar in all relevant respects." *Opsatnik v. Norfolk S. Corp.*, 335 Fed.Appx. 220, 222-23 (3d Cir. 2009) (citation and internal quotation marks omitted). Allegations to consider when comparing a defendant's treatment of a plaintiff with its treatment of a similarly-situated non-member of the plaintiff's protected class include, but are not limited to, "that the two employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the

employer's treatment of them." *Id.* at 223 (citation and internal quotation marks omitted). In addition to direct comparator allegations, an inference of discrimination can also be supported by allegations "of similar racial discrimination of other employees, or [allegations] of discrimination from statements or actions by [the plaintiff's] supervisors suggesting racial animus." *Golod v. Bank of Am. Corp.*, 403 Fed.Appx. 699, 702 n.2 (3d Cir. 2010); *see also Hobson v. St. Luke's Hosp. & Health Network*, 735 F.Supp.2d 206, 214 (E.D. Pa. 2010).

Where a plaintiff alleges "reverse discrimination," *i.e.*, where a non-protected class is the target of the alleged discrimination, the first prong of the *prima facie* analysis is removed. *See Iadimarco v. Runyon*, 190 F.3d 151, 157–58 (3d Cir. 1999) ("[A] plaintiff who brings a 'reverse discrimination' suit under Title VII should be able to establish a prima facie case in the absence of direct evidence of discrimination by presenting sufficient evidence to allow a reasonable fact finder to conclude (given the totality of the circumstances) that the defendant treated plaintiff 'less favorably than others because of [his] race....' ") (citations omitted). Therefore, to sufficiently allege a *prima facie* "reverse discrimination" claim, a plaintiff must allege facts to show that: "(1) he or she was qualified for the position in question, (2) he or she suffered an adverse employment action, and (3) the evidence is adequate to create an inference that the adverse employment action [or less favorable treatment] was based on a trait protected by Title VII." *Koller v. Riley Riper Hollin & Colagreco*, 850 F.Supp.2d 502, 517 (E.D. Pa. 2012) (quoting *Warenecki v. City of Philadelphia*, 2010 WL 4344558, at *5 (E.D. Pa. Nov. 3, 2010) ).

Here, Plaintiff alleges that he was unlawfully terminated on account of his race (Caucasian) in violation of § 1981, Title VII, the PHRA and the Philadelphia Ordinance. For a racial discrimination claim to survive a motion to dismiss, the plaintiff must assert "sufficient factual matter that permits the reasonable inference that [he] was terminated or retaliated against because of [his] race...." *Golod*, 403 Fed.Appx. at 702. Plaintiff's amended complaint, however, contains no factual allegations connecting Plaintiff's termination to his race. The amended complaint is also devoid of any allegations that

similarly situated non-members of his protected class (non-Caucasians) were treated more favorably or any other facts that could support an inference of racial discrimination regarding his termination. Such pleading deficiencies require dismissal of Plaintiff's race discrimination claims. *See Jenkins v. Polysciences, Inc.*, 2017 WL 1361689, at *3 (E.D. Pa. Mar. 29, 2017) (dismissing the plaintiff's Title VII claim for failure to plead any facts that would have raised a reasonable inference that the defendant terminated the plaintiff because of the plaintiff's race).

**\*6** To support his claim of racial discrimination, Plaintiff points to comments made more than fourteen years before his termination as evidence of racial discrimination. Initially, Plaintiff highlights the comment by one of Defendant's *former* executives, who allegedly asked Plaintiff, *prior to his hiring*, if he "got along with minorities" and "black people." (Am. Compl. ¶ 12). He also points to another alleged comment made by an African-American third-party (not an employee of Defendant), who pointed to Plaintiff and another Caucasian employee during a meeting and stated "I think we're going to have problems with those two at the end of the table." (*Id.* at ¶ 14). These statements, however, cannot reasonably be construed to support an inference of unlawful discrimination that allegedly occurred fourteen years *after* the comments were made. Clearly, there is no nexus established between the comments made and the adverse action experienced by Plaintiff.

Plaintiff also alleges that Defendant's Human Resources Manager, Susan Laramore (an African American), exhibited "racial hostility" towards Plaintiff by "repeatedly attempting to undermine Plaintiff in his work." (*Id.* at ¶ 24). Apart from this bald allegation, however, Plaintiff does not assert any facts to support the "racial hostility" by Ms. Laramore. In similar fashion, Plaintiff baldly alleges that he "was the target of frequent jokes about his identified personal characteristics, as well as physical intimidation, verbal abuse and threats such that he became fearful of physical harm." (*Id.* at ¶ 26). Plaintiff does not, however, allege or point to any facts to support this otherwise conclusory allegation, such as the source, timing, or substance of the alleged harassment. Taken together, these conclusory allegations are insufficient to sustain his race discrimination claim.

Case 3:20-cv-00044-CCC   Document 8-1   Filed 01/30/20   Page 80 of 86

Angelini v. U.S. Facilities, Inc., Not Reported in Fed. Supp. (2018)
2018 WL 3155995, 2018 Fair Empl.Prac.Cas. (BNA) 230,075

In addition, under precedent of the United States Court of Appeals for the Third Circuit, stray remarks by non-decision makers cannot support, on their own, an inference of discriminatory treatment. *Gomez v. Allegheny Health Services, Inc.*, 71 F.3d 1079, 1085 (3d Cir. 1995); *Carilli v. Mut. of Omaha Ins. Co.*, 67 Fed.Appx. 133, 135 (3d Cir. 2003) ("While Carilli presents evidence of numerous 'stray remarks by non-decision makers' at Mutual of Omaha ... the evidence Carilli presents fails to link those remarks to the Violence Committee so as to reasonably support an inference of discriminatory intent and pretextual termination by that body."); *Walden v. Ga.-Pac. Corp.*, 126 F.3d 506, 521 (3d Cir. 1997) ("We have generally held that comments by those individuals outside of the decision making chain are stray remarks, which, standing alone, are inadequate to support an inference of discrimination."); *Ezold v. Wolf, Block, Schorr and Solis–Cohen*, 983 F.2d 509, 546 (3d Cir. 1992) (finding that to allow a series of stray remarks over a five year period to suffice to prove discriminatory motive would be to overstep the limits of Title VII).

Plaintiff contends that various fellow employees made discriminatory comments sometime during the course of his fourteen-year employment with Defendant. Plaintiff's factual allegations, however, do not provide any connection between the stray comments of these various non-decision makers and his termination of employment. Without such a connection, these stray remarks are insufficient to support an inference or claim of discrimination. [7]

Plaintiff's amended complaint is also devoid of any factual assertions that Defendant acted more favorably towards similarly situated, minority (non-Caucasian), Project Managers. As noted above, a plaintiff can meet his pleading obligation with respect to an inference of discrimination by alleging facts to show that similarly-situated non-members of the plaintiff's protected class were treated more favorably. "While 'similarly situated' does not mean identically situated, the plaintiff must nevertheless be similar in 'all relevant respects.' " *Opsatnik v. Norfolk S. Corp.*, 335 Fed.Appx. 220, 223 (3d Cir. 2009) (quoting *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997) ); *see also Golod*, 403 Fed.Appx. at 702 (dismissing complaint where plaintiff "did not provide any characteristics

of those individuals who received the promotions to which she alleges she was entitled"). In assessing similarity, relevant factors include: "the employees' job responsibilities, the supervisors and decision-makers, and the nature of the misconduct engaged in." *Wilcher v. Postmaster Gen.*, 441 Fed.Appx. 879, 882 (3d Cir. 2011) (citing *Lee v. Kansas City S. Ry. Co.*, 574 F.3d 253, 260 (5th Cir. 2009) and *Burks v. Wis. Dep't of Transp.*, 464 F.3d 744, 751 (7th Cir. 2006) ). Here, Plaintiff alleges no facts with respect to any similarly situated employees or their treatment by Defendant. Plaintiff alleges only that members of "minority groups" were being "favored" during his employment. (Am. Compl. ¶¶ 27-28). Apart from this bald and conclusory allegation, Plaintiff does not allege any facts to identify his comparators, how they were similarly situated to Plaintiff, the manner in which Defendant favored these other minority employees, when this alleged conduct occurred, or by whom. In light of this lack of requisite factual allegations, the amended complaint does not satisfy the fourth element. [8] Consequently, Plaintiff's racial discrimination claims under § 1981, Title VII, the PHRA and the Philadelphia Ordinance are deficient and, therefore, are dismissed.

### *Plaintiff's Ancestry/Ethnicity Discrimination Claims Under § 1981, the PHRA and the Philadelphia Ordinance*

**\*7** Plaintiff asserts claims for ancestry/ethnicity discrimination premised on his Italian ancestry/ethnicity. Defendant moves to dismiss these ancestry/ethnicity discrimination claims on similar grounds expounded for Plaintiff's racial discrimination claims.

Section 1981 prohibits unlawful discrimination based on race, ethnicity or ancestry, *see Youssef v. Anvil Int'l*, 595 F.Supp.2d 547, 559 (E.D. Pa. 2009), as does the PHRA and the Philadelphia Ordinance. *See* 43 Pa. Cons. Stat. § 955; Phila. Code § 9-1103. A plaintiff asserting a discrimination claim based on ancestry or ethnicity under § 1981, the PHRA, or the Philadelphia Ordinance must meet the same *prima facie* elements requirements of Title VII. *See Velez v. QVC, Inc.*, 227 F.Supp.2d 384, 407 n.21 (E.D. Pa. 2002); *Vandegrift v. City of Phila.*, 228 F.Supp.3d 464, 486 n.206 (E.D. Pa. 2017). [9]

2018 WL 3155995, 2018 Fair Empl.Prac.Cas. (BNA) 230,075

Like Plaintiff's racial discrimination claims, Plaintiff's ancestry/ethnicity discrimination claims lack sufficient factual allegations to support the requisite causal connection between his status as an Italian American and his termination. To support such an inference, Plaintiff relies upon various alleged comments by fellow employees regarding Italians. These comments include the alleged "negative comments regarding Italians" by Carmen Diaz Rosario, a Puerto Rican female and Manager for Philadelphia's Municipal Services Building, (*id.* at ¶ 19), and by Assistant Project Manager, Ed Siegler, who "made fun of Plaintiff's Italian heritage." (*Id.* at ¶ 22). Plaintiff does not identify the content of the alleged "negative comments" or jokes, when they were made, or whether they were made in the presence of any of Defendant's executive management or decision makers. Without this requisite information, no reasonable factfinder could infer or find any causal connection between these comments and the termination of Plaintiff's employment in February 2017.

Plaintiff also points to alleged "derogatory comments about Italians" made by Zachary Jones, an African American Maintenance Manager. (*Id.* at ¶ 20). Plaintiff alleges that Mr. Jones repeatedly used the derogative term "Mamaluke" to refer to Plaintiff and Italians in general, and stated that "all Italians are related and alike" and that they "even smell[ ] alike." (*Id.*). Plaintiff, has, again, not alleged any facts connecting these comments to the decision makers or to the decision to terminate Plaintiff's employment in February 2017. As such, there are no factual allegations from which one could reasonably infer any connection between the baldly alleged "negative" and "derogative" comments and Plaintiff's termination.

Moreover, as set forth above, stray remarks by non-decision makers cannot support, on their own, an inference of discriminatory treatment. *See* cases cited *supra* p. 11. Though Plaintiff has alleged that various fellow employees made ancestry/ethnicity discriminatory comments at times during his fourteen years of employment with Defendant, his factual allegations do not provide any connection between the stray comments of these various non-decision makers and his employment termination. Without some connection, these stray remarks by non-decision makers are insufficient to support the

requisite inference of discrimination. [10] Consequently, Plaintiff's ethnicity/ancestry discrimination claims are deficient and, therefore, are dismissed.

*Plaintiff's Religious Discrimination Claims*

**\*8** At Counts IV and V, Plaintiff asserts claims for religious discrimination under the PHRA and the Philadelphia Ordinance. Specifically, Plaintiff contends that he was unlawfully terminated because he is Catholic. Like Plaintiff's race and ancestry/ethnicity discrimination claims, Defendant moves to dismiss Plaintiff's religious discrimination claims on the basis that Plaintiff has not alleged facts sufficient to infer that his termination was because he is Catholic. This Court again agrees.

Title VII, the PHRA, and the Philadelphia Ordinance are interpreted co-extensively. *Thompson v. Kellogg's USA*, 619 Fed.Appx. 141, 144 n.2 (3d Cir. 2015); *Darby v. Temple Univ.*, 216 F.Supp.3d 535, 543 (E.D. Pa. 2016). [11] As such, this Court looks to the abundant case law addressing discrimination claims under Title VII to assess Plaintiff's claims under the PHRA and the Philadelphia Ordinance. These provisions forbid employers from discriminating against an employee because of that employee's religion or religious beliefs. *See E.E.O.C. v. Abercrombie & Fitch Stores, Inc.*, ––– U.S. –––––, 135 S.Ct. 2028, 2032, 192 L.Ed.2d 35 (2015); *Darby*, 216 F.Supp.3d at 543; Phila. Code § 9-1103.

To establish a claim for religion-based employment discrimination, employees may rely on either the theory of "disparate treatment" or "failure to accommodate." *Abramson v. William Paterson College of N.J.*, 260 F.3d 265, 281 (3d Cir. 2001); *Wallace v. City of Philadelphia*, No. 06 Civ. 4236, 2010 WL 1730850, at \*6 (E.D. Pa. Apr. 26, 2010). Plaintiff purports to bring his claim under the "disparate treatment" theory. Under this "disparate treatment" theory, "the *prima facie* case and evidentiary burdens of an employee ... mirror those of an employee alleging race or sex discrimination." *Abramson*, 260 F.3d at 281. To plead a *prima facie* case, a plaintiff must plead facts sufficient to show that: (1) he is a member of a protected class; (2) he suffered an adverse action; and (3) either similarly-situated non-members of the protected class were treated more favorably, or the

Case 3:20-cv-00044-CCC   Document 8-1   Filed 01/30/20   Page 82 of 86

Angelini v. U.S. Facilities, Inc., Not Reported in Fed. Supp. (2018)
2018 WL 3155995, 2018 Fair Empl.Prac.Cas. (BNA) 230,075

circumstances of the adverse employment action give rise to an inference of unlawful discrimination. *Id.* In addition, because an "employee's religion ... is often unknown to the employer," the Third Circuit has required "that employees [have] informed their employers of their religious beliefs prior to the alleged discriminatory action" in order to make out a *prima facie* case for discharge on account of religion. *Geraci v. Moody–Tottrup, Intern., Inc.,* 82 F.3d 578, 581 (3d Cir. 1996); *see also Morrison v. Access Services, Inc.,* 2014 WL 5286604, at *4 (E.D. Pa. Oct. 15, 2014). At this procedural posture, Plaintiff's allegations must "raise a reasonable expectation that discovery will reveal evidence" that Defendant knew about Plaintiff's protected religious status. *Twombly,* 550 U.S. at 556, 127 S.Ct. 1955. The inference of knowledge from the allegations must be "plausible." *Iqbal,* 556 U.S. at 679, 129 S.Ct. 1937. To withstand a motion to dismiss, in addition to alleging Defendant's knowledge of Plaintiff's religion, Plaintiff must also allege facts that give rise to a plausible inference of discrimination based on that knowledge. *Darby,* 216 F.Supp.3d at 542.

**\*9** To support the requisite inference of religious discrimination, Plaintiff primarily relies on the conduct of a fellow employee, Mr. Zachary Jones, who allegedly made a "host of negative and disparaging statements" about Plaintiff's religion. (Am. Comp. ¶ 20). As the only examples of such statements, Plaintiff alleges that Mr. Jones stated at some unspecified time that "all Catholics drink Jesus' juice," and that he "made fun of and criticized Plaintiff's maintenance of personal religious objects in his own office space." (*Id.*). Plaintiff also baldly asserts that Mr. Jones' conduct was "consistent with the Anti-Catholic tone set by Mr. Karl Letterman, Project Manager of the Triplex." (*Id.*).

Just like the comments cited in support of Plaintiff's racial and ethnicity discrimination claims, this Court finds that these stray statements by fellow employees at some unspecified time over the course of Plaintiff's fourteen-year employment with Defendant cannot reasonably be construed to support an inference of unlawful discrimination when Plaintiff was terminated in February 2017.[12] *See* cases cited *supra* at p. 11. Further, there is no mention anywhere in Plaintiff's amended complaint that Plaintiff ever informed Defendant of his Catholicism prior to his termination or that Defendant had knowledge of it. Thus, Plaintiff has not pled sufficient facts from which a reasonable fact finder could infer that the decision-makers who ultimately terminated Plaintiff's employment were even aware of his religion.

Plaintiff's amended complaint is also silent with respect to Defendant's treatment of any similarly situated non-Catholics. As noted above, a plaintiff can meet his pleading obligation with respect to an inference of discrimination by asserting facts to show that similarly situated non-members of the plaintiff's protected class were treated more favorably. Plaintiff, however, alleges no facts with respect to any similarly situated employees or their treatment by Defendant. As such, Plaintiff has failed to establish facts sufficient to show that non-members of his protected class (non-Catholics) were treated more favorably. Accordingly, Plaintiff has not pled facts sufficient to establish a *prima facie* case that he was terminated and/or discriminated against because of his religion.

### *Plaintiff's Title VII and ADEA Hostile Work Environment and Retaliation Claims*

In its motion to dismiss, Defendant argues that Plaintiff's amended complaint fails to allege facts sufficient to show that a hostile work environment was created or caused by Defendant's actions which related to Plaintiff's race and/or age. In response, Plaintiff concedes that he has not asserted a cause of action for either hostile work environment or retaliation, but has merely alleged these facts to support his general claims of employment discrimination. (*See* ECF 11, at p. 4 n.1). Based on Plaintiff's response, this Court will deem any claims for hostile work environment and retaliation under Title VII and the ADEA withdrawn.

### *Plaintiff's Age Discrimination Claims*

At Counts III, IV, and V of the amended complaint, Plaintiff asserts age discrimination claims under the ADEA,[13] the PHRA, and the Philadelphia Ordinance. Specifically, Plaintiff alleges that he was unlawfully terminated because of his age. Defendant has moved to dismiss these claims on the basis that Plaintiff has not adequately pled facts to support the requisite *prima facie* elements. This Court disagrees.

**\*10** To plead a viable age discrimination claim, a plaintiff must allege facts sufficient to show that: (1) he is forty years of age or older; (2) the defendant took an adverse employment action against him; (3) he was qualified for the position from which he was removed; and (4) he "was ultimately replaced by another employee who was sufficiently younger to support an inference of discriminatory animus." *Brewer v. Quaker State Oil Ref. Corp.*, 72 F.3d 326, 330 (3d Cir. 1995); *Sempier v. Johnson & Higgins*, 45 F.3d 724, 728 (3d Cir. 1995); *Homel v. Centennial Sch. Dist.*, 836 F.Supp.2d 304, 316 (E.D. Pa. 2011) (citing *Potence v. Hazleton Area Sch. Dist.*, 357 F.3d 366, 370 (3d Cir. 2004) ).[14]

This Court finds that Plaintiff has plausibly stated an age discrimination claim against Defendant because he has alleged facts to support that he was: sixty years old and, thus, within the protected class; terminated from a position for which he was qualified; and was replaced by an individual who was younger in age. *See Haynos v. Siemens Water Technologies Corp.*, 2012 WL 5834374, at \*1 (W.D. Pa. Nov. 16, 2012) (denying motion to dismiss an age discrimination claim where plaintiff pled that he was within the protected class, was terminated and then replaced by someone younger); *see also Stabile v. Allegheny Ludlum, LLC*, 2012 WL 3877611, at \*5–7 (W.D. Pa. Sept. 6, 2012) (same). This Court also agrees that an age discrimination claim may be inferred from Plaintiff's assertions that Defendant's CEO asked him how old he was and how much longer he wanted to work approximately one month before his termination. *See e.g., Romantine v. CH2M Hill Engineers, Inc.*, 2010 WL 5419017, at \*13 (W.D. Pa. Nov. 24, 2010) ("Courts have also recognized, however, that some retirement inquiries are so unnecessary and unreasonable, that such inquiries may constitute evidence of age discrimination, especially when placed in the context of all facts and circumstances in a particular case."); *Wargats v. Pittsburgh Technical Inst.*, 2007 WL 81056, at \*5 (W.D. Pa. Jan. 8, 2007) (same).

In addition, Plaintiff's claim is further supported by allegations that his replacement was younger than him, a fact which is also sufficient to create a reasonable inference that Plaintiff was discriminated against in violation of the ADEA. *See Ullrich v. United States Sec'y of Veterans Affairs*, 457 Fed.Appx. 132, 138 n. 3 (3d Cir. 2012) (citing *Hill v. Borough of Kutztown*, 455 F.3d 225, 247 (3d Cir. 2006) ) (age discrimination may be inferred from the fact "that a plaintiff's replacement was sufficiently younger to permit a reasonable inference of age discrimination."). As such, Defendant's motion to dismiss Plaintiff's age discrimination claims is denied.

### *Plaintiff's Whistleblower Claims*
At Count VI, Plaintiff asserts a claim for violation of the Pennsylvania Whistleblower Law, 43 Pa. Cons. Stat. § 1421, *et seq.* Under the Pennsylvania Whistleblower Law:

> **\*11** [n]o employer may discharge, threaten or otherwise discriminate or retaliate against an employee regarding the employee's compensation, terms, conditions, location or privileges of employment because the employee or a person acting on behalf of the employee makes a good faith report or is about to report, verbally or in writing, to the employer or appropriate authority an instance of wrongdoing or waste by a public body or an instance of waste by any other employer as defined in this act.

43 Pa. Cons. Stat. § 1423(a). The Whistleblower Law prohibits an employer from retaliating against an employee because of that employee's report of wrongdoing or waste by the employer, and an employee alleging a violation may bring a civil action for injunctive relief, or damages, or both. *Id.*; *see also Bailets v. Pennsylvania Turnpike Com'n*, 633 Pa. 1, 123 A.3d 300, 307 (Pa. 2015). "Wrongdoing" is defined as: "[a] violation which is not of a merely technical or minimal nature of a Federal or State statute or regulation, of a political subdivision ordinance or regulation or of a code of conduct or ethics designed to

protect the interest of the public or the employer." 43 Pa. Con. Stat. § 1422; *see also Golaschevsky v. Dep't of Environmental Protection*, 554 Pa. 157, 720 A.2d 757, 759 (Pa. 1998). [15]

Defendant argues that Plaintiff's claim should be dismissed because he failed to specifically identify the statute or regulation that Defendant allegedly violated and failed to show that Defendant took any retaliatory action against him following Plaintiff's alleged complaints of wrongdoing. In support of its arguments, however, Defendant relies exclusively on decisions in which the courts were addressing a defendant's motion for summary judgment rather than a defendant's motion to dismiss, as in this case. When addressing motions to dismiss Whistleblower claims, district courts in Pennsylvania have held that a plaintiff need not plead the precise statute or regulation that the defendant allegedly violated by way of its wrongdoing. *See, e.g., Stoneback v. ArtsQuest*, 2012 WL 4963624, at *2 (E.D. Pa. Oct. 17, 2012) (holding that "[w]ith respect to pleading wrongdoing properly, Plaintiff need only plead facts sufficient to permit a reasonable inference that Defendants violated some statute, etc., she need not specifically identify it."); *Keefer v. Durkos*, 371 F.Supp.2d 686, 692 (E.D. Pa. 2005) ("the Court finds no reason for the Plaintiff to enumerate specific laws within her Complaint to withstand the Defendants' Motion to Dismiss."); *Bielewicz v. Penn-Trafford Sch. Dist.*, 2011 WL 1486017, at *5 (W.D. Pa. Feb. 9, 2011). Rather, a plaintiff need only plead facts that could be reasonably inferred as setting forth an alleged report of the statutorily-defined "wrongdoing" or "waste." As such, Defendant's argument that Plaintiff must plead the specific statute and/or regulation is misplaced.

Here, Plaintiff has alleged that for a period of years leading up to his termination, he made numerous reports to management and his superiors regarding a lack of preventive maintenance and serious deficiencies in the maintenance of the elevators at the Triplex buildings that were under his management. (Am. Comp. ¶¶ 91-102). These alleged reports/ complaints occurred at various times between October 2013 and April 2016. (*Id.*). Many of Plaintiff's alleged reports included his complaints with respect to the maintenance work or lack of necessary work being performed by Defendant's elevator service contractor,

Schindler. (*Id.*). Schindler was eventually terminated in July 2016, a month before an elevator crash on August 4, 2016, at the CJC which resulted in the paralysis of a Sheriff's deputy. (*Id.* at ¶ 102). Taking these allegations as true, these facts, as pled, are sufficient to permit a reasonable inference that Plaintiff made reports of actual violation(s) of some statute(s) or regulation(s). Under the circumstances, Plaintiff has met the pleading burden of reporting a statutorily-defined "wrongdoing" and/or "waste."

**\*12** Defendant also argues that Plaintiff has not alleged facts sufficient to infer retaliation. In particular, Defendant argues that the lack of temporal proximity between Plaintiff's alleged reports of wrongdoing and his termination in February 2017 refutes any reasonable inference that he was terminated in retaliation for his reports. While temporal proximity or lack thereof is an appropriate consideration for the requisite causation inquiry, Defendant's arguments are more appropriately decided at the summary judgment stage. Plaintiff has alleged that he had made numerous reports about deficiencies in the maintenance and inspection of the elevators, and that he was kept isolated from any post-accident investigation. When considering these allegations in context, the timing of Plaintiff's alleged termination is significant in that it occurred five months after a mishap in one of the buildings that Plaintiff alleged to had reported problems about for years. Plaintiff has sufficiently pled facts from which retaliation can be inferred. Therefore, Defendant's motion to dismiss this claim is denied.

### *Plaintiff's Common Law Wrongful Termination/ Discharge Claim*

At Count VII, Plaintiff asserts a claim for "violation of the Pennsylvania common law for the tort of firing contrary to public policy." (Am. Comp. at Count VII). The facts underlying this purported claim are the same as those underlying Plaintiff's Whistleblower claim. Defendant argues that this claim should be dismissed because it is preempted by the statutory remedies available under the Whistleblower Law. This Court agrees.

It is well-settled that Pennsylvania law does not recognize a common law cause of action for violating public policy when there is an existing statutory remedy. *Preobrazhenskaya v. Mercy Hall Infirmary*, 71

Case 3:20-cv-00044-CCC   Document 8-1   Filed 01/30/20   Page 85 of 86

Angelini v. U.S. Facilities, Inc., Not Reported in Fed. Supp. (2018)
2018 WL 3155995, 2018 Fair Empl.Prac.Cas. (BNA) 230,075

Fed.Appx. 936, 941 (3rd Cir. 2003); *Wolk v. Saks Fifth Avenue, Inc.,* 782 F.2d 221, 224 n.3 (3rd Cir. 1984) ("The availability of a [statutory] remedy precludes other common law remedies even where the statute is not invoked."); *Bruffett v. Warner Communications, Inc.,* 692 F.2d 910, 918–19 (3d. Cir. 1982); *Jacques v. AKZO International Salt., Inc.,* 422 Pa.Super. 419, 619 A.2d 748, 753 (Pa. Super. Ct. 1993) (citing *Clay v. Advanced Computer Applications,* 522 Pa. 86, 559 A.2d 917, 918 (Pa. 1989) ) ("It is well-settled that the courts will not entertain a separate common law action for wrongful discharge where specific statutory remedies are available."). "It is the existence of a statutory claim, and not the success of one that determines whether a common law claim is preempted." *DeMuro v. Philadelphia Hous. Auth.,* 1998 WL 962103, at *5 (E.D. Pa. Dec. 21, 1998) (quoting *Jaques,* 619 A.2d at 753).

Courts in this district have dismissed common law wrongful discharge claims when a plaintiff has also alleged a claim under the Whistleblower Law. *See, e.g., Rinehart v. Mt. Penn Borough Mun. Auth.,* 2002 WL 32341795, at *11 (E.D. Pa. Dec. 19, 2002) (dismissing common law wrongful discharge claim because "[t]he Pennsylvania legislature appears to have enacted the Whistleblower Law specifically to protect the interest of public employees and the public at large in circumstances such as those alleged, and [the plaintiff] had an appropriate statutory remedy"); *Katzenmoyer v. City of Reading,* 158 F.Supp.2d 491, 503 (E.D. Pa. 2001) (dismissing a wrongful discharge claim because the claim might fall under the Whistleblower Law); *DeMuro,* 1998 WL 962103, at *5 (granting a motion to dismiss a common law wrongful discharge claim because the plaintiff had a statutory remedy under the Whistleblower Law);

*Freeman v. Mckellar,* 795 F.Supp. 733, 742 (E.D. Pa. 2002) (same); *see also Perry v. Tioga County,* 168 Pa.Cmwlth. 126, 649 A.2d 186, 189 (Pa. Commw. Ct. 1995) (same); *cf., Preobrazhenskaya,* 71 Fed.Appx. at 941 (affirming grant of summary judgment as to common law discharge claim because the plaintiff had an available statutory remedy).

Plaintiff has alleged a Whistleblower Law claim in the amended complaint. Therefore, construing the allegations as true, Plaintiff has an appropriate statutory remedy under the Whistleblower Law and, thus, may not also plead a common law wrongful discharge claim. Accordingly, Count VII of the amended complaint is dismissed.

## CONCLUSION

**\*13** For the foregoing reasons, Defendant's motion to dismiss is granted, *in part,* and Plaintiff's race discrimination claims at Counts I, II, IV, and V, Plaintiff's race, religion, and ethnicity/ancestry discrimination claims at Counts IV and V, and Plaintiff's common law claim for unlawful termination/discharge at Count VII are dismissed. Defendant's motion to dismiss is denied as to Plaintiff's age discrimination claims at Counts III, IV, and V, and his Whistleblower claim at Count VII. In light of Plaintiff's response, Plaintiff's claims for hostile work environment and retaliation are deemed withdrawn. An Order consistent with this Memorandum Opinion follows.

## All Citations

Not Reported in Fed. Supp., 2018 WL 3155995, 2018 Fair Empl.Prac.Cas. (BNA) 230,075

### Footnotes

1   Plaintiff does not provide his exact age at the time of his firing, other than alleging that he was over the age of forty. (*Id.* at ¶ 2). However, Plaintiff also alleges that he is "[n]ow sixty years of age...." (*Id.*).

2   Section 1981 provides that:
    All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other. 42 U.S.C. § 1981.

3   Under Title VII, it is unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or

2018 WL 3155995, 2018 Fair Empl.Prac.Cas. (BNA) 230,075

privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).

4  The PHRA provides: "[i]t shall be an unlawful discriminatory practice ... (a) For any employer because of the race, color, religious creed, ancestry, age, sex, national origin ... of any individual or independent contractor, to refuse to hire or employ or contract with, or to bar or discharge from employment such individual or independent contractor, or to otherwise discriminate against such individual or independent contractor with respect to compensation, hire, tenure, terms, conditions or privileges of employment or contract." 43 Pa. Cons. Stat. § 955.

5  The Philadelphia Ordinance provides: "[i]t shall be an unlawful employment practice to deny or interfere with the employment opportunities of an individual based upon his or her race, ethnicity, color ... religion, national origin, ancestry, age ..." Phila. Code § 9-1103.

6  Generally, the substantive elements for employment discrimination claims under § 1981, Title VII, the PHRA, and the Philadelphia Ordinance are interpreted to be identical. *Brown v. J. Kaz, Inc.*, 581 F.3d 175, 181-82 (3d Cir. 2009); *Thompson v. Kellogg's USA*, 619 Fed.Appx. 141, 144 n.2 (3d Cir. 2015); *Darby v. Temple University*, 216 F.Supp.3d 535, 543 (E.D. Pa. 2016).

7  This Court also notes that any inference of discrimination is belied by the fact that Defendant hired Plaintiff in December 2002, where he worked for over fourteen years, transferred Plaintiff to the CJC to replace an African American Building Manager in 2007, and promoted him to a Project Manager position effective February 29, 2016, one year before his alleged termination on February 3, 2017.

8  Notably, apart from citing to the bald allegation contained in paragraph 28 of the amended complaint, Plaintiff offers no argument in his response to Defendant's motion to dismiss with respect to how he has met his pleading burden with respect to similarly situated colleagues.

9  As noted, Title VII, the PHRA, and the Philadelphia Ordinance are interpreted co-extensively. *Thompson v. Kellogg's USA*, 619 Fed.Appx. 141, 144 n.2 (3d Cir. 2015); *Darby v. Temple University*, 216 F.Supp.3d 535, 543 (E.D. Pa. 2016). As such, this Court looks to the abundant case law addressing discrimination claims under Title VII to assess Plaintiff's claims under § 1981, the PHRA, and the Philadelphia Ordinance.

10  In addition, Plaintiff's amended complaint is also devoid of any factual allegations that Defendant acted more favorably towards similarly situated, non-Italian, Project Managers.

11  Notably, Plaintiff does not assert a religious discrimination claim under Count II of his amended complaint, the only count which asserts discrimination claims pursuant to Title VII. Notwithstanding, religious discrimination claims under the PHRA and the Philadelphia Ordinance are analyzed under the same legal framework as religious discrimination claims asserted under Title VII.

12  This Court again notes that any inference of discrimination is also belied by the fact that Defendant hired Plaintiff in December 2002, and promoted him to a Project Manager position effective February 29, 2016, one year before his termination on February 3, 2017.

13  The ADEA provides that: "[i]t shall be unlawful for an employer ... to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age...." 29 U.S.C. § 623.

14  The United States Court of Appeals for the Third Circuit has stated "that the PHRA is to be interpreted as identical to federal anti-discrimination laws except where there is something specifically different in its language requiring that it be treated differently." *Fasold*, 409 F.3d at 184 n.8 (quoting *Fogleman v. Mercy Hosp., Inc.,* 283 F.3d 561, 567 (3d Cir. 2002) ). Finding no such distinguishing language, the Third Circuit has interpreted the relevant provisions of the ADEA and the PHRA "as applying identically ... and as being governed by the same set of decisional law." *Id.* (citing *Fogleman*, 283 F.3d at 567).

15  The statute subsequently defines "waste" as "[a]n employer's conduct or omissions which result in substantial abuse, misuse, destruction or loss of funds or resources belonging to or derived from Commonwealth or political subdivision sources." 43 Pa. Cons. Stat. § 1422. Notably, Defendant makes no argument in its motion to dismiss regarding the adequacy of the allegations of Plaintiff's reports of "waste" in the amended complaint. In the absence of any challenge to Plaintiff's Whistleblower claims premised on Plaintiff's "waste" allegations, Plaintiff's Whistleblower claims must survive.

---